WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Abraham L. Zylberberg
Evan C. Hollander
Richard A. Graham

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| JSC BTA Bank, | ) | Case No. 10-_____ ( ) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |

## VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND REQUEST FOR RELATED RELIEF

Petitioner, Anvar Galimullaevich Saidenov (the "Petitioner"), as the authorized foreign

representative of JSC BTA Bank (the "Bank," or "Debtor"), the debtor in a voluntary

restructuring proceeding currently pending in the Republic of Kazakhstan (the "Kazakh

Proceeding"), by and through his undersigned counsel, respectfully submits this verified petition

in furtherance of the Official Form of Voluntary Petition filed concurrently herewith

(collectively, the "Petition") for entry of an order (i) recognizing the Kazakh Proceeding as a

foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the United States

Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and (ii) granting related relief pursuant to

section 1520 of the Bankruptcy Code. In support of the Petition, the Petitioner has filed

concurrently herewith and incorporated herein by reference (a) the Declaration of Anvar

Galimullaevich Saidenov pursuant to 28 U.S.C. § 1746 (the "Saidenov Declaration") and (b) the

Declaration of Yuriy Vladimirovich Maltsev pursuant to 28 U.S.C. § 1746 (the "Maltsev Declaration") and respectfully represents as follows:

## BACKGROUND

### A. The Bank and the Foreign Representative

2. The Bank was incorporated under the laws of the Republic of Kazakhstan on 15 January 1997 as a closed joint stock company under the name Bank TuranAlem JSC as part of a restructuring and merger between two state owned banks, Alem Bank and Turan Bank. Since then, it has operated as a commercial bank, accepting deposits and making loans. The Bank also provides pension fund services and is engaged in certain insurance activities.

3. On 30 December 2003 the National Bank of Kazakhstan issued the Bank its current banking license (No. N242). The Bank is registered by the Kazakh Ministry of Justice under certificate number N3903 1900 AO. The registered office of the Bank and its principal place of business, in the sense of decision-making and other head office functions, are located at 97 Zholdasbekov Street, "Samal 2" microdistrict, Almaty 050051, Republic of Kazakhstan.

4. On 24 January 2008 Bank TuranAlem JSC changed its name to JSC BTA Bank. The Bank was issued certificate No. 3903-1900-JSC from the Registration Committee of the Kazakh Ministry of Justice. The Bank, together with its subsidiary companies, is known as the "BTA Group."[1]

5. The Petitioner is the Chairman of the Bank's Management Board. He was duly appointed as foreign representative of the Bank pursuant to a 16 October 2009 decision (the

---

[1] The Bank's subsidiaries (companies in which the Bank directly owns 50% of shares or more) are: JSC BTA Zabota, JSC BTA Insurance, JSC BTA Life, JSC London-Almaty Insurance Company, JSC BTA Kazakhstan Savings Pension Fund, JSC BTA Securities, JSC BTA Mortgage, JSC Temirbank, CJSC BTA Bank Kyrgyzstan, CJSC BTA Bank Belarus, BTA Finance Luxembourg SA, TuranAlem Finance BV and Temir Capital BV. The remainder of the BTA Group consists of: OOO BTA Bank Russia, JSC BTA Bank Georgia, CJSC BTA Bank Armenia, OJSC BTA-Kazan, OJSC BTA Bank Ukraine, Sekerbank TAS, JSC BTA Orix Leasing, JSC Temirleasing, OOO TuranAlem Finance. None of these companies are debtors in the Kazakh Proceeding or seeking relief herein.

"Kazakh Decision") of the Specialized Financial Court of Almaty City (the "Financial Court")
and specifically authorized to act in restructuring-related proceedings concerning the Bank
outside Kazakhstan, including proceedings concerning the recognition of the Kazakh
Proceeding and of his appointment in it.[2]

**B.     The Bank's Business**

6.     The BTA Group is one of the leading banking groups in the Commonwealth of
Independent States and has affiliated banks in Russia, Ukraine, Belarus, Georgia, Armenia,
Kyrgyzstan and Turkey. In addition, the Bank maintains representative offices in Russia,
Ukraine, China, the United Arab Emirates and the United Kingdom. The Bank has no branch
or agency in the United States, and its primary assets in the United States consist of balances in
accounts with correspondent banks in New York City.

7.     The vast majority of the Bank's operations are in the Republic of Kazakhstan,
where, as of 30 November 2009, it maintained all of its 22 branches, 231 cash offices, 924
ATMs and 160 self-service terminals. As of 30 November 2009 the Bank was the second
largest bank in the Republic of Kazakhstan by total assets with a market share of 18.0%,
serving approximately 1,237,620 retail customers and 144,672 corporate customers, most of
which reside or are registered, or maintain their operations, inside Kazakhstan. As of 30
November 2009 the Bank employed 5043 people inside and 2 people outside Kazakhstan. It
has no employees in the United States.

8.     Most of the Bank's assets, and nearly all its tangible assets, are located in
Kazakhstan.

---

[2]     A true and correct copy of the Kazakh Decision is attached as Exhibit "A" to the Saidenov Declaration. An
English translation of the Kazakh Decision is attached as Exhibit "B" to the Saidenov Declaration.

## C.    Recent Financial Difficulties

9.    Between 2004 and 2007 the Bank expanded rapidly with significant increases in its total assets and number of branches and cash offices. This expansion was primarily funded through short- and medium-term bank borrowings and the issue of securities in the international capital markets.

10.    On 18 May 2007 the Bank entered into a credit agreement (the "Morgan Stanley Credit Agreement") with Morgan Stanley Bank International Limited pursuant to which the Bank was provided with a credit facility of 36,420,000,000 Japanese Yen (the "Morgan Stanley Loan").

11.    Following Kazakhstan's credit rating downgrade in October 2007 by S&P from BBB to BBB- and the general deterioration in the financial markets since August 2007, the Bank became unable to refinance its international debt, which in turn reduced its ability to make loans.

12.    In October 2008 the government of the Republic of Kazakhstan and the Agency of the Republic of Kazakhstan for Regulation and Supervision of Financial Markets and Financial Organizations (the "FMSA") announced a proposal to recapitalize the Bank as part of a broader plan to stabilize the country's financial system. The plan involved JSC National Welfare Fund Samruk-Kazyna ("Samruk-Kazyna"), Kazakhstan's sovereign wealth fund, providing financial support to struggling financial institutions. A Memorandum of Understanding in relation to this was signed on 9 November 2009.

13.    However, in early 2009, in light of the increasing deterioration in the Bank's financial position and in the quality of its loan portfolio, the Bank was required by the FMSA to increase its provisions for bad debts. Investigations and proceedings are also underway in the Republic of Kazakhstan, the United Kingdom and elsewhere in relation to fraudulent and

unlawful transactions entered into by the Bank's former management prior to February 2009 which have caused the Bank very significant losses.

14.    On 2 February 2009 the government of the Republic of Kazakhstan accepted the FMSA's recommendation to recapitalize the Bank whereby Samruk-Kazyna acquired a controlling shareholding constituting 75.1% of the Bank's total share capital. The Bank also continued to down-size its operating activities in response to the deteriorating market and the Bank's financial condition.

15.    Samruk-Kazyna's acquisition of a controlling stake in the Bank triggered a change of control clause under the Morgan Stanley Credit Agreement. In accordance with its rights under the Morgan Stanley Credit Agreement, on 27 March 2009 Morgan Stanley sent a request to the Bank requiring early repayment of the Morgan Stanley Loan by 30 March 2009.

16.    The Bank had insufficient funds to repay the Morgan Stanley Loan within 7 calendar days following the due date and was also unable to fulfill its obligations to creditors under a number of other agreements. This inability to pay its debts as they fell due formed the basis for the Bank's application to the Financial Court for restructuring (as described in more detail below).

17.    Since 20 April 2009 the Bank has suspended repayment of any outstanding principal amounts of its financial indebtedness pending the restructuring of the Bank but continued paying interest until 22 July 2009, when payment of interest was suspended as well.

18.    In May 2009 the Bank breached certain of FMSA's regulatory requirements due to: (i) a failure to repay certain liabilities; and (ii) excessive exposure to a single borrower. Following the Bank's breach of these regulatory requirements, the Bank entered into an

agreement with the FMSA on 22 May 2009 pursuant to which the Bank submitted a

preliminary restructuring plan to the FMSA on 10 June 2009.

19.   In June 2009 the Bank announced it had recorded negative capital.  Consequently

the Bank and the FMSA entered into a further agreement on 30 June 2009 (the "FMSA June

Agreement") pursuant to which the Bank was obliged, among other things, to provide the

FMSA with a restructuring plan not later than 3 August 2009 (subsequently extended to 18

September 2009).

20.   On 18 September 2009, the Bank submitted an indicative restructuring and

recapitalization plan (the "Indicative Restructuring Plan") to the FMSA in accordance with the

FMSA June Agreement.  Following negotiations with the Bank's creditors during September

2009, the Bank and a steering committee of the creditors (the "Steering Committee")[3] signed a

Memorandum of Understanding with respect to the Indicative Restructuring Plan on 21

September 2009.  The FMSA approved the Indicative Restructuring Plan on 26 September

2009.

21.   Pursuant to the FMSA June Agreement (as amended), on 7 December 2009 the

Bank and the Steering Committee signed a principal commercial terms sheet (the "Principal

Commercial Terms Sheet") setting out principal commercial terms of the restructuring (the

"Restructuring") as well as details of the different restructuring packages that will be available

to the different classes of the Bank's financial creditors and certain other arrangements,

principally relating to the Bank's corporate governance and other aspects of its operations and

---

[3] The Steering Committee presently consists of ABN AMRO Bank N.V. (supported by members of The Royal Bank of Scotland plc's Global Restructuring Group), Commerzbank Aktiengesellschaft, D.E. Shaw Oculus International, Inc., Euler Hermes Kreditversicherungs-AG (acting for and on behalf of the Federal Republic of Germany), Fortis Investment Management UK Limited, Gramercy Advisors LLC, ING Asia Private Bank Limited, KfW (representing its affiliates DEG – Deutsche Investitions- und Entwicklungsgesellschaft mbH and KfW IPEX-Bank GmbH), Standard Chartered Bank, Export-Import Bank of the United States and Wachovia Bank N.A.

business following completion of the Restructuring. A copy of the Principal Commercial Terms Sheet is attached as Exhibit C to the Saidenov Declaration.

### D.     The Restructuring Law of the Republic of Kazakhstan

22.    As in the United States, distressed banks in Kazakhstan are restructured under a specialized body of banking law rather than under the general provisions of Kazakh law dealing with the insolvency of ordinary companies. On 30 August 2009 the Law of the Republic of Kazakhstan *"On amendments and additions to certain legislative acts of the Republic of Kazakhstan on improvements in the Republic of Kazakhstan laws on money payments and transfers, accounting and financial reporting of financial organizations, banking activities and the activities of the National Bank of the Republic of Kazakhstan"* (the "Amending Law") came into force. The Amending Law put into place, among other things, an insolvency regime to deal with the restructuring of financial institutions in the Republic of Kazakhstan. As such, it made amendments to the Civil Procedural Code of the Republic of Kazakhstan (the "Civil Procedural Code") and the Law of the Republic of Kazakhstan *"On banks and banking activity in the Republic of Kazakhstan"* (the "Banking Law") among other laws.[4]

23.    The Amending Law created a new Chapter 6-1 in the Banking Law which deals with the restructuring of insolvent financial institutions. Chapter 6-1 comprises Articles 59-1 to 59-3. Article 59-1 of the Banking Law sets out the concept of bank restructuring in voluntary cases in the Republic of Kazakhstan as follows: "Bank restructuring shall mean a package of administrative, legal, financial, organizational and technical, and other measures and procedures, to be applied to by a bank on the basis of a bank restructuring plan (the

---

[4]     Excerpts of the pertinent provisions (in English translation) are attached to the Maltsev Declaration as Exhibit A.

"restructuring plan") with the aim of improving its financial position and quality of operations."

24.    Article 59-2 provides that a bank may be subject to restructuring if it cannot discharge its debts as they fall due. Inability to pay debts as they fall due in accordance with Article 59-2 is the only ground for restructuring pursuant to the Chapter 6-1 restructuring regime.

25.    In essence, Chapter 6-1 of the Banking Law provides for a bank wishing to restructure to submit a restructuring plan to the Financial Court. Once the decision of the Financial Court to conduct bank restructuring takes effect, the bank is required to convene a meeting of its creditors whose liabilities are to be restructured for the purpose of negotiating and approving the restructuring plan. Approval of the restructuring plan requires the consent of at least two-thirds by value of the bank's liabilities to the creditors whose claims are to be restructured. Following approval by creditors, the bank is required to submit the restructuring plan for final approval by the Financial Court. From the time of the court's initial decision to allow the restructuring proceedings to proceed, the bank may suspend performance of its outstanding obligations to be restructured and, under the Civil Procedural Code, both creditors' claims and executions upon the property of the bank are suspended.

26.    In this case it was necessary for the Bank to invoke Article 2 of the Amending Law, designed for instances in which a restructuring was underway when the amendments came into force, according to which a bank "is entitled to apply to the specialized financial court for restructuring on the basis of documents confirming the conduct of restructuring actions."

### E. The Kazakh Proceeding

27. The Bank applied for restructuring pursuant to the Amending Law, the Civil Procedural Code and the Banking Law on 7 October 2009. The Financial Court granted the application in the Kazakh Decision on 16 October 2009. This approval resulted in an automatic stay of all relevant claims of the Bank's creditors and protection of the Bank's property from execution and attachment until completion of the Restructuring.

28. As part of its decision, the Financial Court ordered that:

(a) the Restructuring of the Bank must be completed by 5 September 2010;

(b) the Petitioner should be responsible for conducting the Restructuring;

(c) the proceeding should be recognized as a judicial proceeding conducted in accordance with the insolvency legislation of the Republic of Kazakhstan in which the Bank's activity is subject to supervision by the FMSA;

(d) the Bank should undertake various actions to notify and inform its creditors in relation to steps to be taken pursuant to the Restructuring, including publishing an information memorandum; and

(e) previous court decisions regarding claims against the Bank should be suspended.

29. Pursuant to a decision of the Financial Court approving the Indicative Restructuring Plan, the Bank intends to publish an information memorandum (the "Information Memorandum") during the first quarter of 2010, which will contain the definitive restructuring plan (the "Restructuring Plan") to be approved by the Bank's creditors at a meeting planned for the end of the quarter.

30. In summary, the Restructuring will be effected through the restructuring of the existing claims of all creditors of the Bank, including Samruk-Kazyna and certain related parties, save for certain categories of excluded creditors, such as depositors and certain government agencies funding special loan programs. Creditors having their claims

restructured will receive a mixture of cash, senior debt, subordinated debt, other forms of debt, equity and so-called "recovery notes" in consideration for the restructuring of their claims. Payments on "recovery notes" will be funded by cash recoveries on any provisioned assets, litigation recoveries and deferred tax recoveries. The Restructuring is expected to be completed in the third quarter of 2010.

31.     Pursuant to the Restructuring, different creditors will have their claims restructured according to different "Packages" based upon the nature of their claims as against the Bank. The Restructuring envisages 4 "Senior Packages" for holders of senior debt totaling approximately US$10.26 billion (plus US$529 million of accrued interest through 31 March 2010) and 2 "Junior Packages" for holders of approximately US$1.35 billion in junior debt. These packages contain the terms for the restructuring of the following types of creditors:  i) Senior Package 1 deals with holders of senior debt, including most bonds and bank loans; ii) Senior Package 2 deals with Export Credit Agency ("ECA") and other government sector creditors and certain trade finance creditors; iii) Senior Package 3 deals with all non-ECA trade finance creditors (subject to certain exclusions); iv) Senior Package 4 deals with creditors holding certain *Shariah*-compliant debt; v) Junior Package 1 deals with Kazakhstan-based pension funds holding subordinated debt; and vi) Junior Package 2 deals with holders of all remaining subordinated debt and perpetual bonds.

32.     The total amount of debt being restructured pursuant to the Restructuring is approximately US$11.6 billion.

**F.     Connections to the United States**

33.     The Bank's principal assets in the United States are balances in accounts of correspondent banks located in New York City.  Its major American creditors are a diverse

group of banks, mutual funds, hedge funds and government agencies, such as the Export-Import Bank of the United States, the OPIC (Overseas Private Insurance Corporation), and the CCC (Commodity Credit Corporation).

34.    This Petition is being filed at this stage as certain creditors have started to take action against the Bank.  For example, accounts of the Bank with UBS and Credit Suisse have been attached in Switzerland by a creditor of the Bank.

35.    In addition, the Bank has received a request for arbitration from OJSC Alfa Bank dated 25 November 2009.  The request is issued pursuant to an arbitration agreement contained within a guarantee issued by the Bank on 9 October 2006.

36.    The Bank is also engaged in litigation in the English Commercial Court (Case no. 2009 Folio 1099) as a claimant relating to the alleged misappropriation of funds belonging to the Bank totaling approximately US$295 million.  The claim concerns the transfer of monies from the Bank to Drey Associates Limited, an English company, pursuant to three so-called "Compensation Agreements" which three defendants, as officers of the Bank, caused the Bank to enter into in the period May to October 2008.  The Bank alleges that the Compensation Agreements were designed to conceal misappropriation of the Bank's funds by those defendants and that the four other defendants (all incorporated or resident in England) facilitated or were used to facilitate the misappropriation.  The English court has granted various freezing and disclosure orders against the defendants.

37.    The Bank also obtained judgment in England on 14 October 2009 against Alexander Stepanov in the amount of US $468 million.  Mr. Stepanov resides in Russia and the English Court took jurisdiction over him based on an English jurisdiction clause in a lien he had granted to the Bank.  The Bank is currently taking various steps to enforce this judgment.

As part of that process, Alan Bloom and Liz Bingham of Ernst & Young were appointed liquidators of an English company, Energomash (UK) Limited, by an English Secretary of State appointment made on 29 October 2009.

38. On 17 December 2009 Goldman Sachs LLC filed a complaint against the Bank and OOO TuranAlem Finance, the Bank's special purpose Russian finance subsidiary, in the Moscow City Commercial Court in Moscow, Russia, seeking judgment on an alleged 3,178,238,400 Russian Ruble claim on bonds issued by OOO TuranAlem Finance and allegedly guaranteed by the Bank.

39. The Bank maintains correspondent deposit accounts within New York to facilitate its wire transfer and credit operations; see paragraph 33 above. Recognition at this time is considered necessary to prevent the risk of parties taking action against the Bank or seeking attachments over the Bank's assets that are located in the United States, which would disrupt its operations and the implementation of the Restructuring Plan.

## JURISDICTION AND VENUE

40. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.

41. Venue is proper in this district. Section 1410 of title 28 of the United States Code provides as follows:

> A case under chapter 15 of title 11 may be commenced in the district court of the United States for the district —
>
> (1) in which the debtor has its principal place of business or principal assets in the United States;
>
> (2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or

> (3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

42.   Although the Bank does not have a place of business in the United States, its principal assets in the United States are located in New York City.

## RELIEF REQUESTED

43.   Petitioner seeks entry of an order pursuant to section 1517 of the Bankruptcy Code recognizing the Kazakh Proceeding as a foreign main proceeding (as defined in section 1502 of the Bankruptcy Code) and granting the Debtor all of the relief afforded to such proceedings pursuant to section 1520 of the Bankruptcy Code.

## BASIS FOR RELIEF

### A.     The Petition Satisfies the Requirements of Chapter 15

44.   Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code.  As set forth below, the Kazakh Proceeding, the Petitioner and this Petition satisfy all of the foregoing requirements.

(i)     The Kazakh Proceeding is a Foreign Main Proceeding

45.   The Kazakh Proceeding is a foreign main proceeding and, as such, satisfies the first condition for the entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code.

46.    As an initial matter, the Kazakh Proceeding plainly comes within the general

definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code, which

states as follows:

> The term "foreign proceeding" means a collective judicial or
> administrative proceeding in a foreign country, including an
> interim proceeding, under a law relating to insolvency or
> adjustment of debt in which proceeding the assets and affairs of the
> debtor are subject to control or supervision by a foreign court, for
> the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

47.    Section 101(23) requires that a "foreign proceeding" (1) be a collective judicial or

administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign

country, (3) under the supervision of a foreign court and (4) for the purpose of reorganizing or

liquidating the assets and affairs of the debtor. See 11 U.S.C. § 101(23). The statute defines

"foreign court" as "a judicial or other authority competent to control or supervise a foreign

proceeding." See 11 U.S.C. § 1502(3).

48.    There should be little doubt that the Kazakh Proceeding qualifies as a "foreign

proceeding" under section 101(23) of the Bankruptcy Code. Section 1516(a) of the

Bankruptcy Code entitles the court to presume that a foreign proceeding is a "foreign

proceeding," if the decision commencing the foreign proceeding so states. See 11 U.S.C. §§

1516(a), 1515(b)(1). Here, the Kazakh Decision recognizes the Kazakh Proceeding "as a

judicial proceeding conducted with the insolvency legislation of the Republic of Kazakhstan in

which the activity of [the Bank] is subject to the supervision by the [FMSA]." Kazakh

Decision, p. 5.

49.    The Kazakh Proceeding is "collective" in the sense that it involves all creditors

collectively (apart from certain excluded categories of creditors) and requires approval of at

least two-thirds (by way of value) of the Debtor's creditors whose claims are the subject matter of the proceeding, to consent for the Restructuring to proceed. See Articles 59-3(6), (7), (8) and (11) of the Banking Law and Articles 312-4(2) and 312-5 of the Civil Procedural Code, as well as the terms of the Kazakh Decision itself.

50.    The Kazakh Proceeding is a judicial proceeding in that the opening of the restructuring proceedings and the approval of the Restructuring Plan each require an Order of the Financial Court, a judicial body of Kazakhstan. See Articles 59-3(5) and (10) of the Banking Law and Articles 312-3 to 312-5 of the Civil Procedural Code. It is also an administrative proceeding in which the restructuring is also controlled or supervised by "the authorized agency," namely the FMSA.[5] See Articles 59-3(2), (3), (4), (9), (14) and (15) of the Banking Law.

51.    The Kazakh Proceeding is pending in a foreign country (Kazakhstan) under a law relating to insolvency, particularly Articles 59-2 and 59-3 of the Banking Law, in which the assets and affairs of the Bank[6] are subject to control or supervision by a foreign court (the Financial Court and the FMSA) for the purpose of reorganization, in particular, the restructuring of the Bank's debts in return for cash payments, the issuance of bonds and/or the issuance of equity. See, e.g., Article 59-1 of the Banking Law ("Bank restructuring shall mean a package of administrative, legal, financial, organizational and technical and other measures and procedures to be applied to by a bank on the basis of a bank restructuring plan (the "restructuring plan") with the aim of improving its financial position and quality of operations."); Saidenov Declaration ¶¶ 23-25, 36-38.

---

[5]    The Financial Court's supervisory role in the Restructuring is shared with FMSA. To that extent, the FMSA is acting as a "foreign court" within the definition of that term in section 1502(3) of the Bankruptcy Code.
[6]    Note that the Bank is an eligible "debtor" under section 1501(c)(1) of the Bankruptcy Code, because it maintains no branches or agencies in the United States. See 11 U.S.C. § 109(b)(3)(B).

52.     In addition to qualifying as a "foreign proceeding" under section 101(23), the

Kazakh Proceeding qualifies as a "foreign main proceeding," which is defined in section

1502(4) of the Bankruptcy Code as "a foreign proceeding pending in the country where the

debtor has the center of its main interests." See 11 U.S.C. § 1502(4).

53.     Although the Bankruptcy Code does not provide a conclusive test for

determining a debtor's "center of main interests," it does provide that the debtor's "registered

office" is presumed to be the center of its main interests. See 11 U.S.C. § 1516(c); see also 8

Collier on Bankruptcy ¶ 1516.03 (noting that the term "registered office" refers to the place of

incorporation or the equivalent for an entity that is not a natural person); In re Artimm, S.r.l.,

335 B.R. 149, 159 (Bankr. C.D. Cal. 2005) (holding that debtor's center of main interests was

Rome, the location of its registered office).

54.     The Bank's registered office is located in Almaty, Kazakhstan, which is thus

presumed to be the center of its main interests.  This conclusion is further supported by the fact

that the Bank maintains its head-office and administrative functions at its corporate

headquarters in Almaty, Kazakhstan, making Almaty its principal place of business.  See In re

Tri-Continental Exch. Ltd., 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006) (equating center of

main interests with principal place of business).  Moreover, most of its operations, branches,

employees and customers are located in Kazakhstan, and its largest shareholder is

Kazakhstan's sovereign wealth fund.

55.     For all of the reasons set forth above, the Kazakh Proceeding is, and should be

recognized as, a foreign main proceeding.

(ii)    The Petitioner is a Foreign Representative Who is a Person

56.    The second requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the foreign representative applying for recognition be a person or body.  See 11 U.S.C. § 1517(a)(2).

57.    The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as follows:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

58.    Under section 101(41) of the Bankruptcy Code, the "term 'person' includes [an] individual . . . ."  11 U.S.C. § 101(41).

59.    The Petitioner in this case is an individual who serves as Chairman of the Bank's Management Board and who has been duly appointed by the Financial Court as (1) the person "responsible for conducting the restructuring of JSC BTA Bank . . ." and (2) specifically authorized to serve as the Bank's "foreign representative" pursuant to the Kazakh Decision. See the Saidenov Declaration and Kazakh Decision, p. 5.  As such, he is both "authorized to administer the reorganization" of the debtor and "to act as a representative" of the Kazakh Proceeding, thus satisfying the second requirement for the entry of an order recognizing the Kazakh Proceeding under section 1517(a) of the Bankruptcy Code.

(iii)    The Petition Meets the Requirements of Section 1515

60.    The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the requirements of section 1515 of the Bankruptcy Code.  See 11 U.S.C. § 1517(a)(3).

Specifically, section 1515 of the Bankruptcy Code sets forth certain procedural requirements which the petition for recognition must meet, including evidence of the foreign proceeding.

61. Here, all of the requirements of section 1515 of the Bankruptcy Code have been met. First, the Bank's chapter 15 case was duly and properly commenced by the Bank's foreign representative, Petitioner Anvar Galimullaevich Saidenov, through the filing of this Petition as required by section 1515(a) of the Bankruptcy Code.

62. Second, evidence of the existence of the Kazakh Proceeding and the appointment of the Petitioner as foreign representative thereof have been provided to the Court as required under section 1515(b)(1) and (d) of the Bankruptcy Code. See Exhibits A-B to the Saidenov Declaration (attaching a true and correct copy of the Kazakh Decision and an English translation thereof).

63. Third, in accordance with section 1515(c) of the Bankruptcy Code, the Saidenov Declaration contains a statement identifying the Kazakh Proceeding as the only foreign main proceeding currently pending with respect to the Bank and notes that, in addition, an order of recognition of the Kazakh Proceeding as a foreign main proceeding issued on 18 December 2009 from the Chancery Division of the High Court Justice of England and Wales in the United Kingdom under that country's Cross-Border Insolvency Regulations 2006.[7] See Saidenov Declaration ¶ 39.

64. For all of the reasons set forth above, Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied and, thus, that the entry of an order recognizing the Kazakh Proceeding as a foreign main proceeding is proper.

---

[7] Like chapter 15 of the Bankruptcy Code, the Cross-Border Insolvency Regulations 2006 implement the Model Law on Cross-Border Insolvency as adopted by the United Nations Commission on International Trade Law on 30 May 1997. Compare Regulation 2 of the Cross-Border Insolvency Regulations 2006 ("The UNCITRAL Model Law shall have the force of law in Great Britain . . . .") with 11 U.S.C. § 1501(a) ("The purpose of this chapter [15] is to incorporate the Model Law on Cross-Border Insolvency . . . .").

**B.    The Debtor is Entitled to Relief under 11 U.S.C. § 1520**

65.    Section 1520 of the Bankruptcy Code sets forth a series of statutory protections that apply automatically upon the entry of an order recognizing a foreign main proceeding, see 11 U.S.C. § 1520, including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Bank worldwide and to the Bank's property that is within the territorial jurisdiction of the United States.  Given that the protections set forth in section 1520 flow automatically from the recognition of a foreign main proceeding under section 1517, the Petitioner respectfully submits that no further showing is required.

## NOTICE

66.    Notice of this Petition has been provided to the Office of the United States Trustee for the Southern District of New York and (ii) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Petitioner is currently aware.  The Petitioner submits that no other or further notice need be provided.

## NO PRIOR REQUEST

67.    No previous request for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that this Court enter an order (i) granting the relief requested herein and (ii) granting the Debtor such other and further relief as the Court deems proper and just.

Dated:   New York, New York
~~January~~ 4, 2010
February 1

WHITE & CASE LLP

By: _Evan C. Hollander_ _____
        Abraham L. Zylberberg
        Evan C. Hollander
        Richard A. Graham
        1155 Avenue of the Americas
        New York, New York 10036-2787
        Telephone: (212) 819-8200
        Facsimile: (212) 354-8113

        Attorneys for Anvar Galimullaevich
        Saidenov as Foreign Representative of
        JSC BTA Bank

## VERIFICATION

ANVAR GALIMULLAEVICH SAIDENOV hereby declares:

1.       I hold the title of Chairman of the Management Board of JSC BTA Bank and have been authorized by the Specialized Financial Court of Almaty City to commence this ancillary case.

2.       I have read this Verification and the foregoing Petition and I am informed and believe that the factual allegations contained therein are true and correct.

3.     I verify under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

    Executed:  Almaty, Kazakhstan
               January 27, 2010

                                    _____
                                    ANVAR GALIMULLAEVICH SAIDENOV