WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Abraham L. Zylberberg
Evan C. Hollander
Richard A. Graham

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 15 |
| JSC BTA Bank, | Case No. 10-_____ (    ) |
| Debtor in a Foreign Proceeding. | |

## DECLARATION OF ANVAR GALIMULLAEVICH SAIDENOV
## PURSUANT TO 28 U.S.C. § 1746

I, Anvar Galimullaevich Saidenov, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.  I submit this declaration (the "Declaration") in support of the Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief (the "Petition"), which is to be filed contemporaneously herewith, and which seeks entry of an order (i) recognizing the voluntary judicial restructuring proceeding (the "Kazakh Proceeding") that was initiated by JSC BTA Bank (the "Bank," or the "Debtor") in the Specialized Financial Court of Almaty City (the "Financial Court") in Kazakhstan and opened pursuant to a 16 October 2009 decision of the Financial Court (the "Kazakh Decision"), as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and (ii) granting related relief pursuant to section 1520 of the Bankruptcy Code. I make this Declaration on the basis of documentation in my possession or supplied to me and on facts and

matters that are known to me or of which I have been informed by others. Where I have been informed by others, the information is true to the best of my knowledge and belief and I state the source of that information.

2. Although Russian is my native language, I am fluent in English and have elected to execute and submit this Declaration in English.

3. I am the Chairman of the Bank's Management Board. Pursuant to the Kazakh Decision,[1] I have been duly appointed as foreign representative of the Bank and been made responsible to conduct the restructuring of the Bank and authorized to act in restructuring-related proceedings concerning the Bank outside Kazakhstan, including proceedings concerning the recognition of the Kazakh Proceeding and of my appointment in it. As such, I have supervisory control over the business records concerning the financial condition of the Bank, all of which are generally created contemporaneously with the events they reflect and are kept in the ordinary course of business by the Bank. I should mention, however, that the Bank is in the process of seeking to recover certain records of some past, possibly fraudulent transactions entered into by the Bank's former management.

4. Contemporaneously herewith, I have caused this chapter 15 case to be commenced through the filing of the Petition.

5. The Bank was incorporated under the laws of the Republic of Kazakhstan on 15 January 1997 as a closed joint stock company under the name Bank TuranAlem JSC as part of a restructuring and merger between two state owned banks, Alem Bank and Turan Bank. Since then, it has operated as a commercial bank, accepting deposits and making loans. The Bank also provides pension fund services and is engaged in certain insurance activities.

---

[1] A true and correct copy of the Kazakh Decision is attached hereto as Exhibit "A." An English translation of the Kazakh Decision is attached hereto as Exhibit "B."

2

6. On 30 December 2003, the National Bank of Kazakhstan issued the Bank its current banking license (No. N242). The Bank is registered by the Kazakh Ministry of Justice under certificate number N3903 1900 AO. The registered office of the Bank and its principal place of business, in the sense of decision-making and other head office functions, are located at 97 Zholdasbekov Street, "Samal 2" microdistrict, Almaty 050051, Republic of Kazakhstan.

7. On 24 January 2008 Bank TuranAlem JSC changed its name to JSC BTA Bank. The Bank was issued certificate No. 3903-1900-JSC from the Registration Committee of the Kazakh Ministry of Justice. The Bank, together with its subsidiary companies, is known as the "BTA Group."[2]

8. The BTA Group is one of the leading banking groups in the Commonwealth of Independent States and has affiliated banks in Russia, Ukraine, Belarus, Georgia, Armenia, Kyrgyzstan and Turkey. In addition, the Bank maintains representative offices in Russia, Ukraine, China, the United Arab Emirates and the United Kingdom. The Bank has no branch or agency in the United States, and its primary assets in the United States consist of balances in accounts with correspondent banks in New York City.

9. The vast majority of the Bank's operations are in the Republic of Kazakhstan, where, as of 30 November 2009, it maintained all of its 22 branches, 231 cash offices, 924 ATMs and 160 self-service terminals. As of 30 November 2009 the Bank was the second largest bank in the Republic of Kazakhstan by total assets with a market share of 18.0%, serving

---

[2] The Bank's subsidiaries (companies in which the Bank directly owns 50% of shares or more) are: JSC BTA Zabota, JSC BTA Insurance, JSC BTA Life, JSC London-Almaty Insurance Company, JSC BTA Kazakhstan Savings Pension Fund, JSC BTA Securities, JSC BTA Mortgage, JSC Temirbank, CJSC BTA Bank Kyrgyzstan, CJSC BTA Bank Belarus, BTA Finance Luxembourg SA, TuranAlem Finance BV and Temir Capital BV. The remainder of the BTA Group consists of: OOO BTA Bank Russia, JSC BTA Bank Georgia, CJSC BTA Bank Armenia, OJSC BTA-Kazan, OJSC BTA Bank Ukraine, Sekerbank TAS, JSC BTA Orix Leasing, JSC Temirleasing, OOO TuranAlem Finance. None of these companies are debtors in the Kazakh Proceeding or seeking chapter 15 relief.

approximately 1,237,620 retail customers and 144,672 corporate customers, most of which reside or are registered, or maintain their operations, inside Kazakhstan. As of 30 November 2009 the Bank employed 5043 people inside and 4 people outside Kazakhstan. It has no employees in the United States.

10. Most of the Bank's assets, and nearly all its tangible assets, are located in Kazakhstan.

11. Between 2004 and 2007 the Bank expanded rapidly with significant increases in its total assets and number of branches and cash offices. This expansion was primarily funded through short- and medium-term bank borrowings and the issue of securities in the international capital markets.

12. On 18 May 2007 the Bank entered into a credit agreement (the "Morgan Stanley Credit Agreement") with Morgan Stanley Bank International Limited pursuant to which the Bank was provided with a credit facility of 36,420,000,000 Japanese Yen (the "Morgan Stanley Loan").

13. Following Kazakhstan's credit rating downgrade in October 2007 by S&P from BBB to BBB- and the general deterioration in the financial markets since August 2007, the Bank became unable to refinance its international debt, which in turn reduced its ability to make loans.

14. In October 2008 the government of the Republic of Kazakhstan and the Agency of the Republic of Kazakhstan for Regulation and Supervision of Financial Markets and Financial Organizations (the "FMSA") announced a proposal to recapitalize the Bank as part of a broader plan to stabilize the country's financial system. The plan involved JSC National Welfare Fund Samruk-Kazyna ("Samruk-Kazyna"), Kazakhstan's sovereign wealth fund, providing

4

financial support to struggling financial institutions, and a Memorandum of Understanding in relation to this was signed on 9 November 2009.

15. However, in early 2009, in light of the increasing deterioration in the Bank's financial position and in the quality of its loan portfolio, the Bank was required by the FMSA to increase its provisions for bad debts. Investigations and proceedings are also underway in the Republic of Kazakhstan, the United Kingdom and elsewhere in relation to fraudulent and unlawful transactions entered into by the Bank's former management prior to February 2009 which have caused the Bank very significant losses.

16. On 2 February 2009 the government of the Republic of Kazakhstan accepted the FMSA's recommendation to recapitalize the Bank whereby Samruk-Kazyna acquired a controlling shareholding constituting 75.1% of the Bank's total share capital. The Bank also continued to down-size its operating activities in response to the deteriorating market and the Bank's financial condition.

17. Samruk-Kazyna's acquisition of a controlling stake in the Bank triggered a change of control clause under the Morgan Stanley Credit Agreement. In accordance with its rights under the Morgan Stanley Credit Agreement, on 27 March 2009 Morgan Stanley sent a request to the Bank requiring early repayment of the Morgan Stanley Loan by 30 March 2009.

18. The Bank had insufficient funds to repay the Morgan Stanley Loan within 7 calendar days following the due date and was also unable to fulfill its obligations to creditors under a number of other agreements. This inability to pay its debts as they fell due formed the basis for the Bank's application to the Financial Court for restructuring (as described in more detail below).

19.   Since April 20, 2009 the Bank has suspended repayment of any outstanding principal amounts under its financial indebtedness pending the restructuring of the Bank but continued paying interest until 22 July 2009, when repayment of interest was suspended as well.

20.   In May 2009 the Bank breached certain of FMSA's regulatory requirements due to: (i) a failure to repay certain liabilities; and (ii) excessive exposure to a single borrower. Following the Bank's breach of these regulatory requirements, the Bank entered into an agreement with the FMSA on 22 May 2009 pursuant to which the Bank submitted a preliminary restructuring plan to the FMSA on 10 June 2009.

21.   In June 2009 the Bank announced it had recorded negative capital. Consequently the Bank and the FMSA entered into a further agreement on 30 June 2009 (the "FMSA June Agreement") pursuant to which the Bank agreed, among other things, to provide the FMSA with a restructuring plan not later than 3 August 2009 (subsequently extended to 18 September 2009).

22.   On 18 September 2009, the Bank submitted an indicative restructuring and recapitalization plan (the "Indicative Restructuring Plan") to the FMSA in accordance with the FMSA June Agreement. Following negotiations with the Bank's creditors during September 2009, the Bank and a steering committee of the creditors (the "Steering Committee")[3] signed a Memorandum of Understanding with respect to the Indicative Restructuring Plan on 21 September 2009. The FMSA approved the Indicative Restructuring Plan on 26 September 2009.

---

[3] The Steering Committee presently consists of ABN AMRO Bank N.V. (supported by members of The Royal Bank of Scotland plc's Global Restructuring Group), Commerzbank Aktiengesellschaft, D.E. Shaw Oculus International, Inc., Euler Hermes Kreditversicherungs-AG (acting for and on behalf of the Federal Republic of Germany), Fortis Investment Management UK Limited, Gramercy Advisors LLC, ING Asia Private Bank Limited, KfW (representing its affiliates DEG – Deutsche Investitions- und Entwicklungsgesellschaft mbH and KfW IPEX-Bank GmbH), Standard Chartered Bank, Export-Import Bank of the United States and Wachovia Bank N.A.

NEWYORK 7464335 (2K)

23.     Pursuant to the FMSA June Agreement (as amended), on 7 December 2009 the Bank and the Steering Committee signed a principal commercial terms sheet (the "<u>Principal Commercial Terms Sheet</u>") setting out principal commercial terms of the restructuring (the "<u>Restructuring</u>") as well as details of the different restructuring packages that will be available to the different classes of the Bank's financial creditors and certain other arrangements, principally relating to the Bank's corporate governance and other aspects of its operations and business following completion of the Restructuring. A copy of the Principal Commercial Terms Sheet is attached hereto as Exhibit C.

24.     In summary, the Restructuring will be effected through the restructuring of the existing claims of all creditors of the Bank, including Samruk-Kazyna and certain related parties, save for certain categories of excluded creditors, such as depositors and certain government agencies funding special loan programs. Creditors having their claims restructured will receive a mixture of cash, senior debt, subordinated debt, other forms of debt, equity and so-called "recovery notes" in consideration for the restructuring of their claims. Payments on "recovery notes" will be funded by cash recoveries on any provisioned assets, litigation recoveries and deferred tax recoveries. The Restructuring is expected to be completed in the third quarter of 2010.

25.     Pursuant to the Restructuring, different creditors will have their claims restructured according to different "Packages" based upon the nature of their claims as against the Bank. The Restructuring envisages 4 "Senior Packages" for holders of senior debt totaling approximately US$10.26 billion (plus US$529 million of accrued interest through 31 March 2010) and 2 "Junior Packages" for holders of approximately US$1.35 billion in junior debt. These packages contain the terms for the restructuring of the following types of creditors: i)

Senior Package 1 deals with holders of senior debt, including most bonds and bank loans; ii) Senior Package 2 deals with Export Credit Agency ("ECA") and other government sector creditors and certain trade finance creditors; iii) Senior Package 3 deals with all non-ECA trade finance creditors (subject to certain exclusions); iv) Senior Package 4 deals with creditors holding certain *Shariah*-compliant debt; v) Junior Package 1 deals with Kazakhstan-based pension funds holding subordinated debt; and vi) Junior Package 2 deals with holders of all remaining subordinated debt and perpetual bonds.

26.     The Bank made an application for restructuring under the Banking Law, the Civil Procedural Code and the Amending Law (each used herein throughout as defined in the Declaration of Yuriy Vladimirovich Maltsev pursuant to 28 U.S.C. § 1746 (filed herewith)) on 7 October 2009. Pursuant to the Kazakh Decision, the application was granted by the Financial Court on 16 October 2009. This approval resulted in an automatic stay of all relevant claims of the Bank's creditors and protection of the Bank's property from execution and attachment until completion of the Restructuring.

27.     As part of its decision, the Financial Court ordered that:

a) the Restructuring of the Bank must be completed by 5 September 2010;

b) I should be responsible for conducting the Restructuring;

c) the proceeding should be recognized as a judicial proceeding conducted in accordance with the insolvency legislation of the Republic of Kazakhstan in which the Bank's activity is subject to supervision by the FMSA;

d) the Bank should undertake various actions to notify and inform its creditors in relation to steps to be taken pursuant to the Restructuring, including publishing an information memorandum; and

e) previous court decisions regarding claims against the Bank should be suspended.

28. Pursuant to the decision of the Financial Court approving the Indicative Restructuring Plan, the Bank intends to publish an information memorandum (the "Information Memorandum") during the first quarter of 2010, which will contain the definitive restructuring plan (the "Restructuring Plan") to be approved by the Bank's creditors at a meeting planned for the end of the quarter.

29. The total amount of debt being restructured pursuant to the Restructuring is approximately US$11.6 billion.

30. The Bank's principal assets in the United States are balances in accounts of correspondent banks located in New York City. It is also anticipated that the Bank will use such balances to make restructuring payments that are to be made with US dollars. Its major American creditors are a diverse group of banks, mutual funds, hedge funds and government agencies, such as the Export-Import Bank of the United States, the OPIC (Overseas Private Insurance Corporation), and the CCC (Commodity Credit Corporation).

31. The Petition is being filed at this stage as certain creditors have started to take action against the Bank. For example, accounts of the Bank with UBS and Credit Suisse have been attached in Switzerland by a creditor of the Bank.

32. In addition, the Bank has received a request for arbitration from OJSC Alfa Bank dated 25 November 2009. The request is issued pursuant to an arbitration agreement contained within a guarantee issued by the Bank on 9 October 2006.

33. The Bank is also engaged in litigation in the English Commercial Court (Case no. 2009 Folio 1099) as a claimant relating to the alleged misappropriation of funds belonging to the Bank totaling approximately US$295 million. The claim concerns the transfer of monies from the Bank to Drey Associates Limited, an English company, pursuant to three so-called

"Compensation Agreements" which three defendants, as officers of the Bank, caused the Bank to enter into in the period May to October 2008. The Bank alleges that the Compensation Agreements were designed to conceal misappropriation of the Bank's funds by those defendants and that the four other defendants (all incorporated or resident in England) facilitated or were used to facilitate the misappropriation. The English court has granted various freezing and disclosure orders against the defendants.

34. The Bank also obtained judgment in England on 14 October 2009 against Alexander Stepanov in the amount of US $468 million. Mr. Stepanov resides in Russia and the English Court took jurisdiction over him based on an English jurisdiction clause in a lien he had granted to the Bank. The Bank is currently taking various steps to enforce this judgment. As part of that process, Alan Bloom and Liz Bingham of Ernst & Young were appointed liquidators of an English company, Energomash (UK) Limited, by an English Secretary of State appointment made on 29 October 2009.

35. On 17 December 2009 Goldman Sachs LLC filed a complaint against the Bank and OOO TuranAlem Finance, the Bank's special purpose Russian finance subsidiary, in the Moscow City Commercial Court in Moscow, Russia, seeking judgment on an alleged 3,178,238,400 Russian Ruble claim on bonds issued by OOO TuranAlem Finance and allegedly guaranteed by the Bank.

36. The Bank maintains correspondent deposit accounts within New York to facilitate its wire transfer and credit operations. Recognition at this time is considered necessary to prevent the risk of parties taking action against the Bank or seeking attachments over the Bank's assets that are located in the United States, which would disrupt its operations and the implementation of the Restructuring Plan.

37. Recognition in the United States will therefore help to facilitate the implementation of the Restructuring.

38. I fully anticipate that the Bank will be able to develop and implement the Restructuring Plan under Kazakh law.

## STATEMENT PURSUANT TO
## SECTION 1515(c) OF THE BANKRUPTCY CODE

39. I am informed that section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."

40. In compliance with section 1515(c) of the Bankruptcy Code, I hereby declare that the only foreign proceeding (as such term is defined in section 101(23) of the Bankruptcy Code) pending with respect to the Bank that is known to me is the Kazakh Proceeding. In addition, an order of recognition of the Kazakh Proceeding as a foreign main proceeding was issued on 18 December 2009 by the Chancery Division of the High Court of Justice of England and Wales in the United Kingdom under that country's Cross-Border Insolvency Regulations 2006. That order is attached hereto as Exhibit D.

## LIST PURSUANT TO
## INTERIM BANKRUPTCY RULE 1007(a)(4)

41. I am informed that Bankruptcy Rule 1007(a)(4) provides as follows:

> In addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the Code.

11

42. In compliance with Interim Bankruptcy Rule 1007(a)(4), I hereby provide the following lists:

### Corporate Ownership Statement

Pursuant to Bankruptcy Rule 7007.1, the following corporation directly or indirectly owns 10% or more of the Bank's equity interests: JSC National Welfare Fund Samruk-Kazyna, which holds 75.10% of the issued share capital of the Bank. Samruk-Kazyna is itself wholly owned by the Republic of Kazakhstan.

### Administrators in the Kazakh Proceeding

As noted above, I caused an application for restructuring pursuant to the Amending Law, the Civil Procedural Law and the Banking Law to be filed on 7 October 2009. On 16 October 2009 the Financial Court issued the Kazakh Decision, granting the application, commencing the Kazakh Proceeding and appointing me as the person responsible to restructure the Bank and as foreign representative of the Bank. My address is 97 Zholdasbekov Street, "Samal 2" microdistrict, Almaty 050051, Republic of Kazakhstan.

### Parties to Litigation in the United States

As of the date of this Declaration, the Bank is not a party to any litigation pending in the United States of which I am aware.

### Entities Against Whom Provisional Relief is Sought under Section 1519

The Bank is not currently seeking any provisional relief but reserves its right to do so should the need arise.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 2͞7͞, 2010
      Almaty, Kazakhstan

_____
Anvar Galimullaévich Saidenov