WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Abraham L. Zylberberg
Evan C. Hollander
Richard A. Graham

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | ) ) ) Chapter 15 |
| JSC BTA Bank, | ) ) Case No. 10-10638 (JMP) |
| Debtor in a Foreign Proceeding. | ) ) ) |

**APPLICATION FOR ORDER SCHEDULING HEARING AND
SPECIFYING THE FORM AND MANNER OF SERVICE OF NOTICE**

Petitioner, Anvar Galimullaevich Saidenov (the "Petitioner"), as the duly authorized foreign representative of JSC BTA Bank (the "Bank," or "Debtor"), the debtor in a voluntary restructuring proceeding currently pending in the Republic of Kazakhstan (the "Kazakh Proceeding"), by and through his undersigned counsel, respectfully submits this application (the "Application") for entry of an order (i) scheduling a hearing on the relief sought in the Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief (the "Petition"), which is to be filed contemporaneously herewith, and (ii) specifying the form and manner of service of notice thereof.  In support of the Application, the Petitioner respectfully represents as follows:

# BACKGROUND

### A.     JSC BTA Bank and the Foreign Representative

2.     The Bank was incorporated under the laws of the Republic of Kazakhstan on 15 January 1997 as a closed joint stock company under the name Bank TuranAlem JSC as part of a restructuring and merger between two state owned banks, Alem Bank and Turan Bank. Since then, it has operated as a commercial bank, accepting deposits and making loans. The Bank also provides pension fund services and is engaged in certain insurance activities. On 24 January 2008 Bank TuranAlem JSC changed its name to JSC BTA Bank.

3.     The Petitioner is the Chairman of the Bank's Management Board. He was duly appointed as foreign representative of the Bank pursuant to a 16 October 2009 decision (the "<u>Kazakh Decision</u>") of the Specialized Financial Court of Almaty City (the "<u>Financial Court</u>") and specifically authorized to act in restructuring-related proceedings concerning the Bank outside Kazakhstan, including proceedings concerning the recognition of the Kazakh Proceeding and of his appointment in it.[1]

### B.     The Kazakh Proceeding

4.     The Bank made an application for restructuring with the Financial Court on 7 October 2009. The application was granted by the Financial Court in the Kazakh Decision on 16 October 2009. This approval resulted in an automatic stay of all relevant claims of the Bank's creditors and protection of the Bank's property from execution and attachment until completion of the Restructuring.

---

[1]    A true and correct copy of the Kazakh Decision is attached as Exhibit "A" to the Declaration of Anvar Galimullaevich Saidenov pursuant to 28 U.S.C. § 1746 (the "<u>Saidenov Declaration</u>"). An English translation of the Decision is attached as Exhibit "B" to the Saidenov Declaration.

C.  **The Bank's Business**

5.  The Bank and its subsidiaries (together, the "BTA Group")[2], form one of the leading banking groups in the Commonwealth of Independent States and have affiliated banks in Russia, Ukraine, Belarus, Georgia, Armenia, Kyrgyzstan and Turkey.  In addition, the Bank maintains representative offices in Russia, Ukraine, China, the United Arab Emirates and the United Kingdom.  The Bank has no branch or agency in the United States, and its primary assets in the United States consist of balances in accounts with correspondent banks in New York City.

6.  The vast majority of the Bank's operations are in the Republic of Kazakhstan, where, as of 30 November 2009, it maintained all of its 22 branches, 231 cash offices, 924 ATMs and 160 self-service terminals.  As of 30 November 2009 the Bank was the second largest bank in the Republic of Kazakhstan by total assets with a market share of 18.0%, serving approximately 1,237,620 retail customers and 144,672 corporate customers, most of which reside or are registered, or maintain their operations, inside Kazakhstan.  As of 30 November 2009 the Bank employed 5043 people inside and 2 people outside Kazakhstan.  It has no employees in the United States.

7.  Most of the Bank's assets, and nearly all its tangible assets, are located in Kazahkstan.

D.  **Recent Financial Difficulties**

8.  Between 2004 and 2007 the Bank expanded rapidly with significant increases in its total assets and number of branches and cash offices.  This expansion was primarily funded

---

[2]     The Bank's subsidiaries (companies in which the Bank directly owns 50% of shares or more) are:  JSC BTA Zabota, JSC BTA Insurance, JSC BTA Life, JSC London-Almaty Insurance Company, JSC BTA Kazakhstan Savings Pension Fund, JSC BTA Securities, JSC BTA Mortgage, JSC Temirbank, CJSC BTA Bank Kyrgyzstan, CJSC BTA Bank Belarus, BTA Finance Luxembourg SA, TuranAlem Finance BV and Temir Capital BV.  The remainder of the BTA Group consists of:  OOO BTA Bank Russia, JSC BTA Bank Georgia, CJSC BTA Bank Armenia, OJSC BTA-Kazan, OJSC BTA Bank Ukraine, Sekerbank TAS, JSC BTA Orix Leasing, JSC Temirleasing, OOO TuranAlem Finance.  None of these companies are debtors in the Kazakh Proceeding or seeking relief herein.

through short- and medium-term bank borrowings and the issue of securities in the international capital markets.

9. On 18 May 2007 the Bank entered into a credit agreement (the "Morgan Stanley Credit Agreement") with Morgan Stanley Bank International Limited, pursuant to which the Bank was provided with a credit facility of 36,420,000,000 Japanese Yen (the "Morgan Stanley Loan").

10. Following Kazakhstan's credit rating downgrade in October 2007 by S&P from BBB to BBB- and the general deterioration in the financial markets since August 2007, the Bank became unable to refinance its international debt, which in turn reduced its ability to make loans.

11. In October 2008 the government of the Republic of Kazakhstan and the Agency of the Republic of Kazakhstan for Regulation and Supervision of Financial Markets and Financial Organizations (the "FMSA") announced a proposal to recapitalize the Bank as part of a broader plan to stabilize the country's financial system. The plan involved JSC National Welfare Fund Samruk-Kazyna ("Samruk-Kazyna"), Kazakhstan's sovereign wealth fund, providing financial support to struggling financial institutions, and a Memorandum of Understanding in relation to this was signed on 9 November 2009.

12. However, in early 2009, in light of the increasing deterioration in the Bank's financial position and in the quality of its loan portfolio, the Bank was required by the FMSA to increase its provisions for bad debts. Investigations and proceedings are also underway in the Republic of Kazakhstan, the United Kingdom and elsewhere in relation to fraudulent and unlawful transactions entered into by the Bank's former management prior to February 2009 which have caused the Bank very significant losses.

13. On 2 February 2009 the government of the Republic of Kazakhstan accepted the FMSA's recommendation to recapitalize the Bank whereby Samruk-Kazyna acquired a controlling shareholding constituting 75.1% of the Bank's total share capital. The Bank also continued to down-size its operating activities in response to the deteriorating market and the Bank's financial condition.

14. Samruk-Kazyna's acquisition of a controlling stake in the Bank triggered a change of control clause under the Morgan Stanley Credit Agreement. In accordance with its rights under the Morgan Stanley Credit Agreement, on 27 March 2009 Morgan Stanley sent a request to the Bank requiring early repayment of the Morgan Stanley Loan by 30 March 2009.

15. The Bank had insufficient funds to repay the Morgan Stanley Loan within 7 calendar days following the due date and was also unable to fulfill its obligations to creditors under a number of other agreements. This inability to pay its debts as they fell due formed the basis for the Bank's application to the Financial Court for restructuring (as described in more detail below).

16. Since 20 April 2009 the Bank has suspended repayment of any outstanding principal amounts under its financial indebtedness pending the restructuring of the Bank but continued paying interest until 22 July 2009, when repayment of interest was suspended as well.

17. In May 2009 the Bank breached certain of FMSA's regulatory requirements due to: (i) a failure to repay certain liabilities; and (ii) excessive exposure to a single borrower. Following the Bank's breach of these regulatory requirements, the Bank entered into an agreement with the FMSA on 22 May 2009 pursuant to which the Bank submitted a preliminary restructuring plan to the FMSA on 10 June 2009.

18. In June 2009 the Bank announced it had recorded negative capital. Consequently the Bank and the FMSA entered into a further agreement (the "FMSA June Agreement") on 30 June 2009 pursuant to which the Bank was obliged, among other things, to provide the FMSA with a restructuring plan not later than 3 August 2009 (subsequently extended to 18 September 2009).

19. On 18 September 2009, the Bank submitted an indicative restructuring and recapitalization plan (the "Indicative Restructuring Plan") to the FMSA in accordance with the FMSA June Agreement. Following negotiations with the Bank's creditors during September 2009, the Bank and a steering committee of the creditors (the "Steering Committee")[3] signed a Memorandum of Understanding with respect to the Indicative Restructuring Plan on 21 September 2009. The FMSA approved the Indicative Restructuring Plan on 26 September 2009.

20. Pursuant to the FMSA June Agreement (as amended), on 7 December 2009 the Bank and the Steering Committee signed a principal commercial terms sheet (the "Principal Commercial Terms Sheet") setting out principal commercial terms of the restructuring (the "Restructuring") as well as details of the different restructuring packages that will be available to the different classes of the banks financial creditors and certain other arrangements, principally relating to the Bank's corporate governance and other aspects of its operations and business following completion of the Restructuring. A copy of the Principal Commercial Terms Sheet can be found as Exhibit C to the Saidenov Declaration.

---

[3] The Steering Committee presently consists of ABN AMRO Bank N.V. (supported by members of The Royal Bank of Scotland plc's Global Restructuring Group), Commerzbank Aktiengesellschaft, D.E. Shaw Oculus International, Inc., Euler Hermes Kreditversicherungs-AG (acting for and on behalf of the Federal Republic of Germany), Fortis Investment Management UK Limited, Gramercy Advisors LLC, ING Asia Private Bank Limited, KfW (representing its affiliates DEG – Deutsche Investitions- und Entwicklungsgesellschaft mbH and KfW IPEX-Bank GmbH), Standard Chartered Bank, Export-Import Bank of the United States and Wachovia Bank N.A.

21. As noted above, the Bank filed an application for restructuring on 7 October 2009, and on 16 October 2009, the Financial Court issued the Kazakh Decision, granting the application, commencing the Kazakh Proceeding and appointing the Petitioner as foreign representative of the Bank.

22. As part of its decision, the Financial Court ordered that:

(a) the Restructuring of the Bank must be completed by 5 September 2010;

(b) the Petitioner should be responsible for conducting the Restructuring;

(c) the proceeding should be recognized as a judicial proceeding conducted in accordance with the insolvency legislation of the Republic of Kazakhstan in which the Bank's activity is subject to supervision by the FMSA;

(d) the Bank should undertake various actions to notify and inform its creditors in relation to steps to be taken pursuant to the Restructuring, including publishing an information memorandum; and

(e) previous court decisions regarding claims against the Bank should be suspended.

23. Pursuant to the decision of the Financial Court approving the Indicative Restructuring Plan, the Bank intends to publish an information memorandum (the "Information Memorandum") during the first quarter of 2010, which will contain the definitive restructuring plan (the "Restructuring Plan") to be approved by the Bank's creditors at a meeting planned for the end of the quarter.

24. The total amount of debt being restructured pursuant to the Restructuring is approximately US$11.6 billion.

## JURISDICTION AND VENUE

25. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. Venue is proper before this Court pursuant to 28 U.S.C. § 1410.

**RELIEF REQUESTED**

26. Petitioner seeks entry of an order, substantially in the form attached hereto as Exhibit A, (i) setting March 1, 2010, or as soon thereafter as the Court's calendar permits, as the date (the "Recognition Hearing Date") for the hearing (the "Recognition Hearing") on the relief sought in the Petition, (ii) setting 4:00 p.m. (New York Time) on the third business day prior to the Recognition Hearing Date as the deadline by which any responses or objections to the Petition must be received; (iii) approving the form of notice of the Recognition Hearing Date (the "Notice") that is attached hereto at Exhibit B; and (iv) approving the manner of service of the Notice described herein.

**BASIS FOR RELIEF**

27. Bankruptcy Rule 2002(q)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that the parties identified therein (the "Chapter 15 Notice Parties") must be given at least 21 days' notice of a hearing to consider the petition for recognition of a foreign proceeding. Fed. R. Bankr. P. 2002(q)(1). Bankruptcy Rules 2002(m) and 9007, in turn, provide, among other things, that when notice is to be given under the Bankruptcy Rules, the presiding court shall designate the form and manner in which such notice shall be given (provided the Bankruptcy Rules do not otherwise specify the appropriate form and manner of such notice). Fed. R. Bankr. P. 2002(m) and 9007.

28. Although Bankruptcy Rule 2002(q) provides that the Chapter 15 Notice Parties must receive at least 21 days' notice by mail of the hearing on the petition for recognition of a foreign proceeding, it fails to specify the form and manner in which such notice must be given. Therefore, pursuant to Bankruptcy Rules 2002(m) and 9007, this Court may specify such form and manner of notice. The Petitioner respectfully submits that service of (i) the Notice, (ii) the Official Form Chapter 15 Petition and (iii) the Petition (including the proposed order to the

Petition) (collectively, the "Notice Documents"), by United States mail, first-class postage prepaid, upon the Chapter 15 Notice Parties in accordance with Bankruptcy Rule 2002(q) on or before February 5, 2010 constitutes adequate and sufficient notice of this chapter 15 case and the relief sought in the Petition. Accordingly, the Petitioner respectfully requests that this Court approve the foregoing manner of service of the Notice Documents pursuant to Bankruptcy Rules 2002(m) and 9007 and Bankruptcy Rule 2002(q).

29. Bankruptcy Rule 1011(b) provides, among other things, that a party objecting to a petition filed to commence an ancillary proceeding under chapter 15 of the Bankruptcy Code has 21 days from the date of service of the petition to respond to such petition. Fed. R. Bankr. P. 1011(b). In light of this requirement, the Petitioner respectfully submits that setting (i) March 1, 2010 (or as soon thereafter as the Court's calendar permits) as the Recognition Hearing Date and (ii) the third business day prior to the Recognition Hearing Date as the Objection Deadline is appropriate.

30. Section 1514(c) of the Bankruptcy Code provides that when notification of the commencement of a case is to be given to foreign creditors, such notification shall, *inter alia*, indicate the time period for filing proofs of claim, specify the place for filing such proofs of claim and indicate whether secured creditors need to file proofs of claim. 11 U.S.C. § 1514(c). It is not clear, however, that section 1514 applies in the context of an ancillary case under chapter 15. As explained in Collier on Bankruptcy, section 1514 is the "last in a series of sections dealing with the international aspects of cases under chapters *other than chapter 15* that began with section 1511." 8 Collier on Bankruptcy, 1514.01 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) (emphasis added). Given that section 1514(c) does not appear to apply in this chapter 15 case (as Petitioner has not sought to commence a case under any other

chapter of the Bankruptcy Code), the Petitioner respectfully requests that the requirements contained therein be waived in this instance.

## NOTICE

31. Notice of this Petition has been provided to (i) the Office of the United States Trustee for the Southern District of New York and (ii) the Debtor. The Petitioner submits that no other or further notice need be provided.

## NO PRIOR REQUEST

32. No previous request for the relief requested herein has been made to this or any other court.

WHEREFORE, the Petitioner respectfully requests that this Court enter an order (i) granting the relief requested herein and (ii) granting the Debtor such other and further relief as the Court deems proper and just.

Dated: New York, New York
February 5, 2010

          WHITE & CASE LLP

          By: */s/ Evan C. Hollander*
            Evan C. Hollander

            1155 Avenue of the Americas
            New York, New York 10036-2787
            Telephone: (212) 819-8200
            Facsimile: (212) 354-8113
            Abraham L. Zylberberg
            Evan C. Hollander
            Richard A. Graham

            Attorneys for Anvar Galimullaevich
            Saidenov as Foreign Representative of
            JSC BTA Bank