**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>JSC BTA Bank,<br><br>     Debtor in a Foreign Proceeding | )<br>)<br>) Chapter 15<br>)<br>) Case No. 10-10638 (JMP)<br>)<br>) |

**OBJECTION TO MOTION FOR CONTEMPT AND STAY OF ARBITRATION PROCEEDINGS**

Banque Internationale de Commerce-Bred's Geneva branch ("BIC-BRED") appears specially to respond to JSC BTA Bank's ("BTA Bank") Motion for Contempt and Stay of Arbitration Proceedings against BIC-BRED (the "Motion"). By filing this Objection, BIC-BRED does not consent to the jurisdiction of this Court, which BIC-BRED expressly contests.

**PRELIMINARY STATEMENT**

1.    BIC-BRED is the Swiss branch of a French bank with no United States offices, employees, or deposit accounts. BIC-BRED is pursuing a foreign arbitration arising out of a foreign contract with BTA Bank that explicitly chose Swiss law as the governing law and Switzerland as the arbitral forum for resolving any disputes concerning the contract. BIC-BRED is not subject to this Court's personal jurisdiction and is therefore not within the ambit of the bankruptcy stay. Furthermore, the terms of the Recognition Order issued by this Court make it clear that it was not intended to apply to proceedings such as this arbitration that has absolutely no connection to the United States. Accordingly, this Court should deny BTA Bank's Motion for lack of personal jurisdiction and/or clarify that the Recognition Order does not apply to the parties' almost-completed foreign arbitration.

## BACKGROUND

2. BIC-BRED is the Swiss branch of the French bank, Banque Internationale de Commerce-Bred, located at 21, Rue Du Rhone, C.P. 3296, CH-1211, Geneva, Switzerland. BIC-BRED is subject to Swiss law. Banque Internationale de Commerce-Bred's headquarters is located at 18, Quai De La Rapee, F-75012, Paris, France. (*See* Declaration of Ilario Cirieco ("Cirieco Decl.") ¶ 2.)

3. BIC-BRED is active in the trade finance area, with its activities concentrated in the Mediterranean countries as well as in Central and Eastern Europe. (Cirieco Decl. ¶ 3.)

4. BIC-BRED and Banque Internationale de Commerce-Bred do not conduct any business in the United States or otherwise maintain contacts sufficient to subject it to the jurisdiction of this Court. Neither BIC-BRED nor Banque Internationale de Commerce-Bred has any offices, employees, phone listings, real property or deposit accounts in New York or anywhere else in the United States. (Cirieco Decl. ¶¶ 4-8, 10.)

5. BTA Bank is a Kazakh bank headquartered at 97, Dzholdasbekov str., Samal-2, Kazakhstan, 050051, Almaty. (*See* Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief ("Chapter 15 Petition"), Docket No. 2 at ¶ 3.)

6. On July 29, 2008, BIC-BRED and BTA Bank executed a contract (the "Agreement") by which BIC-BRED extended a loan in the amount of $20 million to BTA Bank with a reimbursement date of August 4, 2009 and interest to be paid semi-annually at a rate of London Inter-bank Offer Rate 6-month period plus a margin of 1% per annum and management fees of 1.75% over the total amount. The purpose of the loan proceeds, which were paid to BTA Bank on July 31, 2008, was to partially finance the construction of an underground trading and

entertainment complex in Moscow, Russia. (*See* Declaration of Sirin Yüce ("Yüce Decl.") ¶ 3; Yüce Decl. Ex. A.)

7. In July 2009, BTA Bank announced that it would cease to pay all principal and interest payments on all debts and to date remains in breach of its obligations under the Agreement with BIC-BRED. (Yüce Decl. ¶ 4.)

8. Upon information and belief, on October 16, 2009, the Debtor commenced a voluntary restructuring proceeding currently pending before the Specialized Financial Court of Almaty City in the Republic of Kazakhstan ("Kazakh Proceeding"). (Motion at ¶ 1.)

9. On October 29, 2009, BIC-BRED commenced arbitration against BTA Bank before the Chamber of Commerce and Industry of Geneva by submitting a Notice of Arbitration. (*See* Yüce Decl. Ex. B.) The Arbitration was commenced pursuant to a binding arbitration clause in the Agreement, which states as follows:

> *We agree that this transaction shall be governed by and construed in accordance with Swiss law and any dispute arising in connection to this loan agreement will be submitted to arbitration conducted in accordance with the arbitration rules of the Geneva Court of International Arbitration.*

(Yüce Decl. Ex. A.)

10. In the Arbitration, BIC-BRED is seeking a determination by the arbitral tribunal that BTA Bank has breached its contractual obligations under the Agreement and is liable to BIC-BRED for the amount of the loan, including damages and interest. (Yüce Decl. ¶ 6.) The Arbitration has no factual or legal nexus with the United States. It concerns a contract negotiated and executed outside the United States that is governed by Swiss law and whose parties are a Kazakh bank and the Swiss branch of a French bank – none of whom do business in the United States. The Arbitration does not implicate any issues of United States law and will

not affect any property located in the United States. If BIC-BRED is successful in obtaining a declaration that BTA Bank has breached its obligations, BIC-BRED has no intention of seeking enforcement of the award against any property located in the United States. (Yüce Decl. ¶ 13.) Indeed, BTA Bank's January 27, 2010 Chapter 15 Petition itself indicates that it has little or no property against which BIC-BRED could execute even if it wanted to do so. (*See* Chapter 15 Petition, Docket No. 2 at ¶ 6) In sum, the Arbitration has no more connection to the United States than it does to Papua New Guinea or Antarctica.

   11. On March 17, 2010, Francis Fitzherbert-Brockholes of White & Case, counsel for BTA Bank, sent an email to Messrs Cirieco and Desmeules, Vice Presidents of BIC-BRED, and copying others, regarding BTA Bank's restructuring proceeding, which commenced in Kazakhstan in October 2009. (*See* Yüce Decl. Ex. C.) In the email, Mr. Fitzherbert-Brockholes states:

> *To date, the BTA Bank restructuring has been recognised in both the United Kingdom and in the United States. This has resulted in a complete stay of all litigation against BTA **in those jurisdictions.** We are considering whether we should seek recognition elsewhere.* (emphasis added).

Mr. Fitzherbert-Brockholes then discusses the ongoing Swiss arbitration indicating that it will proceed absent some agreement of the parties and that the recognition in the United States does not have the effect of automatically staying it. (*Id.*)

   12. On June 21, 2010, more than three months after the deadline originally set by the Arbitrator, Mr. Philippe Pinsolle, BTA Bank filed its Statement of Defence. (*See* Yüce Decl. Ex. D.) In the Statement of Defence, BTA Bank asserts that the "US Recognition order grants a world-wide stay of court and arbitration proceedings against the Respondent" and that "by continuing the present proceedings, [BIC-BRED] is currently in breach of this order." (*Id.* at ¶ 42.) This is the first time that any representative of BTA asserted to BIC-BRED or any

representative that the Recognition Order had the effect of staying the Arbitration. (*See* Yüce Decl. ¶ 8.)

13.   On June 24, 2010, Mr. Fitzherbert-Brockholes sent a letter to BIC-BRED's Swiss counsel asserting that BIC-BRED is obliged to refrain from proceeding with the Swiss Arbitration under the terms of the Recognition Order issued by this Court. (*See* Yüce Decl. Ex. E.)

14.   One June 28, 2010, BIC-BRED submitted its Answer to the Statement of Defence, and asserted, *inter alia*, that BIC-BRED was not subject to the Recognition Order's stay provision. (*See* Yüce Decl. Ex. F. at Part V.) BIC-BRED has taken no further action in the Arbitration following the submission of this document. (*See* Yüce Decl. ¶ 10.) Indeed, up until the June 21 submission of the Statement of Defence, BTA Bank had taken the position that the Recognition Order only stayed litigation in the United States and BTA Bank had indicated that the Arbitration would go forward absent some agreement between the parties. (*See* Yüce Decl. Ex. C ("[T]he BTA Bank restructuring has been recognised in both the United Kingdom and in the United States...[which] has resulted in a complete stay of all litigation against BTA in those jurisdictions.").)[1] This is consistent with the terms of the Recognition Order itself, which provided for service upon parties located only within the United States.[2] Presumably the Arbitration did not go as well as BTA Bank expected and it has now changed position and

---

[1]   Even the Statement of Defence, although it asserts that the US Recognition order grants a world-wide stay, concurrently states that "[t]he effect of recognition is to stay litigation and arbitration proceedings in England and the USA." (*See* Yüce Decl. Ex. D at ¶¶ 42-43.)

[2]   (*See* Recognition Order at 4 ("The Petitioner shall provide service and notice of this Order by (i) first class mail, postage prepaid, upon (a) all parties to litigation pending in the United States in which a Debtor is a party at the time of filing of the Chapter 15 Petitions, (b) the United States Trustee for the Southern District of New York, (c) each bank at which the Debtor maintains correspondent accounts in the U.S., (d) all known U.S. creditors of the Debtor, and (ii) publication in the National Edition of the Wall Street Journal, which service and notice shall constitute adequate and sufficient service and notice of this Order.").)

belatedly seeks to use the Recognition Order as a last effort to forestall a potentially negative result in the Arbitration.

15. On July 5, 2010, BTA Bank submitted its Reply to the Claimant's Answer, at which time, the Arbitration was fully briefed. (*See* Yüce Decl. Ex. G.)

16. On July 12, 2010, the Arbitrator, Mr. Pinsolle, sent an email to counsel for the parties to the Arbitration stating that he has "close[d] the arbitration proceedings pursuant to Article 29 of the Swiss Rules." (Yüce Decl. ¶ 12; Ex. H.) Thus, there will be no further briefings or hearings and the only action that remains to be taken in the Arbitration is a ruling by the Arbitrator as to the requested relief.

## OPPOSITION

### I. BIC-BRED Is Not Subject to This Court's Personal Jurisdiction.

17. BTA Bank acknowledges that BIC-BRED is potentially subject to the automatic stay *only* if BIC-BRED is subject to the *in personam* jurisdiction of this Court since § 1520 of the Bankruptcy Code makes it clear that any action against the property of the debtor (an *in rem* proceeding) is limited to the "territorial jurisdiction of the United States." (Motion ¶¶ 9-10.) Where a party is not subject to such *in personam* jurisdiction, that party is not subject to the automatic stay and may proceed with, for example, foreign arbitrations.

18. Such was the case in *Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512 (2d Cir. 1975). There, Copal, a Japanese corporation, initiated an arbitration against Fotochrome, a New York corporation, before the Commercial Arbitration Association in Japan. During the pendency of the arbitration, Fotochrome declared bankruptcy. *In re Fotochrome, Inc.*, 377 F. Supp. 26, 28 (E.D.N.Y. 1974). The arbitration nevertheless proceeded and Copal obtained a favorable judgment. When Copal sought to enforce the award as a debt against the estate, the bankruptcy court held that the award was obtained in violation of the bankruptcy stay and was therefore

invalid. *Id.* The district court overturned that ruling and the Second Circuit affirmed. *Id.* at 34; *Fotochrome, Inc.*, 517 F.2d at 520. The district court noted:

> It is not surprising that the Japan Commercial Arbitration Association made its award despite the bankruptcy court order. Our courts were bereft of any basis to exercise *in personam* jurisdiction over Copal — much less the Arbitration Association— in this case until after proceedings in Japan had terminated and Copal filed its claim here.

*In re Fotochrome, Inc.*, 377 F. Supp. at 28 (emphasis added); *see also In re Mak Petroleum, Inc.*, 424 B.R. 904, 905-906 (Bankr. M.D. Fla. 2010) (finding that the creditor never established or maintained any identifiable contacts in the U.S., and therefore was not subject to the exercise of the bankruptcy court's personal jurisdiction and not enjoined by the automatic stay); *In re EAL (Delaware) Corp.,* Civ. A. No. 93-578, 1994 WL 828320, at *16 (D. Del. Aug. 3, 1994) ("[U]nless [creditor] had the 'minimum contacts' with the United States needed for this Court and the Bankruptcy Court to exercise jurisdiction over it, the automatic stay and stay order did not operate against [creditor].")

19.     BTA Bank bears the burden of demonstrating that the court has personal jurisdiction. *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam). There are two types of personal jurisdiction: general and specific. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996). BTA Bank does not identify what sort of jurisdiction it claims exists over BIC-BRED, but neither type subjects BIC-BRED to jurisdiction here.

      **A.     BIC-BRED Is Not Subject To General Jurisdiction In New York Or The United States.**

20.     General jurisdiction exists when a defendant has maintained systematic and continuous contacts with the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984). Personal Jurisdiction over a non-domiciliary defendant in a

diversity or federal question case, like the instant action, is determined by reference to the law of the state in which the court sits, unless otherwise provided by federal law. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir. 1985) (citing *U.S. v. First National City Bank*, 379 U.S. 378, 381-82 (1965)).

21. Under New York's general jurisdiction statute, N.Y. CPLR § 301, "a foreign corporation is subject to general personal jurisdiction in New York if it is 'doing business' in the state." *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95 (2d Cir.2000). "[A] corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York, 'not occasionally or casually, but with a fair measure of permanence and continuity.'" *Id.* The corporation must be engaged in "a continuous and systematic course of 'doing business' here...." *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 536 (1967). There is no precise test for "doing business" in the state, and courts must look to "the aggregate of the corporation's activities in the State...." *Laufer v. Ostrow*, 55 N.Y.2d 305, 310 (1982). Courts consider several factors: whether there are offices in the state, phone listings, property in the state, individuals permanently located in the state promoting the company's interests, or employees based in the state. *See Wiwa*, 226 F.3d at 98.

22. Here, BIC-BRED and Banque Internationale de Commerce-Bred:

- Do not have any offices in New York or anywhere else in the United States;

- Do not have any employees based in New York or anywhere else in the United States;

- Do not maintain phone listings in New York or anywhere else in the United States;

- Do not own property in New York or anywhere else in the United States;

- Do not have any deposit bank accounts in New York or anywhere else in the United States;

- Do not engage in any public relations work in New York or anywhere else in the United States; and

- Have not applied for an application seeking authorization to do business in New York pursuant to New York Business Corporation Law §.

(*See* Cirieco Decl. ¶¶ 4-10.)

23. The only contact that BIC-BRED has with the state is the maintenance of a correspondent account, which does not suffice for jurisdiction under New York law or Federal Rule of Civil Procedure 4(k)(2). "The mere maintenance of a correspondent account in New York no more establishes minimum contacts with the United States than it does provide a basis for the exercise of long-arm jurisdiction." *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 731-32 (S.D.N.Y. 2010); *see also Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameris*, No. 03 Civ 16812004, WL 2199547, at *15 (S.D.N.Y. Sept. 29, 2004) (even though defendant purposefully availed itself of the privilege of conducting business in the forum, exercise of jurisdiction would not comport with due process where defendant's "only purposeful contacts with New York are its demands for payment under the L/C and the maintenance of correspondent banking relationships in New York"); *Leema Enters., Inc. v. Willi*, 575 F. Supp. 1533, 1536 (S.D.N.Y.1983) (finding that the maintenance of correspondent bank account into which money connected to fraud was deposited did not constitute sufficient contacts with New York to satisfy due process).

**B.     BIC-BRED Is Not Subject To Specific Jurisdiction In This Matter**

24. Nor is BIC-BRED subject to specific jurisdiction of this Court. Under New York's long-arm statute, a court may exercise jurisdiction over a non-domiciliary who "in person or through an agent . . . transacts business within the state" so long as the cause of action

arises from that act. *See* N.Y. C.P.L.R. § 302(a)(1). Two conditions must be met: (1) the defendant must "transact business" in New York; and (2) the claim against defendant must arise out of that business activity. *Int'l Customs Assocs. v. Ford Motor Co.*, 893 F. Supp. 1251, 1258 (S.D.N.Y. 1995) (citing *Cutco Indus. Inc. v. Naughton* 806 F.2d 361, 365 (2d Cir. 1986).

25. As set forth above, BIC-BRED and Banque Internationale de Commerce-Bred do not transact any business or conduct any purposefully directed activities in the United States, let alone New York. Even if BIC-BRED did transact business in New York, the claim against it – that it has violated the automatic stay – does not relate to such activity. The Swiss Arbitration is the only proceeding to which BIC-BRED and BTA Bank are parties to a controversy. *See, e.g.*, *Helicopteros*, 466 U.S. at 416 (requirement for in personam jurisdiction is "controversy" arising out of or relating to defendant's contacts with the forum). BIC-BRED's claims in the Swiss Arbitration do not arise out of any of BIC-BRED activity "purposefully directed" at the United States. As noted above, there is no nexus whatsoever between the Arbitration or the underlying Agreement and the United States whatsoever. It is a foreign proceeding, involving foreign parties to a contract negotiated and performed (and then breached) outside the United States.

## II.    The Recognition Order Should Not Apply To Enjoin The Arbitration

26. As noted above, BIC-BRED vigorously contests this Court's personal jurisdiction over it. Even if this Court determined that there was jurisdiction over BIC-BRED (which there is clearly not), the Recognition Order should not apply to enjoin the Arbitration. Indeed, it does not appear that the Recognition Order was intended to apply to proceedings lacking any conceivable nexus to the United States, such as the Arbitration. For example, the Recognition Order's notice provision only requires that notice be given to, *inter alia*, "parties to

litigation pending in the United States in which the Debtor is a party" and "all known U.S. creditors of the Debtor" and makes no mention of foreign creditors or proceedings. (*See* Recognition Order at 4.) Moreover, BTA Bank itself apparently also initially interpreted the Recognition Order as only applying to proceedings within the United States – and not to the Arbitration – and conveyed this understanding to BIC-BRED. (*See* Yüce Decl. ¶ 7; Ex. C.)

27. As an initial matter, it is not clear that there is any action by BIC-BRED to be enjoined. The Arbitration is before an experienced international tribunal employing recognized procedures. The Arbitrator is already familiar with the issues and, more important, under the applicable rules the Arbitration has been closed. The issues have been defined and substantive briefing by BIC-BRED and BTA Bank is complete. The only item outstanding is a ruling by the Arbitrator as to the requested relief.[3] Accordingly, there is no reason to attempt to interfere with the Arbitrator's ability to issue his decision without interruption.

28. This is particularly true here given the indisputable federal policy favoring international arbitration. Indeed, courts routinely refrain from applying the automatic stay in order to allow binding arbitration proceedings to proceed. The Federal Arbitration Act (9 U.S.C. §§1-307) embodies the "federal policy favoring arbitration" requiring federal courts to "rigorously enforce agreements to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625-27 (1985) ("congressional policy manifested in the Federal Arbitration Act [] requires courts liberally to construe the scope of arbitration agreements

---

[3] Indeed the only action taken by BIC-BRED after receiving notice on June 21, 2010 that BTA Bank was now arguing that the Recognition Order may apply to the Arbitration, was to file an Answer to BTA Bank's Statement of Defence, which was due only a few days later, so that it would avoid default. BTA Bank subsequently filed with the Arbitrator a Reply to that Answer a week later. In any event, BIC-BRED has taken no further action and does not presently intend to take any further action so it is unclear what BTA Banks seeks to have this Court enjoin, presumably unless BTA Bank filed a motion to enjoin the Arbitrator from ruling. (Yüce Decl. at ¶¶ 10-11.)

covered by that Act"). This policy is so important that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). The federal policy favoring arbitration applies in bankruptcy cases. *See, e.g.*, *In re U.S. Lines, Inc.*, 197 F.3d 631, 639 (2d Cir. 1999); *MBNA Am. Bank, NA v. Hill*, 436 F.3d 104, 108 (2d Cir 2006); *McDonald v Cash 'N Advance (In re Lucas)*, *312* B.R. 407, 409-10 (Bankr. D. Nev. 2004) (noting that the "emerging majority rule [is] that the bankruptcy court has no discretion to enforce an otherwise enforceable arbitration provision in a noncore proceeding . . . [and] discretion to do so in a core proceeding, but the federal policy in favor of arbitration must be considered in exercising that discretion."). International arbitration is especially respected, even in bankruptcy proceedings. *See Societe Nationale Algerienne Pour La Recherche v. Distrigas Corp.*, 80 B.R. 606, 611 (D. Mass. 1987).

29.     Even where the automatic stay *does* apply, courts routinely grant relief from stay in order to permit foreign arbitrations to proceed. *See, e.g.*, *MBNA Am. Bank*, 436 F.3d at 110-11 (reversing bankruptcy court and remanding with directions to stay proceedings in favour of arbitration of core claim); *In re Winimo Realty Corp.* 270 B.R. 108, 126 (S.D.N.Y 2001) (reversing bankruptcy court's denial of motion to compel arbitration of core matter because arbitration of dispute "would not jeopardize an underlying purpose of the Bankruptcy Code"). In fact, in the Second Circuit, a court will not have discretion to override an otherwise mandatory arbitration agreement unless it finds the proceeding: (1) to be based on a provision of the Bankruptcy Code that inherently conflicts with the FAA; or (2) to be one in which arbitration of the claim would "necessarily jeopardize" the objectives of the Bankruptcy Code. *Id.* at 108. "[E]ven a determination that a proceeding is core will not automatically give the bankruptcy court discretion to stay arbitration," for not all bankruptcy "proceedings necessarily jeopardize

the objectives of the Bankruptcy Code." *In re U.S. Lines, Inc.*, 197 F.3d at 640. A determination that a conflict exists is based on the particular claims and circumstances of the case. *See In re Winimo Realty Corp.* 270 B.R. at 126.

30.     Furthermore, courts have often permitted "litigation to be concluded in another forum, particularly if the nonbankruptcy suit involves multiple parties or is ready for trial." Lawrence P. King, COLLIER ON BANKRUPTCY § 362.07[3][a] (15th ed. 2006); *In re Rexene Prods. Co.*, 141 B.R. 574, 575 (Bankr. D. Del. 1992) ("[T]he fact that [the non-bankruptcy judge] has already heard and decided two issues support[s] the granting of relief on the grounds of judicial economy."). That is the case here where the parties by joint voluntary agreement selected the Swiss arbitral tribunal as the forum for litigation, have already committed resources to the resolution of the dispute, have completed their submissions to the Arbitrator, and are only waiting for the issuance of a decision.

31.     Moreover, the other facts and circumstances particular to this case weigh heavily in favor of allowing the Arbitration to proceed. Even if the automatic stay did have any effect here, it would only be because BTA Bank sought and obtained recognition of the Kazakh restructuring proceeding as a foreign main proceeding under Chapter 15 of the United States Bankruptcy Code (11 U.S.C. §§1501-1532). As the legislative history makes clear, the purpose of Chapter 15 is "to encourage cooperation between the United States and foreign countries with respect to transnational insolvency cases" and "to provide greater legal certainty for trade and investment." H.R. Rep. No. 199-31, 109th Cong., 1st Sess. 114 (2005). In its petition for recognition, BTA Bank represented that recognition is "necessary to prevent the risk of parties taking action against the Bank or seeking attachments over the Bank's assets that are located in

the United States."[4]  (Chapter 15 Petition at ¶ 39.)  However, here the Arbitration was commenced before BTA Bank sought recognition in the United States and unlike several other litigations and one arbitration referenced in the Chapter 15 Petition, there is no specific mention of the arbitration commenced by BIC-BRED.  Indeed, after the Recognition Order was issued, BTA Bank's representatives stated to BIC-BRED that the "effect of recognition is to stay litigation and arbitration proceedings in . . . the USA" (*see* Statement of Defence at ¶ 41) and indicated that they expected the Arbitration to continue unless the parties agreed otherwise. (*See* Yüce Decl. ¶ 7.)

    32. Furthermore, if BIC-BRED obtains a favorable ruling in the Arbitration, it does not intend to collect or levy against – or take any other action with respect to – property located in the United States.  Indeed, any ruling by the Arbitrator would not be self-executing or have any immediate effect on property of the estate in the Kazakh proceeding or elsewhere.  It is merely a determination of the damages owed to BIC-BRED based on BTA Bank's breach of the Agreement.

    33. The situation in *La Recherche v. Distrigas Corp.*, 80 B.R. 606 (D. Mass. 1987), is instructive.  There the district court reversed the Bankruptcy Court to allow the creditor to commence arbitration to determine damages resulting from breach of contract that was rejected by the debtor. *Id.* at 614.  The District Court stated:

> In weighing the strong public policy favoring international arbitration with any countervailing potential harm to bankruptcy policy upon the present facts, this Court finds the scales weighted in favor of arbitration. As discussed earlier, no major bankruptcy issues will be implicated in valuing contract damages and the international arbitration panel requires no special expertise to accomplish their

---

[4] Notably, BTA Bank has sought recognition even though it states that "[m]ost of the Bank's assets, and nearly all of its tangible assets, are located in Kazakhstan" and its principal assets in the United States are merely accounts of correspondent banks in New York City. Chapter 15 Petition, Docket No. 2 at ¶¶ 8, 33.

> task. While international arbitration will require a temporary and limited incursion into the Bankruptcy Court's exclusive jurisdictional bailiwick, no bankruptcy policies will suffer adverse impact. Conversely, the very image of the United States in the international business community stands to be tarnished. It is important and necessary for the United States to hold its domiciliaries to their bargains and not allow them to escape their commercial obligations by ducking into statutory safe harbors.

*Id.* at 613-614. Here, where there is not even a United States Bankruptcy case pending and the foreign arbitration has no conceivable nexus with the United States, United Sates law or property within the United States, there is even less of a reason to ignore the strong policy enforcing the arbitrability of disputes.

## CONCLUSION

For the reasons stated above, BIC-BRED requests that the Court enter an Order denying BTA Bank's motion and/or clarifying that the Recognition Order does not apply to enjoin the Arbitration, and grant such other and further relief as it deems just and proper.

Dated:   July 19, 2010

                                              Respectfully submitted,

                              By:   /s/ William T. Russell Jr.
                                   SIMPSON THACHER & BARTLETT LLP
                                   William T. Russell, Jr.
                                   Robert H. Smit
                                   425 Lexington Avenue
                                   New York, NY  10017
                                   Telephone: (212) 455-2000
                                   Facsimile:  (212) 455-2502
                                   email:     wrussell@stblaw.com
                                                  rsmit@stblaw.com

                                   *Attorneys for BIC-BRED*