**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------: | | |
| | : | Chapter 15 |
| In re | : | |
| | : | Case No. 10-10638 (JMP) |
| JSC BTA BANK, | : | |
| | : | |
|     Debtor in a Foreign Proceeding | : | |
| | : | |
| ------------------------------------------------------------: | | |

**MEMORANDUM DECISION DENYING MOTION OF FOREIGN**
**REPRESENTATIVE FOR CONTEMPT AND STAY OF ARBITRATION**
**<u>PROCEEDINGS</u>**

WHITE & CASE LLP
*Attorneys for Foreign Representative*
1155 Avenue of the Americas
New York, New York 10036

    Evan C. Hollander, Esq.
    Douglas P. Baumstein, Esq.

SIMPSON THACHER & BARTLETT LLP
*Attorneys for BIC-BRED*
425 Lexington Avenue
New York, New York 10017

    William T. Russell, Jr., Esq.
    Paige E. Fleming, Esq.
    Robert H. Smit, Esq.

HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

### *Introduction*

On March 2, 2010, the Court entered an order in this chapter 15 case (the "<u>Recognition Order</u>") granting the petition for recognition of the foreign main proceeding of JSC BTA Bank ("<u>BTA Bank</u>") currently pending in the Specialized Financial Court of Almaty City, Republic of Kazakhstan (the "<u>Kazakh Court</u>").  The foreign representative for BTA Bank, Anvar Galimullaevich Saidenov (the "<u>Foreign Representative</u>"), is Chairman of the Management Board of BTA Bank.

Until recently, this chapter 15 case has been relatively uneventful, but that changed on July 2, 2010 when the Foreign Representative filed a Motion for Contempt and to Stay Arbitration Proceedings (the "<u>Motion</u>") against Banque International de Commerce – BRED Paris, succursale de Geneve, Switzerland ("<u>BIC-BRED</u>").  The Motion seeks to hold BIC-BRED, the Swiss branch of a French bank, in contempt for a willful violation of the automatic stay that came into effect upon entry of the Recognition Order.

The alleged stay violation grows out of the arbitration of an uncomplicated commercial dispute between BIC-BRED and BTA Bank pending before a sole arbitrator appointed by the Geneva Chamber of Commerce and Industry in Switzerland (the "<u>Arbitration Proceeding</u>").[1]  The dispute is governed by Swiss law and arises out of a

---

[1] The Arbitrator, Philippe Pinsolle, entered an award dated July 19, 2010 in favor of BIC-BRED and against BTA Bank for the full amount of the unpaid loan plus interest and costs.  Thus, the arbitration has run its course, and the Motion to stay the arbitration is now moot.  Therefore, the Court limits its decision to those aspects of the Motion seeking to hold BIC-BRED in contempt.  The Award also comments on and rejects the request of BTA Bank to suspend the Arbitration Proceeding due to the alleged worldwide

loan agreement dated July 29, 2008 that documents the terms of a $20 million advance from BIC-BRED to BTA Bank.  The same financial difficulties that caused BTA Bank to undertake a restructuring of its financial affairs in the Republic of Kazakhstan also led to a default by BTA Bank in the repayment of this loan when due in August, 2009.  In response to this payment default, BIC-BRED pursued remedies that included attachment of the shares of two Dutch companies and obtaining authorization to attach assets of BTA Bank held in Switzerland at UBS AG and Credit Suisse.  While moving aggressively to protect itself in Switzerland, BIC-BRED also took steps in the main insolvency proceeding in Kazakhstan to participate as a creditor in the restructuring of BTA Bank.

The law firm of White & Case through its New York office represents the Foreign Representative in this chapter 15 case and through its London office represents BTA Bank in the Swiss arbitration.  BTA Bank engaged in activities relating to the arbitration for a number of months following entry of the Recognition Order and sought, without success, to consensually suspend the arbitration in light of the restructuring of the financial affairs of BTA Bank that was then taking place in Kazakhstan pursuant to applicable local law.  BTA Bank filed a statement of defense in the Arbitration Proceeding on June 21, 2010, asserting that the Recognition Order, under the authority of section 1520(a)(1) of the Bankruptcy Code, grants a worldwide stay of judicial and arbitration proceedings including the proceeding in Geneva.

The issue presented appears to be one of first impression under chapter 15 jurisprudence – whether the automatic stay that becomes applicable to "the debtor and the

---

application of the Recognition Order, noting that this issue was not raised until months after commencement of the arbitration.  The discussion of this issue in the Award has not influenced the Court's decision.

property of the debtor that is within the territorial jurisdiction of the United States" operates as a bar to the continuation of a pending arbitration proceeding brought against the debtor entity in a foreign jurisdiction.

Counsel for the Foreign Representative relies on a textual reading of the words used in Section 1520(a)(1) and precedent giving extraterritorial effect to the automatic stay in plenary chapter 11 cases to contend that the automatic stay applies to the debtor entity wherever the debtor may be found. Such a reading of Section 1520(a)(1), while possible in view of the words used in the text, disregards the international origins and purposes of chapter 15 and leads to absurd consequences that could not have been intended by Congress or the international experts in insolvency law who drafted the Model Law on Cross-border Insolvency on which chapter 15 is based.[2] If the provision regarding the automatic stay in chapter 15 cases were to be construed in the manner urged by the Foreign Representative, even the court in the foreign main proceeding in Kazakhstan would be subject to the stay and would need permission from this Court before taking any action that might impact the foreign debtor. No rational cross-border insolvency regime would give a bankruptcy court in the United States so much unintended automatic extraterritorial power in conjunction with the recognition of a foreign proceeding.

As explained more fully below, the Court concludes that the automatic stay does not afford broad anti-suit injunctive relief to the debtor entity outside the territorial jurisdiction of the United States upon entry of an order of recognition in a chapter 15

---

[2]  Section 1508 states "[i]n interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."

case.  This conclusion is based on the need to respect the international aspects of these Bankruptcy Code provisions, the limited and specialized definition of the term "debtor" when used in chapter 15, and the fact that cases under chapter 15 are ancillary in nature and do not create an estate within the meaning of section 541 of the Bankruptcy Code. Importantly, any application of the language of section 1520(a)(1) should reject an extraterritorial interpretation that would stay miscellaneous foreign litigation or arbitration proceedings having no meaningful nexus to property of the foreign debtor located in the United States.  A more restrained reading of the section is appropriate, and in assessing the Motion, the Court has given due consideration to the disruptive consequences of a worldwide stay of all proceedings involving the debtor that would arise automatically upon recognition.

One such potentially disruptive consequence would be to convert a bankruptcy court in the United States into what amounts to a global clearing house for resolving the right to proceed in an appropriate foreign tribunal against a foreign business enterprise that may have only insignificant contacts with the United States.  This broadly expansive interpretation of section 1520(a)(1) would be most unwelcome, both here and in other countries, and would improperly centralize global control of dispute resolution within an ancillary case in the United States that is meant to support, not supplant, a main proceeding in a foreign jurisdiction.  Additionally, a recognition order under chapter 15 should not be the indirect means for obtaining global relief that could not otherwise have been achieved by order of the court having jurisdiction of the main foreign proceeding. Accordingly, for the reasons stated, the Motion of the Foreign Representative is denied.

### *Relevant Facts and Procedural History*

The facts underlying the present contested matter are undisputed.  BTA Bank is one of the largest banks in the Republic of Kazakhstan, where it serves more than one million retail customers.  BTA Bank has no tangible assets or employees within the United States, conducts no business within the United States, and its only connections with the United States are balances in accounts of correspondent banks located in New York City.[3]  BIC-BRED, the Swiss branch of a French bank, has no assets or employees within the United States, conducts no business within the United States, and appears to have no significant connections with the United States aside from maintaining a correspondent bank account.[4]

In July 2008, BIC-BRED and BTA Bank entered into a loan agreement whereby BIC-BRED loaned BTA Bank $20 million to finance the construction of an entertainment complex in Moscow (the "Loan Agreement").[5]  The Loan Agreement is governed by Swiss law, and requires the parties to submit any disputes arising from the agreement to arbitration in Switzerland.[6]  In July 2009, BTA Bank announced that it would cease to

---

[3] Verified Petition For Recognition Of Foreign Main Proceeding And Request For Related Relief, dated February 4, 2010 (ECF Doc. # 2) p.3(¶¶7-8).

[4] Objection To Motion For Contempt And Stay Or Arbitration Proceedings, dated July 19, 2010 (ECF Doc. # 24) (the "Objection") p.8-9(¶22).

[5] *See* Declaration of Sirin Yuce Pursuant In Support Of Objection, dated July 19, 2010 (ECF Doc. # 25) (the "Yuce Declaration") p.1(¶3).

[6] *See* Yuce Decl. Ex. A (Loan Agreement) p.5 ("This transaction shall be governed by and construed in accordance with Swiss law and any dispute arising in connection to this loan agreement will be submitted to arbitration conducted in accordance with the arbitration rules of the Geneva Court of International Arbitration.").

pay all principal and interest payments on its debts.[7]   On August 4, 2009, BTA Bank

defaulted on its obligations under the Loan Agreement.[8]   Thereafter, in September 2009,

BIC-BRED obtained an attachment on BTA Bank's shares in two Dutch companies and

obtained authorization to attach certain BTA Bank assets held at two Swiss banks.  *Id.*

p.10(¶56).

*(i)*     ***The Arbitration Proceeding***

On October 29, 2009, BIC-BRED commenced the Arbitration Proceeding against

BTA Bank in Switzerland, seeking a determination by the Arbitrator that BTA Bank

breached the Loan Agreement and is liable to BIC-BRED for the amount of the loan,

including damages and interest.[9]   On June 21, 2010, BTA Bank filed a statement of

defense in the Arbitration Proceeding alleging that BIC-BRED's continued proceeding

violated the Recognition Order because "the U.S. Recognition Order grants a worldwide

stay of court and arbitration proceedings."[10]   On June 24, 2010, counsel for BTA Bank

contacted BIC-BRED and requested that it suspend the Arbitration Proceeding in light of

the Recognition Order.[11]    BIC-BRED declined that request and denied that the

Recognition Order stayed the Arbitration Proceeding.[12]   On July 5, 2010, BTA Bank

---

[7] Yuce Decl. ¶ 4.

[8] *See* Award, dated July 19, 2010 (the "Award") p.10(¶55).

[9] Yuce Decl. ¶ 6.

[10] Yuce Decl. Ex. D (Statement of Defense) p.8(¶42).

[11] Declaration of Evan C. Hollander in Support of Motion, dated July 2, 2010 (ECF Doc. # 20) (the "Hollander Decl.") Ex. 2 (Letter, dated June 24, 2010, from White & Case LLP to Mentha & Associes).

[12] *See* Hollander Decl. Ex. 3 (Answer to Statement of Defense, dated June 28, 2010) p. 7(¶36).

submitted a reply brief in the Arbitration Proceeding in Switzerland, and the Arbitration Proceeding was closed on July 12, 2010.[13]  Thereafter, on July 19, 2010, the Arbitrator issued the Award in the Arbitration Proceeding.  The Award includes a discussion by the Arbitrator concerning the Recognition Order and its impact on the Arbitration Proceeding.[14]

*(ii)*     ***The Kazakh Proceeding and the Chapter 15 Case***

On October 16, 2009, BTA Bank commenced its reorganization proceedings in Kazakhstan (the "Kazakh Proceeding").  The Kazakh Proceeding was subsequently recognized in the United Kingdom in December 2009 and in Ukraine in February 2010.[15] On February 4, 2010, the Foreign Representative filed a petition for recognition of the Kazakh Proceeding as a foreign main proceeding under chapter 15.[16]  Following an uncontested hearing on March 2, 2010, this Court granted the petition and entered the Recognition Order substantially in the form submitted by counsel for the Foreign Representative.[17]  The Recognition Order granted BTA Bank "all of the relief set forth in section 1520 of the Bankruptcy Code including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to

---

[13] Yuce Decl. ¶¶ 11-12.

[14] *See* Award, pp.18-19(¶¶ 96-104) (holding that BTA Bank's argument was inadmissible because it was raised belatedly, and further noting that in any event the Recognition Order did not stay the Arbitration Proceedings).

[15] Award p.10(¶57).

[16] ECF Doc. # 1.

[17] ECF Doc. # 9.

the Bank worldwide and to the Bank's property that is within the territorial jurisdiction of the United States." Recognition Order ¶B.

On July 2, 2010, the Foreign Representative filed the Motion,[18] seeking an order confirming that the Recognition Order stayed the Arbitration Proceeding and seeking to hold BIC-BRED in contempt. BIC-BRED objected to the Motion mainly on jurisdictional grounds. The parties presented oral argument at a hearing on July 20, 2010, and the Court reserved judgment. On July 26, 2010, the Foreign Representative submitted a supplemental letter brief in further support of the Motion (the "BTA Supplemental Letter"), and shortly thereafter BIC-BRED responded with its own supplemental letter brief.

### *Discussion*

The question presented is whether BIC-BRED should be held in contempt for an alleged willful violation of the automatic stay that came into effect upon entry of the Recognition Order.[19] The Foreign Representative bases his argument on a textual analysis of section 1520(a)(1), looking to the plain language and legislative history of section 1520(a)(1) and relying on citations to plenary bankruptcy cases that have recognized the extraterritorial effect of the automatic stay. In response, BIC-BRED

---

[18] ECF Doc. # 19.

[19] The Foreign Representative seeks sanctions only on account of those actions taken by BIC-BRED in continuing to prosecute the Arbitration Proceeding after being informed on June 24, 2010 of the Foreign Representative's legal position. *See* Hearing Tr. at 9:17 – 10:4.

argues that the Recognition Order does not stay the Arbitration Proceeding and, in any event, that the Court lacks jurisdiction over BIC-BRED.[20]

Upon consideration of the text of the statute in light of its international origins and applications, the Motion fails to establish a basis for finding that the automatic stay applies to BIC-BRED or that BIC-BRED should be sanctioned.  Given the facts before the Court and after careful review of section 1520(a)(1) in context, continued prosecution by BIC-BRED of the Arbitration Proceeding in Switzerland did not violate the automatic stay.  The Arbitration Proceeding relates to an entirely distinct foreign financing transaction that has no direct or indirect impact upon property within the territorial jurisdiction of the United States.  The bankruptcy court, at least in the setting of an ancillary chapter 15 case, should not stand in the way of a foreign arbitration process when the outcome will have no foreseeable impact on any property of the foreign debtor in the United States.

> **A.    Section 1520(a)(1) stays actions against a foreign debtor within the United States and applies in other countries only to the extent that such actions affect property of the debtor that is "within the territorial jurisdiction of the United States."**

In interpreting the meaning of section 1520(a)(1), the Court is bound by the plain meaning of the statute.  *See U.S. v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242 (1989) ("the plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters").  Section 1508 requires the Court to consider the international origin of chapter 15 when construing the plain language of each of the individual

---

[20] *See* Objection at p.1 ("BIC-BRED is not subject to this Court's personal jurisdiction and is therefore not within the ambit of the bankruptcy stay"); Hearing Tr. at p.22:6 ("[T]here simply is no jurisdiction over BIC in the United States").

component provisions of chapter 15.  *See* 11 U.S.C. § 1508 ("In interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions.").  Section 1508 represents an instruction to take into account more than the words used within a particular section of chapter 15 and is a license to depart where appropriate from the well-settled rule of statutory interpretation that a court should prefer specific provisions over the general when striving to uncover the meaning of a statute. *See United States v. Torres-Echavarria*, 129 F.3d 692, 699 n.3 (2d Cir. 1997) ("The operative principle of statutory construction is that a specific provision takes precedence over a more general provision.").

The "international origins" of chapter 15 is a dominant and consistent theme that underlies the various specific provisions of this chapter and that distinguishes chapter 15 from all other chapters within the Bankruptcy Code.  This is the one chapter of the Bankruptcy Code predicated on the concept of international coordination and cooperation and that encourages bankruptcy courts to look beyond the shores of the United States for interpretative guidance.

Notably, chapter 15 invokes the jurisdiction of the bankruptcy court to assist in the administration of a foreign insolvency or restructuring proceeding.  *See Tacon v. Petroquest Res. Inc. (In re Condor Ins. Ltd.),* 601 F.3d 319, 329 (5th Cir. 2010) ("… Chapter 15 was intended to facilitate cooperation between U.S. courts and foreign bankruptcy proceedings…").    Its most basic objective is to foster the orderly

administration of cross-border restructurings.[21]  Section 1501(a) expressly states that the purpose of chapter 15 is "to provide effective mechanisms for dealing with cases of cross-border insolvency."  11 U.S.C. § 1501(a).  That section goes on to specify that the chapter is meant to encourage "cooperation between – (A) courts of the United States … and (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases."  *Id.*  Section 1504 makes clear that any case commenced under chapter 15 is "ancillary" to a foreign proceeding pending elsewhere.[22]

Chapter 15 cases are specialized proceedings unlike plenary cases commenced under the Bankruptcy Code.  Among the key differences, the term "debtor" has a narrower and more restrictive definition for purposes of chapter 15 and commencement of a chapter 15 case does not create an "estate" as that term is used in the Bankruptcy Code.  In a plenary case, a "debtor" is defined as a "person or municipality concerning which a case under this title has been commenced."[23]  The commencement of such a case "creates an estate" consisting of all of a debtor's property, "wherever located and by whomever held."  11 U.S.C. § 541(a).  To protect such property and preserve the estate, the commencement of such a plenary bankruptcy case triggers the operation of a worldwide automatic stay preventing the commencement or continuation of actions against the debtor and its property anywhere in the world.  11 U.S.C. § 362(a)(1).

---

[21] Chapter 15, with additional alterations designed to mesh with United States bankruptcy law, derives from the Model Law on Cross-Border Insolvency (the "Model Law") promulgated by the United Nations Commission on International Trade Law in 1997.

[22] 11 U.S.C. § 1504 (entitled "Commencement of ***ancillary*** case") (emphasis added).

[23] 11 U.S.C. § 101(13).

In contrast, the term "debtor" for purposes of chapter 15 identifies "an entity that is the subject of a foreign proceeding."  11 U.S.C. § 1502.  Thus, the very definition of the word debtor when used in the chapter 15 context has an international perspective. The definition requires the Court to look outside the United States and recognize that the entity in question is already subject to the authority of a foreign court.  Additionally, the filing of a chapter 15 petition does not lead to automatic relief or the creation of an "estate."  Instead, the bankruptcy court administering the chapter 15 case must take action and issue orders (such as the Recognition Order in this case) to grant relief[24] in the form of "recognition" of an already-existing, earlier commenced foreign main or nonmain insolvency proceeding.[25]

Despite this ancillary character of a chapter 15 case and the auxiliary role of the bankruptcy court, the Foreign Representative argues that the language of section 1520(a)(1) plainly states that upon recognition section 362 of the Bankruptcy Code applies to the chapter 15 debtor without any territorial limitations.  Section 1520(a)(1) delineates the consequences of entry of a recognition order as follows:

> (a) Upon recognition of a foreign proceeding that is a foreign main proceeding – (1) sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States.

---

[24] *See* 8-1519 Collier on Bankruptcy P 1519.01 ("Unlike voluntary cases filed under section 301, where the filing of a petition commences a case and commencement of the case constitutes an order for relief, a petition for recognition filed under section 1515 of the Bankruptcy Code is only an application.").

[25] *See* 11 U.S.C. § 1504 ("A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515"); § 1517(b) ("Such foreign proceeding shall be recognized – (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or (2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.").

The Foreign Representative submits that the language used in this section must be read to distinguish between the debtor and its property.  Under his proposed interpretation, section 362 applies to the debtor in all jurisdictions and to the property of the debtor *that is* within the territorial jurisdiction of the United States – with the modifying words "that is" referring to debtor's property and not to the debtor itself.[26]  When considered purely as a linguistic matter and without regard to context and statutory purpose, the syntax of the words as used in section 1520(a)(1) does lend support to the construction advocated by the Foreign Representative.

This interpretation, however, is focused too narrowly on scanning the words and ignores the ancillary nature of chapter 15, the specialized definition of the word "debtor," and the interpretative mandate of section 1508.  It would be contrary to the essential purposes and structure of a chapter 15 case for recognition of a foreign main proceeding to stay a commercial arbitration proceeding as remote as this one – a proceeding in Switzerland between two foreign banks relating to a loan transaction that has no connection to the United States or to any property of the chapter 15 debtor "that is within the territorial jurisdiction of the United States."

This concept of territorial jurisdiction is an essential aspect of promoting cooperation and greater legal certainty in cross-border cases.  The phrase "within the territorial jurisdiction of the United States," as defined in section 1502(8), highlights the *in rem* nature of jurisdiction in a chapter 15 case and refers to tangible property within the

---

[26] *See* Motion at p.4(¶9) ("If Congress' intention had been to limit the otherwise extraterritorial application of section 362 to the United States, the statute would have needed to include commas (or different language) as follows:  'sections 361 and 362 apply with respect to the debtor, and the property of the debtor that is, within the territorial jurisdiction of the United States'") (emphasis in original).

territory of the United States and intangible property deemed under applicable nonbankruptcy law to be located within this country. *See* 11 U.S.C. § 1502(8). The definition is a source of clarity with respect to the intended scope of the automatic stay in a chapter 15 case – it applies only to property within the United States. As such, this territorial delineation serves to eliminate any doubt as to the extent of the authority of the bankruptcy court over property of a foreign debtor.

Such obvious precision appears to be lacking with respect to the application of the automatic stay in a chapter 15 case to the foreign debtor itself. The Foreign Representative propounds an interpretation of section 1520(a)(1) that would result in applying the automatic stay to the debtor entity wherever in the world the debtor may be found for all purposes (including a stay of the Arbitration Proceeding). But the breadth of this proposed interpretation with respect to the debtor itself is difficult to reconcile with language in the same sentence that so carefully circumscribes the application of the automatic stay to property that is within the territorial jurisdiction of the United States. The unmistakable thrust of section 1520(a)(1) is to limit the application of the automatic stay to property located within the United States. This makes it difficult for the Foreign Representative to urge an expansive reading in those instances when the stay is being applied to the debtor rather than to its property. It is internally inconsistent for the same phrase to simultaneously specify both an unrestricted global reach and a tightly restricted territorial approach.

Aside from the unworkable extraterritorial interpretation of section 1520(a)(1) suggested by the Foreign Representative, two alternative interpretations exist to potentially reconcile what initially appears to be incongruity in that section's language.

15

One possibility, but a terribly strained one, would be to construe the territorial limitation within section 1520(a)(1) as extending to both the debtor and its property. Such a reading would limit the effect of the automatic stay to actions against a debtor commenced within the United States and to debtor property located here and would tie the word "debtor" to the phrase "within the territorial jurisdiction of the United States." That reading is consistent with international cooperation and avoids absurd results but fails to account for placement of the words "that is" within the text of this sentence. Those words break the connection between the debtor and the United States.

Such a reading also appears to be inconsistent with certain language identified by the Foreign Representative in the immediately following subsection of chapter 15. Section 1520(b) provides that section 1520(a) "does not affect the right to commence an individual action or proceeding in a foreign country to the extent necessary to preserve a claim against the debtor." The Foreign Representative argues that section 1520(b) would be "entirely unnecessary" if section 1520(a)(1) was not intended to stay actions outside of the United States. Motion p.4(¶10). The argument, while not dispositive on the point, does add support to an alternative interpretation that would extend the automatic stay to the debtor in other jurisdictions in appropriate circumstances.

This leads the Court to conclude that the best reading of section 1520(a)(1), and one that is consistent with the plain meaning of the words as written, is that the stay arising in a chapter 15 case upon recognition of a foreign main proceeding applies to the debtor within the United States for all purposes and may extend to the debtor as to proceedings in other jurisdictions for purposes of protecting property of the debtor that is within the territorial jurisdiction of the United States. This more limited extraterritorial

application of the automatic stay to the debtor entity fulfills the cross-border purposes of chapter 15 within the United States without broadly imposing a stay on all actions or proceedings against the debtor including those lacking any proper connection to the chapter 15 case.

To illustrate this interpretation of the section with particular reference to the Arbitration Proceeding, that proceeding concerns an entirely foreign transaction that has no connection to the United States and no conceivable impact on debtor property in this country. Even though the Arbitration Proceeding does affect the Kazakh Proceeding, the automatic stay does not apply to an arbitration that is entirely unrelated to proceedings in the chapter 15 case. It is possible, however, to envision the example of a hypothetical foreign arbitration with different facts, one that might involve a determination of rights of a third party in property of a foreign debtor that is within the territorial jurisdiction of the United States. Regardless of its venue in another country, such an arbitration proceeding that affects property interests of the debtor in this country would be subject to the automatic stay under the interpretation of section 1520(a)(1) articulated in this decision.

The Court's interpretation of section 1520(a)(1) is consistent with the other provisions of chapter 15 relied on by the Foreign Representative. For example, the meaning of section 1520(b) is clarified and permits the bringing of an action in a foreign country to preserve a claim in those instances where such an action would affect debtor property in the United States.

Similarly, the Court's interpretation comports with section 1528[27] that extends bankruptcy court jurisdiction over certain foreign assets of a chapter 15 debtor upon the

---

[27] Section 1528 states:

commencement of a subsequent plenary bankruptcy case but that does not expand jurisdiction as to the debtor itself. *See* 11 U.S.C. § 1528. From this silence in relation to the debtor, the Foreign Representative deduces that it was unnecessary for the drafters "to expand the protections afforded the debtor (as opposed to its property) upon the filing of a subsequent plenary case" because recognition already stayed actions against the debtor wherever located pursuant to section 1520(a)(1). *See* BTA Supplemental Letter p.3. But the silence with respect to jurisdiction over the debtor merely underscores the *in rem* nature of chapter 15 bankruptcy jurisdiction.

This emphasis on assets, rather than the debtor entity, is not surprising given the multiple jurisdictions that must interact in cross-border insolvency cases. Most notably, the chapter 15 debtor that later commences a plenary case is already subject to the jurisdiction of at least one foreign court. Section 1528 thus confirms the shared and cooperative nature of the jurisdiction over a chapter 15 debtor, and reinforces the Court's interpretation that jurisdiction over the debtor may only be exercised on the basis of the assets of the debtor.

---

> After recognition of a foreign main proceeding, a case under another chapter of this title may be commenced only if the debtor has assets in the United States. The effects of such case shall be restricted to the assets of the debtor that are within the territorial jurisdiction of the United States and, to the extent necessary to implement cooperation and coordination under sections 1525, 1526, and 1527, to other assets of the debtor that are within the jurisdiction of the court under sections 541(a) of this title, and 1334(e) of title 28, to the extent that such other assets are not subject to the jurisdiction and control of a foreign proceeding that has been recognized under this chapter.

11 U.S.C. § 1528.

18

No reported case under chapter 15 has ever applied the automatic stay to an action or proceeding in a foreign country, and the Motion does not cite any relevant case authority to support the position that the automatic stay should apply globally to all proceedings against the debtor. The Foreign Representative relies on inapposite cases that have recognized the extraterritorial effects of the automatic stay arising in plenary bankruptcy cases outside of the chapter 15 context. *See Lykes Bros. S.S. Co. v. Hanseatic Marine Serv., GmBH (In re Lykes Bros. S.S. Co.)*, 207 B.R. 282, 287 (Bankr. M.D. Fla. 1997) (analyzing the global scope of the automatic stay in chapter 11); *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) (same); *In re McLean Indus.*, 74 B.R. 589, 601 (Bankr. S.D.N.Y. 1987) (same).

The global reach described in these chapter 11 cases has no relation to the shared jurisdictional model of a chapter 15 case that is an adjunct to a foreign proceeding. In a plenary case, the broad application of the automatic stay is a logical consequence of the creation of a worldwide estate consisting of all debtor property wherever located. 11 U.S.C. § 541(a). To protect this worldwide estate from the actions of creditors, a bankruptcy court possesses *in rem* jurisdiction over all estate property, regardless of its actual location, effectively treating all such property as if it is legally located "within the jurisdictional boundaries of the district in which the court sits." *H.K. & Shanghai Banking Corp. v. Simon (In Re Simon)*, 153 F.3d 991, 996 (9th Cir. 1998) (bankruptcy courts have "constructive possession" over all estate property); *Tultex Corp. v. Freeze Kids, L.L.C.*, 252 B.R. 32, 40 (S.D.N.Y. 2000) ("[28 U.S.C. §] 1334(e) allows a bankruptcy court to assert *in rem* jurisdiction over the property of the bankruptcy estate wherever that property may be located.").

Given that litigation against the debtor itself could adversely affect this worldwide estate, and thereby "impugn [a bankruptcy] court's jurisdiction over and administration of the estate," it is necessary for the automatic stay in a plenary case to also stay litigation against the debtor regardless of where such litigation is commenced. *In re Nakash*, 190 B.R. at 768 (Bankr. S.D.N.Y. 1996). *See also In Re Simon*, 153 F.3d at 996 ("[a]s to actions against the Bankruptcy Estate, Congress clearly intended exterritorial application of the Bankruptcy Code."). In the plenary context, therefore, the expansive reach of a bankruptcy court over actions against a debtor in other countries necessarily derives from a court's *in rem* jurisdiction over the worldwide estate.

By contrast, in the chapter 15 context, a bankruptcy court's jurisdiction over property of the debtor is expressly limited to property located "within the territorial jurisdiction of the United States." *See*, *e.g., In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr. S.D.N.Y. 2009) (noting that section 1520(a) "refers to 'property of the debtor' to distinguish it from the 'property of the estate' that is created under § 541(a). In a chapter 15 case, there is no 'estate'; nevertheless § 1520(a) imposes an automatic stay on any action with respect to the debtor's property located in the United States"); *In re Gold & Honey, Ltd.*, 410 B.R. 357, 373 n.19 (Bankr. E.D.N.Y. 2009) ("§ 1520 only makes §§ 361 and 362 applicable with respect to the debtor and property of the debtor within the United States … granting recognition would presumably leave [a creditor] to consider itself free to continue to violate the stay … outside the United States"); *In re Pro-Fit Holdings Ltd.*, 391 B.R. 850, 863 (Bankr. C.D.Cal. 2008) (distinguishing in dicta between the automatic stay in a plenary case, which applies worldwide, and the automatic stay arising from a recognition order in a chapter 15 case, which applies only within the territorial

20

jurisdiction of the United States).  In the chapter 15 context, therefore, a bankruptcy court's limited *in rem* jurisdiction requires only that the court possess the power to stay actions against a debtor that could impact property located within the United States.[28]

> **B.**    ***The Foreign Representative's interpretation of Section 1520(a)(1) would lead to absurd results unsupported by legislative history***

Even if the Court were to find the language of section 1520(a)(1) to be ambiguous, that language must be construed to avoid an absurd result.  *See Frank G. v. Bd. of Educ.*, 459 F.3d 356, 372 (2d Cir. 2006) ("ambiguous statutes are to be construed so as to avoid absurd results").  With that goal in mind, the process of statutory interpretation must take into account the purpose and scope of chapter 15 as explained in section 1501 and the international nature of chapter 15 cases.

Given the global goals of the chapter, it is unimaginable that Congress intended section 1520(a)(1) to be used as an automatic means to interfere with proceedings that

---

[28] The Recognition Order does not require the Court to reach a different conclusion.  The Recognition Order contains language that could be construed to support the Foreign Representative's interpretation of section 1520:  "The Debtor and the Foreign Representative are granted all of the relief set forth in section 1520 of the Bankruptcy Code including … the application of the protection afforded by the automatic stay … ***to the Bank worldwide*** and to the Bank's property that is within the territorial jurisdiction of the United States."  Recognition Order ¶B (emphasis added).  As noted at the hearing, however, the Court did not intend the order to create a global stay of actions against the debtor. *See* Hearing Tr. at 17:5-13 ("[A]t the time that I entered the form of order that you had presented at the time of the recognition hearing, which was an uncontested proceeding, I never contemplated that one of the possible uses of that order would be to obtain coercive relief as against a commercial arbitration proceeding being conducted in Switzerland between the foreign debtor and a foreign financial institution").  Other provisions of the Recognition Order confirm the Court's understanding. *See* Recognition Order ¶D ("The Petitioner shall provide service and notice of this Order … upon (a) all parties to litigation pending in the United States in which the Debtor is a party … (d) all known U.S. creditors of the Debtor").  Moreover, the interpretation of section 1520(a)(1) in this decision recognizes the possibility of worldwide application of the automatic stay to the debtor in those circumstances that may affect property of the debtor within the United States.

may be pending anywhere in the world, including the Arbitration Proceeding that is the subject of the pending Motion.  Section 1520(a)(1), if interpreted in the manner suggested by the Foreign Representative, would convert the recognition of a foreign main proceeding into the granting, by operation of law, of a worldwide anti-suit injunction as to any proceeding against the debtor, regardless of subject matter, that may be pending or threatened against the foreign debtor in any country around the globe.  The absurdity of such a far reaching result is obvious.

Additionally, the Foreign Representative's proposed expansive interpretation of section 1520(a)(1) is not supported by legislative history.  Courts are to consult the Guide to Enactment of the Model Law (the "Guide") when construing the meaning of chapter 15.  *In re RSM Richter Inc. v. Aguilar (In re Ephedra Prods. Liab. Litig.)*, 349 B.R. 333, 336 (S.D.N.Y. 2006) (Rakoff, D.J.) ("the House Judiciary Committee, in enacting Chapter 15, specifically indicated that the Guide 'should be consulted for guidance as to the meaning and purpose of [Chapter 15's] provisions.' H.R. REP. NO. 109-31 (I), at 106 n. 101, *as reprinted in* 2005 U.S.C.C.A.N. 169 n. 101.").

The Foreign Representative notes that the Guide "makes clear that one result of the recognition of a foreign main proceeding may be the imposition of relief that is greater than the relief that is afforded to the debtor in the main proceeding."  BTA Supplemental Letter p.1.  The excerpt quoted by the Foreign Representative, however, merely provides that the legal consequences of recognition within the territorial jurisdiction of the state administering the ancillary proceeding may differ from the legal consequences of the foreign law governing the foreign main proceeding.  *See* BTA Supplemental Letter, quoting ¶ 143 of Guide ("it is justified to impose on the insolvent

debtor the consequences of article 20 in the enacting State [i.e., the United States]… even if the automatic effects of the insolvency proceeding in the country of origin are different from the effects of article 20 in the enacting State").

Paragraph 145 of the Guide raises some questions regarding the impact of recognition on a pending arbitration but is inconclusive.  According to the Foreign Representative, section 145 of the Guide contemplates that "recognition of a foreign main proceeding may automatically result in the stay of foreign arbitral proceedings…"  BTA Supplemental Letter p.2.  The excerpted language offers guidance that is consistent with this decision.  In those instances where the subject matter of an arbitration has an impact on property of a foreign debtor within the United States, the order recognizing the foreign main proceeding may in fact lead to the stay of foreign arbitration proceedings.  Paragraph 145, however, does not provide support for the extreme notion that recognition carries with it an automatic stay of all foreign arbitration proceedings of every kind, nature and description.  That would be an absurd result.

C.    *Equitable and practical concerns support the Court's interpretation of section 1520(a)(1)*

Principles of judicial restraint support the Court's conclusion.  BTA Bank is a Kazakh bank with no assets, employees or operations in the United States, subject to a pending foreign main restructuring proceeding in Kazakhstan.  BIC-BRED is the Switzerland-based branch of a French bank with no assets, employees or operations in the United States.  The Loan Agreement has no connection to the United States and contemplates the development of real property located in Russia.  The Arbitration Proceeding arising from BTA Bank's default under the Loan Agreement was conducted in Switzerland pursuant to Swiss law.  The parties' contacts with the United States are

insignificant.  Holding that the Recognition Order stays such an ordinary payment dispute between two foreign banks would lead to needless intervention by the bankruptcy court into a dispute having no relationship to the United States.

Equitable concerns also militate against the relief sought by the Foreign Representative.  The Award determined that BTA Bank's procedural defenses relating to the effect of the Recognition Order were interposed too late.  *See* Award p.18(¶98) (noting that BTA Bank failed to timely raise its defense based on the stay under section 1520(a)(1) because "the proper place for the discussion devoted to the US Recognition Order … was the statement of defense.").  Essentially, the Motion is a last ditch attempt by the Foreign Representative to use the automatic stay in a chapter 15 case to discipline one of the creditors of BTA Bank and block the efforts of BIC-BRED to improve its position relative to other creditors.  The effort comes too late to affect the outcome of the Arbitration Proceeding.

### D.  *BIC-BRED may not be sanctioned in the chapter 15 case*

BIC-BRED in opposing the Motion has side stepped policy considerations and questions of statutory interpretation and has focused most of its attention on the question of whether the Court has the authority to enter enforceable orders against a foreign bank that claims to do no business here.  While BIC-BRED has provided substantial support for the proposition that it is not subject to jurisdiction of courts in the United States and, consequently, that effective relief may not be granted with respect to the Motion, the Court does not need to decide whether BIC-BRED is properly subject to the jurisdiction of the Court for purposes of a finding of contempt.  While it seems likely that a finding of contempt might not be enforceable as to BIC-BRED, the Court concludes that the

automatic stay that came into effect upon entry of the Recognition Order does not apply to the Arbitration Proceeding and that BIC-BRED did not violate the stay in Switzerland. Accordingly, no grounds are present for a finding of contempt.

### *Conclusion*

As a general matter, chapter 15 deals with the protection of assets of a foreign debtor in this country and with claims by and against the debtor that may be brought in this country.  Other courts of competent jurisdiction have authority over the debtor and are available to administer foreign assets or to exercise personal jurisdiction.  Based on the foregoing analysis of the language of section 1520(a)(1) and the ancillary nature of a chapter 15 case, the argument of the Foreign Representative for extraterritorial application of the automatic stay to the debtor in a foreign arbitration or other proceeding is rejected except in those situations where there is a demonstrated relationship between that proceeding and property of the debtor within this country.

The Motion is denied, and BIC-BRED is directed to submit an order consistent with this decision.

Dated: New York, New York
       August 23, 2010

                                         *s/ James M. Peck*
                                        Honorable James M. Peck
                                        United States Bankruptcy Judge