# EXHIBIT 1

Share via
Facebook
Share on
Twitter



### Restructuring banks
# Don't start from here
**Kazakhstan shows it is possible to make banks' creditors share the pain**

Nov 25th 2010 | from PRINT EDITION

AS IRELAND grapples with its banking crisis, distant Kazakhstan, which dealt with its own blow-up in February 2009, offers an interesting lesson. The Kazakh restructuring, completed in September this year, is unusual because instead of getting a state guarantee, the majority of the creditors of BTA Bank, the biggest problem, shared the pain. Even senior bondholders, who are high in the pecking order, were hit. In most other countries—including Ireland, so far—they have been wrapped in cotton wool, at taxpayers' expense.

Most BTA creditors were offered a menu of options which included a haircut on their assets, various combinations of senior and subordinated debt, and a small stake in the bank's equity to keep them interested in its future. The government faced down those who warned that, if senior bondholders and trade creditors were included, the market would ostracise Kazakhstan for years. Around $12 billion of bonds and commercial debt was reduced to $4 billion. The external debt of the Kazakh banking sector, which was 26% of GDP when the crisis struck, has been roughly halved.


At least the ATMs still pay out in full

The Irish government recently dared to force holders of subordinated debt of Anglo Irish Bank, its worst lender, to take a haircut. The holders of €1.6 billion ($2.2 billion) of these bonds, which are at the bottom of the creditors' hierarchy, were asked to sacrifice 80% of principal. But the government has hesitated to extend the pain to senior bondholders.

There are good grounds not to: first, if they face losses then depositors, who in theory have the same seniority, might start a run. Second, senior bank bonds from other euro-zone countries, especially Greece, Portugal and perhaps Spain, might suffer contagion. Third, other Irish banks are thought to be big holders of Anglo Irish Bank senior bonds, so they would suffer further losses. And fourth, the European Central Bank would take losses on its reserves of Irish bank bonds and those that it is holding as collateral.

Across Europe and in America, changes in banking law are being put in place which will make it easier to force bank creditors to share the pain of a failure next time. Germany is working on a restructuring framework and Britain's Banking Act, passed last year, created a new "special resolution regime". The new rules in America envisage imposing losses on all creditors (but not depositors).

Yet the worry remains that if all creditors face the risk of loss in a crisis, they will start a run, creating a self-fulfilling prophesy. Students of the Kazakh example argue that a firm voice at the start of a crisis, insisting that the burden will be shared, works wonders for market expectations. The Irish did the opposite, giving blanket bank guarantees in September 2008 which have

Share via
Facebook recently been extended to the end of June at least.

The alternative, which some regulators prefer, is to create a specific layer of debt that would bear losses if a bank fails, without (it is hoped) triggering a run of all creditors. Switzerland has already chosen one version of this approach by forcing its two big banks to issue new contingent convertible ("CoCo") bonds that turn into equity if necessary. Whatever the method they choose, the message for all countries being held to ransom by their banks' senior debtholders is clear: don't start from here.

from PRINT EDITION | Finance and Economics

About *The Economist* online   About *The Economist*   Media directory   Staff books   Career opportunities   Contact us   Subscribe                [+] Site feedback

Copyright © The Economist Newspaper Limited 2010. All rights reserved.   Advertising info   Legal disclaimer   Accessibility   Privacy policy   Terms of use                Help



» Print

This copy is for your personal, non-commercial use only.

# IFR-Kazakh bank 'bail-in' model may work for Ireland

Wed, Dec 1 2010

(The following article first appeared in the Nov. 20 issue of International Financing Review, a Thomson Reuters publication)

by Sandrine Bradley

NEW YORK, Dec 1 (IFR) - As the EU takes steps to address the Irish situation, the "bail-in" model used to restructure a number of Kazakh banks has become an increasingly viable option. However, those involved in that deal believe the international focus and political backdrop to an Irish solution could make the implementation of this type of model more complicated for Ireland.

The bail-in model that was implemented in Kazakhstan's BTA Bank, Alliance Bank ASBN.KZ and Temirbank TEBN.KZ is now receiving greater international attention as momentum gathers with regard to a solution for the Irish banking crisis.

In deals such as Dubai World or Ukraine's Naftogaz, or indeed Ireland's Anglo Irish Bank, national governments have intervened to protect international bondholders from suffering write-downs. However, across the Kazakhstan bank sector the state was adamant that there would be no bail-out or state guarantee, and that international creditors would "share the pain" of balance sheet restructuring.

Under the terms of the restructuring, the banks effectively saw all debt wiped out, with creditors in return receiving a mixture of reinstated debt instruments, equity, cash and asset recovery notes. The enormous sums written off under the plan, which in the case of BTA Bank cut debt from about US$12bn to US$4.4bn, are in direct contrast to the experience in most comparable situations.

The logo of bank BTA is seen on the top of its office in Almaty. The bail-in model that was implemented in three Kazakh banks, including BTA Bank, is now receiving greater international attention as momentum gathers with regard to a solution for the Irish banking crisis.

According to one source close to the BTA restructuring: "There has been a lot of interest from a number of jurisdictions for this model and from regulatory bodies such as Basel. However, you do need certain critical ingredients for the Kazakhstan model to work. These include the political will, creditor will as well as a good economic rationale and incentive for restructuring."

At the beginning of the year Kazakh state-controlled fund Samruk-Kazyna became the owner of BTA Bank when it recapitalised the business under an emergency nationalisation. However, under the terms of the nationalisation, there were no sovereign guarantees.

One source said "Samruk was simply buying shares in the business", which it would be legally bound to sell, for the same price as they were acquired, once the bank was deemed fully fit post-restructuring.

By contrast, in Europe governments have become more involved, seemingly blessing weak banks with their sovereign imprimatur.

"If a government bail-out occurs and liquidity issues are not addressed because the government now owns the debt, the banks are basically being let off the hook. This just pushes the sovereign curve wider and is not good for the EU. The banks need to keep the debt on their books, which will give them the impetus to change it," said another source.

In June this year, following the recapitalisation of BTA Bank, 92% of its creditors approved the debt restructuring plan, which needed the backing of a two-thirds majority. All outstanding debt was cancelled under the deal, so the reinstated debt instruments that creditors received under the restructuring plan were instead newly issued facilities.

This created a streamlined capital structure, which was achieved by fitting a large number of disparate claims into simplified categories based on seniority and rolling them into separate new instruments.

While there were a number of players engaged in the process, the state remained the driver throughout what became a 14-month negotiation.

"Investment banks were crucial to the execution and the lender steering committee was an active and important player in getting the deal done, but the state itself was clear that it owned the strategy and knew where it wanted the deal ultimately to end up," said Marcia Favale-Tarter, who advised both BTA and the prime minister of Kazakhstan on the restructuring of the banks at the time of the restructuring.

One important element in the success of this model and getting creditor consent for the BTA deal was the asset recovery programme, which provided the hook for the creditors to do the deal. In the case of BTA, the prospect of recovery through allegations of fraud (to the tune of circa US$6.4bn) laid the path for the restructuring.

"BTA recognised creditor concerns and found the economic incentive for the restructuring through the asset recovery programme. This provided the hook for the creditors to do the deal BTA had looked at the nature of the losses and the allegations of mis-management provided a reasonable prospect of recovery," said the first source.

Finding this asset value in Ireland will take time and research, but according to the source it is just a question of how far down the chain one has to go in order to find the assets.

"Kazakhstan found consultants who knew about banking and economic crime. They could do the research and find claims. It's true you can't pluck a bald chicken but they're quite tasty if you roast them a little," he said.

There are other potential forms of value creation, such as the professional liability of the service providers. In Ireland's case, more

analysis clearly needs to be done and the consensus among the Kazakhstan advisers is that the EU is doing the right thing in trying to find out the nature and extent of the losses.

"Once you understand the nature and the type of recovery assets you are looking at, you can start," added the source.

IRISH APPLICATION

However, the international focus and the greater contagion risk inherent in the Irish situation obviously make a "bail-in" model, where creditors are "sharing the pain", potentially more tricky.

"Some aspects of the Kazakhstan model could be transferred to Ireland. The process is important, having a totally independent adviser, clear leadership and union of purpose. In Kazakhstan, the leadership were forced to have one voice. By communicating with one voice, market volatility is reduced and in turn contagion risk," argued another person close to the Kazakhstan situation.

He further maintained that although the international focus of Ireland and the political backdrop could make implementation of a bail-in model more tricky, it could still be done.

"Yes, there are more famous people with bigger wallets involved, who will not be happy to take a hit, but with a consistent message then these people will eventually begin to position themselves and a restructuring can be done," he said.

Samruk-Kazyna, which now holds a 81.43% stake in the restructured BTA, says that it intends to exit its investments in the three restructured Kazakh banks, BTA, Alliance and Temirbank, within the next three years.

(Sandrine Bradley is an IFR reporter)

© Thomson Reuters 2010. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only.



**» Print**

This copy is for your personal, non-commercial use only.

## Clock ticking for Ireland's sovereign wealth fund

Wed, Nov 24 2010

By Natsuko Waki

LONDON (Reuters) - Ireland's 24-billion-euro sovereign wealth fund could disappear long before it gets to plug the pension shortfall it was originally intended for as Dublin is expected to use more of the stash to fix its banks.

On one level, there may never be a more appropriate time to tap a "rainy-day" fund of savings. But using up tomorrow's savings today breaches the fund's original mandate and illustrates how the fate of these funds (SWFs) fate is ultimately dictated by sponsoring governments.

Moreover, it could call into question the $3 trillion SWF industry's billing as a provider of global financial stability geared to invest in long-term assets regardless of fleeting market panics and disruptions.

Originally, withdrawals from the National Pensions Reserve Fund (NPRF) could not take place before 2025, when the government plans to supplement the cost of Ireland's social welfare and public service pensions between then and 2055.

However, Ireland has amended the rule and used 7 billion euros (6 billion pounds) from the 9-year-old fund to recapitalise banks in 2009. It plans to tap a further 3.7 billion euros for the banking sector and European Minister Dick Roche has repeatedly indicated the pension fund is part of an available cash buffer for Ireland.

In order to finance the 7 billion euro investment, the NPRF sold all of its sovereign bonds and used all cash balances. Subsequently, in order to reduce heavy equity weighting, the fund sold 2.7 billion euros of equities in 2009.

"Would the manager have taken the decision with profit considerations? The answer is no. It is a perfect example of political pressure and decisions being forced upon them," said Andrew Ang, adviser to Norway's SWF and an associate at the U.S. National Bureau of Economic Research.

"The original aim was to pay for pensions, not to bail out banks. Consequences are that in a few years it ceases to exist or becomes a mere shadow of what formally was and there's no way the fund can meet its original intension to pay for large pension liabilities."

The NPRF is a founding member of industry group International Forum of Sovereign Wealth Funds established in 2009, which includes the world's biggest funds like Abu Dhabi Investment Authority or China Investment Corporation (CIC).

Their voluntary code of practice, the so-called Santiago Principles, states that an investment policy should be consistent with its defined objectives and based on sound portfolio management principles.

"You set up the fund with some purpose, ensure that purpose can be attained and set up an optimal corporate governance structure, and it clearly failed in Ireland's case," Ang said.

Despite its attachment to the world's elite SWF group, the NPRF's funding position is different from other mainstream funds like CIC or Norway's, which manage export windfall revenues.

The NPRF, initially funded out of a one-off cash transfer from telecom privatisations, relies on the government to top it up each year from its coffers.

CHANGING MANDATE

As a result of the government-directed move to buy preference shares of Bank of Ireland and Allied Irish Bank, the NPRF's portfolio was split in two. The component that holds these banks has already lost 400 million euros, while the other portfolio made a healthy 20 percent last year.

"The NPRF is now positioned quite differently for the next phase of its investment, compared with its portfolio and investment strategy since its inception in 2001," Paul Carty, chairman of NPRF, said in an annual report earlier this year.

The NPRF has a new objective of outperforming the cost of government debt over rolling five year periods by reducing equity weightings and enhancing allocation into alternative products, such as emerging markets and infrastructure.

Ireland's sovereign borrowing cost remains high above 8 percent, some 554 basis points above Germany's.

Ireland is expected to receive up to 90 billion euros in Europe/IMF loans. It is also expected to cut 10 billion euros in public spending and raise 5 billion euros in tax in the next four years.

SOURCE OF MONEY

Ireland is not alone in dipping into its sovereign fund to revive the economy, although it may be the first one to change its mandate to do so.

Kuwait's sovereign wealth fund spent at least 1.5 million dinars late in 2008 to stop a slide on the local bourse and helped banks raise fresh capital in 2009.

Kazakhstan's Samruk-Kazyna has also bailed out the domestic financial sector hit by the credit crisis, spending $9 billion transferred from the government to bail out banks.

Unlike Ireland's NPRF, both funds have wider objectives, which allow them to rescue troubled domestic firms if needed.

Moreover, the NPRF's funding position -- where it relies on the already heavily indebted state for cash -- is making it hard to ringfence capital in times of the crisis.

"For a nation facing the financial crisis, actual stocks and bonds held by the government are higher in the pecking order in terms of funding because it's a real source of money," said Garett Jones, economist and a member of Financial Markets Group at George Mason University.

"The real problem is future pension benefits are likely to be lower. The chronic problem is that voters are unlikely to believe future government promises."

© Thomson Reuters 2010. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only.