# EXHIBIT 5



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales Court of Appeal (Civil Division) Decisions

**You are here:** BAILII >> Databases >> England and Wales Court of Appeal (Civil Division) Decisions >> JSC BTA Bank v A [2010] EWCA Civ 1141 (19 October 2010)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2010/1141.html*
Cite as: [2010] EWCA Civ 1141

[New search] [Printable RTF version] [Help]

**Neutral Citation Number: [2010] EWCA Civ 1141**

Case No: A3/2010/1955 & A3/2010/2042

IN THE HIGH COURT OF JUSTICE
COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
THE HONOURABLE MR JUSTICE TEARE
IN PRIVATE
[2010] EWHC 1779 (Comm)

Royal Courts of Justice
Strand, London, WC2A 2LL
19/10/2010

B e f o r e :

**THE RIGHT HONOURABLE LORD JUSTICE MAURICE KAY**
**(Vice President of the Court of Appeal, Civil Division)**
**and**
**THE RIGHT HONOURABLE LORD JUSTICE LONGMORE**
**and**
**THE RIGHT HONOURABLE LORD JUSTICE PATTEN**
———————————

Between:

## JSC BTA BANK

**Respondent**

## - and -

## A

**Appellant**

———————————

**Mr Duncan Matthews QC, Mr Lawrence Akka, Mr Thomas Grant & Mr Alexander Winter (instructed by Stephenson Harwood) for the Appellant**
**Mr Stephen Smith QC, Mr Philip Marshall QC & Mr Tim Akkouh (instructed by Hogan Lovells International LLP) for the Respondent**

**Mr Robert Miles QC (instructed by Freshfields Bruckhaus Deringer LLP) for the Interested Party**
**Hearing date: 16th September 2010**
_____

### HTML VERSION OF JUDGMENT
_____

Crown Copyright ©

### The Appeal

1. This is the judgment of the court.

2. This is an appeal, heard in private, against the order of Teare J imposing a receivership on the assets of Mr A pending the trial of claims made against him for misappropriations allegedly made by him while he was chairman of the claimant bank in Kazakhstan ("the Bank"). The Bank was effectively nationalised in February 2009 when a national wealth fund compulsorily acquired 75.1% of the Bank's share capital.

3. Mr A denies these claims. He says that the claims are an attempt by the President of Kazakhstan, Nursultan Nazarbayev, to take control of his assets in support of a politically motivated action against him because he (the appellant) is a leading figure in Kazakhstan's democratic opposition. His evidence (which is not, of course, accepted) paints a chilling picture of life in Kazakhstan where power resides with the President and the members of his family and close associates, where the rule of law is not respected and where dissent is ruthlessly eliminated. In 2003 Mr A was arrested and imprisoned and his assets seized after what he and others have said was a politically motivated trial. Whilst imprisoned on what he says were "trumped-up" charges he says that he was subjected to mistreatment, torture and an unsuccessful plot to assassinate him and that his assets were "distributed to the President's coterie". He says that political assassination is used in Kazakhstan as a means of silencing opposition and that there was a further attempt to assassinate him in 2004 in Moscow.

4. In late January 2009 Mr A was forced to leave Kazakhstan hurriedly. He arrived in London, speaking no (or very little) English, and now lives with his wife and three of his four children in a house in Bishop's Avenue. He is seeking indefinite leave to remain in this country. In August 2009 these proceedings were commenced by the Bank and a Freezing Order was issued against him together with an order restraining him from leaving the jurisdiction and requiring him to surrender his passport.

5. When he disclosed his assets pursuant to the Freezing Order they were said to be worth, in total, several billion US dollars. Since then, as a result of corrections and further evidence, he appears to value his assets in a somewhat smaller figure but the valuation is still in excess of one billion US dollars.

6. Mr A does not hold his assets in his own name. Rather, a nominee appears to hold shares in a holding company on his behalf and by that means controls the shareholdings in a chain of other companies at the bottom of which chain is an operating business. The use of a nominee and of companies registered in off-shore jurisdictions makes it difficult to trace his assets. He says that the elaborate scheme by which he owns his assets is necessary to protect him from unlawful depredations by the President of Kazakhstan.

7. The Bank has asserted that there has been non-compliance with the Freezing Order inasmuch as Mr A has been reluctant to disclose his assets and the methods by which they are held on trust for him, has probably still not disclosed all his assets and has broken the terms of the Freezing Order by disposing of some of his assets. The Bank also says further that he is still likely to continue to put his assets beyond the reach of the Bank if the Bank gets a judgment and the only way in which it is possible to preserve the assets, of which it is aware, is by the court appointment of receivers to hold those assets. The judge found (in Mr A's favour) that he did not breach the Freezing Order in the manner alleged because the dispositions relied on were made in the ordinary course of his business but he was persuaded that Mr A would in the future continue to try to put his assets beyond reach of any judgment and that a receivership order was therefore appropriate. Mr A appeals against the making of that order and the Bank cross-appeals against the finding of the judge that the dispositions were made in the ordinary course of business.

8.    In relation to the receivership order the judge summarised his conclusions in the following way:-

"126. In summary therefore the circumstances which give reason to believe that the Freezing Order may not provide the Bank with adequate protection against the risk that Mr A's assets will be dissipated prior to any judgment that the Bank obtains are as follows:

i) His initial disclosure of his assets can now be seen to have been seriously inadequate in that he failed to mention the crucial role of a nominee and the nature of the operating assets (save for one). There are grounds for believing that he wished to make it difficult for the Bank to enforce the Freezing Order.

ii) There are grounds to believe that his failure to mention the sale of Eurasia Tower to Clyde & Co was to avoid the Bank's solicitors learning of the sale and that $20m. had been received in part payment.

iii) There are grounds to believe that his failure to mention the sale of BTA Kazan to Clyde & Co was to avoid the Bank's solicitors learning of the sale and that the proceeds of the sale had been received, though this was unlikely to succeed in the light of a press release by BTA Kazan.

127. Those matters give rise to a real risk, in my judgment, that Mr A may use the structure by which he holds his assets to deal with them in breach of the Freezing Order. He has said that he will not do so and no breach has yet been proved but in the light of his prior conduct I am unable, on this application, to be sure that he will not do so in the future. There is therefore good reason for making the Receivership Order. It follows that I am unable to accept Mr Trace's submission that whatever the position may have been in November 2009 there is no longer a risk of dissipation of the assets.

128. The unexplained whereabouts of at least $40m. paid out to Drey provide good reason for making the Receivership Order in support of the Bank's proprietary claim."

9.    In para 161 the judge expressed his conclusion in this way

"Although Mr A has stated that he will obey the orders of this court that statement has to be considered in the light of his conduct in this action. He has stated that he can be trusted but I have to have regard not only to what he has said but also to what he has done. Consideration of his conduct with regard to disclosure of his assets in August/September 2009 and of his failure to inform Clyde & Co. of dealings in the Eurasia Tower and BTA Kazan has left me unable to trust him not to deal with his assets in breach of the Freezing Order."

10.    Mr Duncan Matthews QC on behalf of Mr A attacked this conclusion by saying:-

i) the judge misdirected himself in law and applied the wrong test for making a receivership order and should have held that such an invasive remedy should only be made if the judge was actually sure that Mr A would breach the Freezing Order when the receivership order was made. The order had to be an order of last resort and should only be made when it was "necessary" to do so;

ii) the judge was wrong to attach weight to the admittedly inadequate initial response to the freezing order in August 2009 when Mr A had by April 2010 disclosed everything there was to disclose;

iii) the judge was also wrong to say that Mr A had failed to mention the sale of his interests in Eurasia Tower and BTA Kazan to Clyde & Co because evidence unearthed after the draft judgment was distributed showed that he had done so.

**The Legal Test**

11.    There can be no doubt that the court has power to appoint a receiver in support of a freezing injunction.

The jurisdiction is conferred by s.37 of the Senior Courts Act 1981 in general terms:-

"(1) The High Court may by order (whether interlocutory or final) grant an injunction or appoint a receiver in all cases in which it appears to the court to be just and convenient to do so.

(2) Any such order may be made either conditionally or on such terms and conditions as the court thinks just."

12.  An early instance of the exercise of the power was in <u>Derby v Weldon</u> (No. 3) decided by Sir Nicholas Browne-Wilkinson VC on 7th November 1988 when freezing injunctions were known as Mareva injunctions. He said:-

"The first question of law, which does not give me much trouble but was very properly referred to by [counsel], is whether a Receiver can be appointed in aid of a Mareva injunction. In my judgment it plainly can be done. If the proper preservation of the assets frozen under the Mareva order requires the introduction of a Receiver to hold certain assets, I can see no reason why such a Receiver should not be appointed as a matter of law."

He thought it right to appoint a receiver on the facts of that case.

13.  When the case reached this court at [1990] Ch 65 Neill LJ said (page 94):-

"Section 37(1) of the Act of 1981 gives the High Court a similar jurisdiction to appoint a receiver to that conferred for the grant of an injunction. The remedies are of course separate remedies and in some cases it may be appropriate to grant only one of those remedies rather than both. I am quite satisfied, however, that in this case the judge was right to appoint a receiver … as well as granting an injunction."

14.  It is true that the appointment of a receiver is a very intrusive remedy. It is also expensive and not easily reversible. These considerations can, however, be ameliorated by an appropriately fortified undertaking in damages. A receivership order will no doubt be completely inappropriate in the ordinary Freezing Order case where assets are constituted by money in bank accounts (in respect of which the relevant bank can be given notice) or by immovable property. The order will therefore only be appropriate in cases where an injunction is insufficient on its own. Such cases are only likely to arise where there is a measurable risk that, if it is not granted, a defendant will act in breach of the Freezing Order or otherwise seek to ensure that his assets will not be available to satisfy any judgment which may in due course be given against him. If, therefore, the method by which a defendant beneficially holds his assets is transparent, a receivership order may well not be necessary. But if it is opaque and there is a reasonable suspicion that such opacity will be used by a defendant to act in breach of a freezing order, it may well be the case that a receivership order is appropriate.

15.  In <u>Don King Productions Inc v Warren</u> [1999] 2 Lloyds Rep 392, 396 Neuberger J (as he then was) accepted the proposition that it would be appropriate to appoint a receiver:

"Where there is strong evidence to suggest at an interlocutory stage that the Mareva injunction … [is] being breached."

This is obviously correct as far as it goes but was not intended as a complete statement of the law; Mr Matthews accepted that but relied on <u>National Australia Bank Ltd v Bond Brewing Holdings Ltd</u> [1991] VLR 386, 541 where it was said that the appointment of a receiver was

"an extraordinary and drastic remedy, to be exercised with utmost care and caution and only where the court is satisfied there is imminent danger of loss if it is not exercised."

If "imminent" is intended to mean only "in the near future" we would not accept that that is a definitive statement of the law because as Robert Walker J (as he then was) said, in making an admittedly much

narrower receivership order than is sought in this case, in <u>International Credit and Investment Co (Overseas) Ltd v Adham</u> [1998] BCC 134, 136 F – G:-

> "… It has become increasingly clear, as the English High Court regrettably has to deal more and more often with international fraud, that the court will, on appropriate occasions, take drastic action and will not allow its orders to be evaded by the manipulation of shadowy offshore trusts and companies formed in jurisdictions where secrecy is highly prized and official regulation is at a low level."

16.  The judge rejected Mr A's submission that, before a receivership order could be made, there must be evidence that the defendant has breached or is about to breach the terms of the Freezing Order made against him. He said (para 15):-

> "There may be other circumstances which show that the defendant cannot be trusted to obey the Freezing Order. In the present case reliance is placed on the defendant's inadequate disclosure of his assets. In my judgment inadequate disclosure may, depending on the circumstances of the case, enable the court to conclude that the Freezing Order does not provide the claimant with adequate protection."

17.  We agree that that is the right approach and if, therefore, a Freezing Order does not, of itself, provide adequate protection to a claimant because there is a measurable risk that a defendant may use the structure by which he holds his assets to deal with those assets in breach of the Freezing Order, then a receivership order will normally be justified.

18.  The question is therefore whether there is such a measurable risk in this case. That is primarily a matter of judgment in the light of the ascertainable facts which the judge familiar with the case is in by far the best position to make. If he has decided that there is such a risk, this court will be reluctant to interfere.

**The Facts**

19.  Mr Matthews attacked the judge's conclusions by reminding us (1) that there was every reason for Mr A to organise his affairs as he did, (2) that a receivership order would be extremely invasive and (on the basis of the expert evidence of the well-known receivership and insolvency expert Mr Christopher Morris) (3) that the outside world would perceive any such order as indicating either that the businesses currently operated by Mr A were insolvent or at least that, since Mr A was no longer in charge, the businesses would wither and die because clients were no longer able to deal with Mr A. He then submitted that any initial inadequacy in disclosure had been cured by the time the matter came before the judge and the judge was wrong to treat that and the failure to declare dealings in certain assets as justifying his conclusion that there was a risk that Mr A would deal with his assets in breach of the order.

20.  In the light of these arguments it is necessary to set out something of the history of disclosure of assets as relied on by the judge and the history of the supposed failure to declare dealings in Eurasia Tower and BTA Kazan to Clyde & Co who were then acting for Mr A.

**Disclosure History**

21.  The original Freezing Order (at this stage in the sum of £175 million) was made by Blair J on 13th August 2009 and, in accordance with the usual form, required a disclosure of assets together with information about where certain moneys had gone ("the Schedule C questions") within 48 hours. Mr A applied for the order requiring information to be stayed pending an application to discharge the Freezing Order. Teare J refused that application but extended time for providing information about assets until 27th August 2009. Mr A sought to appeal Teare J's refusal of a stay. He obtained a stay pending appeal but that appeal was dismissed on 30th September 2009 although Mr A did obtain from this court an order that the information about assets which he was to disclose should be restricted to the Bank's solicitors and not passed on to the Bank. Mr A had sworn (but not served) affidavits on 27th August 2009 to comply with Teare J's original order; he served those affidavits after this court had given its judgment on 30th September.

22. That disclosure was so defective that Teare J found it necessary on 16th October 2009 to order that Mr A be cross-examined. This itself is an unusual course which judges of the Commercial Court are often reluctant to take. The court is quite busy enough as it is without having to make space in its list for urgent applications to cross-examine defendants on defective affidavits supplied in purported compliance with directions contained in Freezing Orders. It is well-settled that such cross-examination is to be confined to the supposed inadequacy of the defendant's affidavit and is not permitted to amount to pre-trial interrogatories. The cross-examination initially took place on 27th October. Naturally enough Mr A was asked questions about the identity of individuals involved in his asset holding structure but he said that he did not wish to reveal the names of individuals for fear of reprisals by the authorities in Kazakhstan; Teare J nevertheless required him to reveal their names and Mr A then disclosed that a nominee held assets on his behalf.

23. A day's cross-examination did not prove to be enough because it emerged that other documentation existed which required to be disclosed. The further date of 18th November was set but it was only on the day before that second cross-examination that Clyde & Co (then acting for Mr A) provided that further documentation. It became clear that assets held by a nominee were held pursuant to trust deeds but no such deeds had been produced. These were produced by Clyde & Co on 24th November 2009; although most of them purported to be executed after the date of the Freezing Order, one was earlier. On or about 11th December the Freezing Order was amended to prevent Mr A dealing with any of his assets, unless the total unencumbered value of his assets within the jurisdiction exceeded £175 million.

24. On 15th December 2009 Clyde & Co sent the following letter to the Bank's solicitors:-

   "We refer to your various letters concerning the cross-examination of our client….

   We enclose, at Annex 1 to this letter, a table which sets out further information in relation to our client's assets which have already been disclosed to you. In each case, where documents are available they are listed in the table and enclosed with this letter. Although some of the information and documents listed in the table may have been disclosed previously, this table is not intended to supersede previous disclosure given by our client. Where no documents are disclosed that is because our client does not have and/or cannot obtain copies of any relevant documents.

   We also enclose a copy of the balance sheet for Company N.

   The companies to which you refer at points 31 and 32 of Annex A to your letter dated 25th November 2009 are the same company. Our client made disclosure in respect of these companies on 27th August 2009.

   For the avoidance of doubt, please note that in voluntarily answering the questions you have raised in correspondence, our client does not agree to disclose any further information which he is not obliged by the Freezing Order to disclose. Our client will not answer any further questions.

   Yours very truly"

   It was the receipt of this letter with its final stone-walling sentence that persuaded the Bank that they were never going to get to the bottom of the corporate share structure of the various companies in which Mr A had said he had an interest without a receivership order and the application for that order was made on 19th February 2010. The stone-walling stance did not survive the service of the application and on 16th April 2010 Mr A did produce what Mr Matthews called:

   "a very full account of, inter alia, Mr A's main underlying assets and the structure by which they are held."

25. Whatever the truth of that, it is impossible to conclude that Mr A had been doing his best to comply with the orders of the court. One quite understands that he had to arrive in London in haste in January 2009 at a

time when he spoke very little English and with a family for which he had to provide. But by May 2009 (and probably before) he was already instructing Clyde & Co in relation to his complaints about the Kazakh government since Clyde & Co had on 6th May 2009 brought arbitration proceedings against the government on behalf of two of Mr A's companies and a further arbitration was begun on the same day in August 2009 as the Freezing Order was obtained. By the first return date fixed for the Freezing Order, Clyde & Co were already able to serve a 32 page witness statement presumably taken on Mr A's instructions. Any perceived difficulty about Mr A's unfamiliarity with the English language and English legal procedures has to be seen in that context.

26. It is no doubt intensely irritating to become involved in substantial litigation, especially litigation in which one is a defendant. It may be the case that Freezing Orders like the one made in this case are not a feature of Kazakh jurisprudence. But those who take up residence in this country must understand that judges of the Commercial Court do not make Freezing Orders lightly; they only do so where there is a good arguable case against the defendant and, where the allegations are (as in this case) allegations of fraudulent conduct, where there is a good arguable case of fraud. Of course they do not pre-judge the matter; they accept that when the matter is examined at trial there may be a wholly innocent explanation of apparently fraudulent conduct. But in case there is no such explanation, they are concerned to hold the ring between the parties so as to ensure that if (but only if) there is a judgment, the defendant will not have dissipated his assets before judgment is given. English litigants understand this all too well and non-English litigants must recognise that this has been the position in England for many years and that English judges expect that such litigants understand that position and co-operate with the court to ensure that their assets are preserved. Ordinary living expenses and dispositions in the ordinary course of business are, of course, untouched by the order, as the order itself makes plain.

27. The judge dealt with the inadequate initial disclosure at length in paras 76-85. He took as an example the disclosure of an "indirect interest in Blackdesert Holdings Ltd" and explained how that was a meaningless disclosure as it stood until it was possible to see that through various companies in a chain. Blackdesert was the developer of a tower block in Moscow comparable in size and development to Canary Wharf. (We attempt to explain this more fully below in connection with the subsequent disposition of Eurasia Tower). He concluded that there was a serious possibility that Mr A's omissions were made in order to make it difficult for the Bank to enforce the Freezing Order.

28. The judge then turned to the disclosure made in relation to the proprietary claim which he called the Schedule C disclosure. That schedule showed that $295m was paid to a company called Drey, who then paid out parts of that sum to various entities in the course of a very short period of time; but the schedule showed that of that sum $215m had come back to the Bank which also accepted that a further $30m had also been received by it. But a payment of $41.1m had been paid to an entity called F.M. Company and was still missing. In his cross-examination Mr A denied any interest in all but 5 of the companies mentioned in the chart and said the chart and the information in it had been provided by a Mr Y with whom he was no longer in contact. The judge concluded, despite strenuous argument to the contrary, that he could not disbelieve Mr A's assertion that he had no interest in the companies mentioned in the chart other than the 5 he agreed he did have an interest in. But he was also not persuaded that Mr A had in his third affidavit "bared his soul" (as Mr A would have the judge believe). He was left with a reasoned suspicion that he had not declared all his assets. He then added (para 100):-

> "But his explanation also reveals a remarkable state of affairs, namely, that Mr Y, with whom Mr A is no longer in contact, has very considerable power over A's funds. This emphasises the need for a receiver to be appointed in relation to the Bank's proprietary claim in respect of (at least) the missing $40m paid to FM Company. (The $30m payment to Estar has now been found to have made its way back to the Bank where it remained for a short period before being paid out to ABN Amro on a trade finance transaction.) Mr A has now admitted owning Devesta, a company recorded by him as having made substantial transfers of the sums first paid to Drey. This apparent change of evidence (which he attributes to a mistranslation or a failure on his part to express himself) also emphasises the need for a receiver to be appointed,"

29. In all the circumstances it is not surprising that Teare J, who has, after all, been familiar with the case since August 2009 and has seen and heard Mr A being cross-examined over a 2 day period, came to the conclusion that Mr A wanted to make it difficult for the Bank to enforce the Freezing Order and might use

the structure by which he holds his assets to deal with them in breach of the order. These are exactly the circumstances in which a receivership order will be justified.

30.    The judge, of course, (see para 7 above) justified the making of the order not merely because disclosure was inadequate but also because there were dealings which he concealed from his own solicitors. So it is to those we turn.

### Eurasia Tower and BTA Kazan

31.    The Eurasia Tower was used by the judge as an example of Mr A's inadequate disclosure in August/September 2009 because it was a substantial structure in Moscow similar to Canary Wharf acquired by Mr A as a base site in 2004. It was a joint venture between Mr A (through a company called Handcart which held 50% of the shares in a company called Blackdesert which held 99% of the shares in a company called Company P which owned the shares in Tekhinvest which owned the office block known as Eurasia Tower, all as eventually explained in April 2010) and a Mr Pavel Fuchs. In his August affidavit Mr A merely disclosed an "indirect interest in Blackdesert Holdings Ltd". The only document supplied with that disclosure was a share certificate saying that 5000 Blackdesert shares were held by Handcart and 10,000 shares in Handcart were held by a company called Company S. This lack of transparency was one of the reasons why the judge was induced to order Mr A's cross-examination. It was only after that cross-examination that it emerged that it was a nominee who held the shares in Company S for Mr A and it became apparent that Mr A controlled Blackdesert. No indication had been given in Mr A's August 2009 affidavit that Blackdesert was in a chain that ended up with Eurasia Tower as an operating business. The judge was (not surprisingly) satisfied (para 85) that there was a serious possibility that Mr A omitted any reference to a nominee and the Eurasia Tower in order to make it difficult for the Bank to enforce the Freezing Order and to enable any breach to remain undetected.

32.    It then further emerged in April 2010 that Mr A had agreed on 15th September 2009 to sell his interest in Eurasia Tower for $50m to Mr Fuchs. The first tranche ($20m) was paid on 1st December 2009 and title then passed. In his first cross-examination Mr A said he owned a construction project valued at $50m. He did not say he had recently agreed to sell it for that price. After the title to the shares in Blackdesert had passed to Mr Fuchs on 1st December, the attachments to Clyde & Co's letter of 15th December 2009 said (wrongly) that Handcart owned 50% of the shares in Blackdesert. Mr Stephen Smith QC for the Bank submitted that Mr A did not tell Clyde & Co about the sale and that that was a deliberate deception. In the absence of any denial by Mr A or his legal team that he had failed to inform Clyde & Co of the sale, the judge concluded "on the evidence presently available" (para 113) that Mr A had indeed not told Clyde & Co about the sale because (para 114) Mr A did not wish the Bank's legal team to know that his interest in Blackdesert had been sold and that he had already received $20m in part payment.

33.    Similar points have been made about a sale by Mr A of his interest in the bank BTA Kazan. He referred to his interest in BTA Kazan during his cross-examination of 18th November 2009 without saying that he had sold that interest in October 2009. The proceeds of the sale were used to purchase subordinated debt in BTA Moscow. The judge concluded that, as with the Eurasia Tower sale, Mr A did not inform Clyde & Co of the sale.

34.    Mr Matthews submitted to us that it was very unfair to conclude that Mr A had not informed Clyde & Co of these dealings because in order to establish that he had informed them of those dealings Mr A would have had to waive privilege in his instructions to Clyde & Co. He was never invited to do this and the judge should not, therefore, have made any findings as to what Mr A did or did not tell Clyde & Co. This submission was not made to the judge on the hearing of the application of the receivership order. If it was a point to be relied upon, it ought to have been.

35.    This aspect of the case is somewhat bedevilled by the fact that between December 2009 and April 2010, Mr A changed his solicitors and had Messrs. Stephenson Harwood acting for him by the time of the hearing of the receivership application. Although they took over Clyde & Co's papers, they were no doubt not completely familiar, at the time of the argument in relation to the receivership application, with all the attendance notes. When it became apparent (on delivery of the draft judgment in July 2010) that the judge was placing considerable reliance on Mr A's supposed failure to mention the dealings in Eurasia Tower and BTA Kazan to Clyde & Co, Stephenson Harwood traced an attendance note of a meeting between Mr A

and someone at Clyde & Co of 30th September 2009 which must in all probability have taken place after the Court of Appeal had, on that date, upheld Teare J's decision that Mr A must make disclosure although he was proposing to take proceedings to discharge the freezing order. A heavily redacted copy of that attendance note was then (quite improperly) sent to the judge and he was invited to amend his draft judgment before he delivered the definitive version.

36. The proper procedure was not (of course) to ask the judge to make a substantial amendment to his judgment but to apply, in the event of permission to appeal being granted, for the admission of the attendance note as fresh evidence. No such application has been formally made.

37. Mr Matthews submitted that, in spite of the procedural impropriety, this court should not let the judge's finding on this important matter stand and we have, exceptionally, decided to consider the position in the light of that attendance note, the un-redacted parts of which read

> "Disposal of some assets in list
>
> Signed off on already
>
> …
>
> Have to now disclose affidavits
>
> o   Sch C
>
> o   - List of Assets
>
> o   Has the list changed?
>
> o   MA – Yes
>
> o   Eurasia agreement signed
>
> o   BTA Kazan."

It does therefore appear that Mr A may have informed Clyde & Co that there were dealings (or potential dealings) at a time when the freezing order was in any event confined to the sum of £175 million and Mr A was saying that his assets were well in excess of that sum.

38. That does not, however, affect the real gravity of the Bank's legitimate complaint against Mr A that he was not disclosing his assets. As explained above, there was no mention of Eurasia Tower at all in his first two affidavits and an asset the size of Canary Wharf can hardly have slipped Mr A's mind.

39. The judge, instead of saying (as he might well have done) that the attendance note unearthed by Stephenson Harwood would have to be relied on in this court if permission to appeal was granted and not otherwise, added certain paragraphs to his final judgment as delivered asking himself whether it would be unfair or unjust to Mr A to refuse to review his judgment. He concluded it would not, partly because he (para 204 (ii))

> "would remain of the view that his seriously inadequate initial disclosure of his assets provides reason to believe that the Freezing Order may not provide the Bank with adequate protection against the risk that his assets may be dissipated prior to judgment. There would remain a risk that he may use the structure by which he holds his assets to deal with them in breach of the Freezing Order. I would still be left unable to trust him not to deal with his assets in breach of the Freezing Order."

We do not find this in the least surprising.

40.    So, although (in the light of the attendance note now produced) we do not think Mr A can be said to have concealed his dealings in Eurasia Tower and BTA Kazan from his own solicitors, we consider that the inadequate initial disclosure in August 2009, not ameliorated until April 2010 and then only under the pressure of cross-examination and reluctant disclosure of critical documents, amply justifies the judge's conclusion that there is a measurable risk that Mr A will, if he is able to do so, act in breach of the Freezing Order granted by Blair J and continued by Teare J. We therefore dismiss Mr A's appeal against the making of the receivership order. In these circumstances it is strictly unnecessary to consider the cross-appeal but, since the parties have attached considerable significance to the matter, we will say something about it.

### The Cross-appeal

41.    Mr A applied to the judge for clarification of the meaning and effect of the Freezing Order which he made on 12th November 2009 as subsequently amended on 11th December 2009. The freezing order (in paragraph 4(c)) now restrains Mr A, without the prior consent of the Bank, from in any way disposing of, dealing with or diminishing the value of any of his assets outside England and Wales unless the total unencumbered value of all his assets within the jurisdiction exceeds £175 million. He accepts that this has not been the position at any time since 11th December 2009 material to the application under appeal.

42.    The point at issue on this appeal concerns the scope of paragraph 9(b) of the order which provides that:-

        "This Order does not prohibit the First to Third and Fifth to Seventh Respondents from dealing with or disposing of any of their assets in the ordinary and proper course of any business conducted by them personally."

43.    Mr A sought declarations that none of the following transactions was a breach of the Freezing Order. They were:-

        (i) the sale of shares in BTA Kazan Joint-Stock Commercial Bank (Tatarstan) by Rikas Finance, TuranAlem Capital, Delta Torg and AMK-Invest in October 2009;

        (ii) the sale of shares in OAO Omsk Bank by the same entities in January 2010;

        (iii) the proposed sale of shares held by ZRL Beteiligungs in ZAO BTA Investbank (BTA Armenia); and

        (iv) the marketing of Project D.

44.    Until amended on 11th December 2009 the freezing order allowed Mr A to dispose of or deal with his assets outside the jurisdiction so long as the total value of his assets worldwide exceeded £175 million. The change in the order to the form described above means that transactions (ii) – (iv) are prevented by the injunction unless they fall within the exception contained in para 9(b). But at the hearing before the judge the Bank was unable on the evidence to show that the value of Mr A's assets worldwide did not exceed £175 million and Mr Stephen Smith QC, on behalf of the Bank, therefore accepted that it could not prove a prior breach of the order in respect of the disposal of the shares in BTA Kazan made on 1st December 2009 regardless of whether the transaction fell within paragraph 9(b) of the order. But the Bank did dispute that the sale of the shares was in the ordinary course of Mr A's business.

45.    At the hearing the Bank therefore relied on only two matters as constituting breaches of the Freezing Order. These were the sale of the shares in Omsk Bank and the use of the proceeds of sale to acquire Tier 2 subordinated debt in BTA Moscow, another bank owned and controlled by Mr A. The judge held that these transactions were dealings and disposals in the ordinary course of a business carried on by Mr A so as to fall within the provisions of paragraph 9(b) but he declined to decide whether the proposed sale of Mr A's interest in BTA Armenia and in Project D were permitted by the Freezing Order in advance of those transactions taking place. He also applied his ruling that the Omsk Bank transactions were within the exception to the BTA Kazan share disposal and also to the sale of Mr A's interest in the Eurasia Tower property which featured in the evidence in connection with the receivership application.

46.  We are therefore concerned on the Bank's cross-appeal with the transactions (i) and (ii) in paragraph 43 above and with the sale of the Eurasia Tower.

47.  Freezing orders (like Mareva injunctions before them) commonly contain express exceptions to the order which entitle a defendant to expend money on ordinary living expenses up to a stated amount and to deal with or dispose of assets in the ordinary and proper course of business. The effect of these provisions is to authorise the expenditure or disposal of assets covered by the exception free from the restrictions imposed by the order and therefore without the necessity of giving prior notice to the claimant or of obtaining the consent of the claimant or the court.

48.  The exception about disposals of assets in the ordinary course of business contained in paragraph 9(b) is not quite in standard form. To come within the exception the dealing or disposal must be in the ordinary and proper course of a business conducted by Mr A personally. It was common ground before us that the concluding words should be construed so as to include disposals made by a company or other entity controlled by Mr A if the transactions in question can be said to have been carried out in the ordinary course of Mr A's own business. This is consistent with paragraph 5 of the order which provides that:-

>     "Paragraph 4 applies to all the Respondents' assets whether or not they are in their own name and whether they are solely or jointly owned and whether or not the Respondent asserts a beneficial interest in them. For the purpose of this Order the Respondents' assets include any asset which they have the power, directly or indirectly, to dispose of or deal with as if it were their own. The Respondents are to be regarded as having such power if a third party holds or controls the asset in accordance with their direct or indirect instructions."

49.  Just as Mr A is restrained by the order from disposing of or dealing with the underlying assets of the companies, trusts or other entities controlled by him, so he is entitled to the benefit of the exception contained in paragraph 9(b) in relation to such transactions. The judge had rejected Mr Smith's submission that dealings by those entities in their own assets and investments, whilst caught by paragraphs 4 and 5 of the freezing order, were not covered by the paragraph 9(b) exception because they were carried out as part of the company's business and not that of Mr A. The judge's rejection of that argument (which was not challenged on this appeal) was based on being able to treat disposals by a wholly controlled company or other entity as a disposal of an asset by Mr A in the course of _his_ business. But the judge did not decide that a disposal by one of the underlying companies is necessarily a disposal by Mr A so that Mr A cannot rely on paragraph 9(b) in a case where the disposal or dealing by the company is not carried out as part of Mr A's own business regardless of whether it can be justified as a transaction within the ordinary business of the company which carried it out.

50.  Exceptions such as the one contained in paragraph 9(b) have their genesis in the early authorities as to the basis of and limitations upon the grant of _Mareva_ relief. The purpose of a freezing order is not to give a claimant security for a possible judgment over the defendant's assets but the more limited one of preventing a judgment from going unsatisfied due to the dissipation by the defendant of his assets. The requirement that the disposal should not be one designed to avoid the satisfaction of a judgment sets the boundaries of protection.

51.  The convenient starting point in terms of authority is the judgment of Robert Goff J (as he then was) in Iraqi Ministry of Defence v Arcepey Shipping Co SA (The Angel Bell) [1981] QB 65. This concerned an application by creditors of a defendant who was subject to a Mareva injunction for the court to authorise the repayment of a loan out of monies otherwise subject to the order. The judge granted the application. Two passages are, we think, relevant for the purposes of the present appeal. The first is at page 71 C-E:-

>     "Mr. Hobhouse submitted that the purpose of the _Mareva_ jurisdiction was to freeze a foreign defendant's assets in this country to ensure that there is a fund available in this country from which the plaintiff will be able to satisfy a judgment. In support of this he relied in particular on the form of the order usually made in these cases which restrains the defendant from dealing with his assets within the jurisdiction and from removing his assets from the jurisdiction. I do not, however, see that the usual form of the order as such assists his argument. As was made plain by Mustill J. in the _Third Chandris_ case, the point of the _Mareva_ jurisdiction is to proceed by stealth, to pre-empt any action by the defendant to remove his assets from the jurisdiction. To achieve that result the injunction must be in a wide form because, for

example, a transfer by the defendant to a collaborator in the jurisdiction could lead to the transfer of the assets abroad by that collaborator. But it does not follow that, having established the injunction, the court should not thereafter permit a qualification to it to allow a transfer of assets by the defendant if the defendant satisfies the court that he requires the money for a purpose which does not conflict with the policy underlying the *Mareva* jurisdiction."

52.    The second is at page 73 B-C:

"All the interveners are asking is that the defendants should be free to repay such a loan if they think fit to do so, not that the loan transaction should be enforced. For a defendant to be free to repay a loan in such circumstances is not inconsistent with the policy underlying the *Mareva* jurisdiction. He is not in such circumstances seeking to avoid his responsibilities to the plaintiff if the latter should ultimately obtain a judgment; on the contrary, he is seeking in good faith to make payments which he considers he should make in the ordinary course of business. I cannot see that the *Mareva* jurisdiction should be allowed to prevent such a payment. To allow it to do so would be to stretch it beyond its original purpose so that instead of preventing abuse it would rather prevent businessmen conducting their businesses as they are entitled to do.

53.    The decision in the Angel Bell was affirmed by the Court of Appeal in Normid Housing Association Ltd v Ralphs [1989] 1 Lloyd's Rep 274 where the plaintiffs sought an injunction to restrain a firm of architects from compromising a claim which they had against their professional indemnity insurers on the ground that it would prejudice the plaintiffs' rights under the Third Parties (Rights Against Insurers) Act 1930. In the alternative, the injunction was sought by way of *Mareva* relief on the basis that the settlement of the claim amounted to the disposal of a chose in action.

54.    This alternative argument was given relatively short shrift by the Court of Appeal. Lloyd LJ (at p. 275) said that:-

"The Courts have never allowed the *Mareva* jurisdiction, beneficial though it be, to inhibit the ordinary course of business or to interfere with a defendant's ordinary transactions, especially where third parties are involved. This was decided so far as concerns the payment of debts in the ordinary course of business in the case which is usually known as The Angel Bell [1980] 1 Lloyd's Rep. 632; [1981] Q.B. 65, even though it was arguable on the facts of that case that the debt in question was irrecoverable as a money lending transaction. It was decided, so far as the ordinary living expenses of individuals are concerned – even though the living expenses were on the grand scale – in P.C.W. (Underwriting Agencies) Ltd v P.S. Dixon [1983] 2 Lloyd's Rep. 197 as varied on appeal.

But the principle extends beyond the payment of debts, or the incurring of ordinary living expenses. It applies also to all ordinary transactions in the course of business or, I would add, in the course of life. That appears from the decision of the Court of Appeal in Avant Petroleum Inc. v Gatoil Overseas Inc., [1986] 2 Lloyd's Rep. 236. I need not refer to the facts of that case. The relevant passage is to be found in the judgment of Lord Justice Neill at p. 243 where he said:

… The *Mareva* jurisdiction should not be used if the effect of the injunction which is granted is to bring to an end entirely a bona fide and established method of trading unless some wholly new arrangements are made between the party enjoined and some third party.

So the question on the present appeal comes to this: whether the proposed settlement would be a transaction in the ordinary course of business? To my mind it would. It is not suggested, as I have already said, that the proposed settlement is in any way collusive. Obviously it could not be in the ordinary course of business if it were. Nor is it certain that the architects are bound to recover at least £250,000. If the insurers can show that the only valid claim against them arises under the 1983-1984 policy and if they can show that the policy is voidable for non-disclosure, the architects would recover nothing. So this is not a case where the proposed settlement is inexplicable save on the basis that the architects are putting their

assets, or seeking to put their assets, beyond the plaintiffs' reach."

55. At p. 276 he went on:

> "Secondly, Mr Blackburn submits that the words "ordinary course of business", which I have used and which are to be found in all the cases, should, on the facts of the present case, be confined to the business of the architects as architects, for example in designing buildings. It does not extend to settling claims. This, with respect, is a misunderstanding of the policy behind the *Mareva* jurisdiction. Of course a settlement of this kind is not something that happens every day. But that does not mean that when it does happen it is not in the ordinary course of business. I do not propose myself to offer any definition of what is meant by "ordinary course of business". It can, perhaps, best be regarded as the obverse of the concept of dissipating a defendant's assets. But whether or not that be the right touchstone, it certainly covers the bona fide settlement of claims whether by or against a defendant on legal advice."

56. These cases are important for the guidance which they contain about the legitimate scope of freezing order relief but the issue on the Bank's appeal against the clarification order is a narrower one. Although a freezing order is not intended to prevent the carrying out of transactions in the ordinary course of the defendant's business or, as Lloyd LJ put it, in the ordinary course of life, the question for Teare J was not whether the transactions under review ought be permitted under the order but whether they fell within the express exception contained in paragraph 9(b) of that order.

57. As Robert Goff J recognised in *The Angel Bell*, freezing orders (like *Mareva* injunctions before them) are not in terms limited to disposals or dealings with assets which amount to dissipation. That qualification would render the order practically useless and its policing impossible. Instead, the form of order now contained in the annexe to the CPR and in the Commercial Court Guide imposes a blanket restriction on dealings with or disposals of assets up to a stated value but caters for the principles enshrined in the *Angel Bell* by containing an express exception for disposals in the ordinary and proper course of business and a general right for the defendant to apply to the court for permission to carry out a particular transaction not falling within that exception. It was under a general liberty to apply of this sort that the order in the *Angel Bell* was made.

58. The issue for us therefore is not whether the transactions in question were permissible under the Angel Bell or Normid Housing principles but the much more limited question of whether Mr A (or the companies he controlled) were entitled to carry them out without first seeking the consent of the Bank or the court. It is clear from the passages in Lloyd LJ's judgment in Normid that the scale of permissible transactions extends beyond the scope of the ordinary course of business exception, although it was not necessary in that case (as it is in this) for the Court of Appeal to decide where the boundary lay. The proposed settlement of the architects' claim was, on any view, unobjectionable and not therefore susceptible to the grant of *Mareva* relief.

59. In his second witness statement of 16th March 2010 made in support of the application for clarification, Mr A states that the sale of the shares in BTA Kazan and Omsk Bank were sales to independent third parties of shares of which he was the ultimate beneficial owner. BTA Kazan (which has its head office in Kazan, the capital of the Tatarstan region of Russia), was owned as to 47% by the Bank and as to a further 51% by four companies (Rikas Finance, TuranAlem Capital, Delta Torg and AMK-Invest) of which Mr A was or is the ultimate beneficial owner. These shares were therefore assets of Mr A within the meaning of paragraph 5 of the freezing order.

60. Mr A and the four companies were also shareholders in BTA Moscow (now AMT). His evidence is that he decided in 2008 that BTA Kazan should be merged with BTA Moscow so as to become a branch of the Moscow bank and that discussions to that end then took place between the Management Board of the Bank, representatives of BTA Kazan and the Management Board of BTA Moscow. These failed to produce a workable plan for integration with the result that in the summer of 2008 the Bank decided to dispose of BTA Kazan.

61. In 2009 (as described earlier) the Bank was nationalised and Mr A decided he would dispose of his 51%

interest in BTA Kazan. Interest in purchasing the shares was shown by Mr Mudaris Idrisov, the chairman of BTA Kazan, but, according to Mr A, he withdrew following pressure from the government of Kazakhstan. The shares were then sold to three companies (Rusueftkihin Dil Co; Bushpromreserv; and Naiada Development) controlled by a Mr Maxim Pukhlikov. These are said to have been arm's-length sales to purchasers independent of Mr A and there is no evidence to the contrary.

62.   The sales were completed in October 2009 and the proceeds of sale (amounting to the equivalent of US$15 million) were used to buy Tier 2 subordinated debt in BTA Moscow. This is now held by the four companies in place of their shares in BTA Kazan. The economic effect of the transaction is that the proceeds of sale have been lent to or invested in BTA Moscow.

63.   Mr A says in his second witness statement that the sale of the 51% stake was entirely proper and legitimate and was not done with any intention to dissipate the assets. But, as explained earlier, that is not the issue on this appeal. If what Mr A says about the transaction is correct, it would follow that he could have obtained permission to complete the transaction that he applied to the court to do so. But to bring himself within the paragraph 9(b) exception and so obviate the need for such an application, the disposal of the shares must have been carried out in the ordinary course of Mr A's own business.

64.   Very little information is given about these companies in the second witness statement. Mr A says that they are investment companies which regularly acquire and sell equity holdings in other businesses. They also acquire medium to long-term investments which include interest-bearing corporate debt. The Bank in its evidence challenged this assertion by reference to the activities of the four companies listed in the Russian Unified Register of Legal Entities but Mr A says in his fourth witness statement of 17th May 2010 that the entries in the register are not conclusive and that a joint stock company is entitled to carry on other types of business.

65.   Perhaps the most questionable aspect of the BTA Kazan sale is the decision of the vendor companies to invest the proceeds of sale in the subordinated debt of BTA Moscow. The Moscow Bank had a very low credit rating (Caa 2) which would make it an unattractive and potentially risky choice for most investment companies. It is difficult to believe that the decision to invest the proceeds of sale in that business is explicable other than by reference to Mr A's ownership of BTA Moscow.

66.   He accepts that it was always intended that the proceeds of sale would be used to purchase the subordinated debt. BTA Moscow is not put forward as a safe investment but his answer to the criticism of the investment on these grounds is that it was a less risky investment than the shares in BTA Kazan and Omsk Bank. We will return to this point after dealing with the Omsk Bank transaction.

67.   Prior to the transactions in question the shares in Omsk Bank were owned as to 19.99% by BTA Moscow and by the four companies in the following proportions: Rikas Finance (19.99%); TuranAlem Capital (19.92%); Delta Torg (18.98%) and AMK-Invest (9.99%). The remainder of the share capital (11.13%) was owned by various unconnected third parties.

68.   Mr A says in his second witness statement that BTA Moscow had a branch in Omsk (as it did in Kazan) and was therefore a competitor with Omsk Bank. A decision was taken in 2007 by BTA Moscow to sell the shares but a buyer did not emerge until 2009. The sale was eventually completed in January 2010 when BTA Moscow sold its shares for R83,982,707.64 (the equivalent of US$2.9 million).

69.   At the same time the four companies also agreed to sell their shareholdings to the same purchaser for equivalent values. Rikas Finance received the equivalent of US$2.6 million; TuranAlem Capital US$2.6 million; Delta Torg US$2.5 million and AMK-Invest US$1.3 million. On 11th February 2010 these companies used the proceeds of sale (as in the case of the BTA Kazan sale proceeds) to purchase subordinated debt in BTA Moscow.

70.   Mr A says in his second witness statement that it was always intended that when BTA Moscow sold its shares in Omsk Bank the other four companies would do the same but, in the light of this decision, it is more likely that the decision to dispose of their holdings in Omsk Bank was taken as part of BTA Moscow's strategy to dispose of its interest in BTA Kazan and Omsk Bank and not as part of some independent investment decision taken by the four companies.

71.    The evidence is that the four investment companies are all shareholders in BTA Moscow and therefore have an interest in the growth of the Bank. But this is not the same rationale for the purchase of the subordinated debt as Mr A gives earlier in his second witness statement when he says that the subordinated debt purchased with the proceeds of sale of the shares in BTA Kazan and Omsk Bank is typical of the medium and long-term investments made by these companies.

72.    Mr A says in his second witness statement that the four investment companies acquire and divest from holdings regularly in order to concentrate on holdings of the most value and thereby maximise the yield on capital over the long-term. He says that he was not the person who took the decision on behalf of the companies to sell their holdings in BTA Kazan. The decision was taken by the directors, although he approved of it. There is no evidence from the directors to confirm this but if it is right then it would follow that these were disposals by the companies themselves as part of their own business regardless of whether the assets were owned or controlled by Mr A. To bring the case within paragraph 9(b), it would be necessary to show that the directors simply acted on instructions from Mr A in relation to the share sales which is not the case which he puts forward in his evidence.

73.    The material question for the judge was whether these transactions could be brought within paragraph 9(b) as being carried out in the ordinary course of a business conducted by Mr A personally. Mr Smith made a broader submission to the judge that Mr A did not conduct any business personally and that even when dealing in the underlying assets through the medium of the investment companies he was doing no more than to hold and manage his own assets. This was not as such the conduct of a business.

74.    Teare J's rejection of these submissions was based in large part on his construction of paragraph 9(b). He refers in his judgment to the definition of "ordinary course of business" by Lloyd LJ in Normid Housing quoted earlier but, as already explained, the focus of the Court of Appeal in that case was on whether the settlement of the issued claim justified the grant of *Mareva* relief. In that context the description of a disposal in the ordinary course of business as being the obverse of the dissipation of assets makes sense because that was the issue in relation to the grant or not of the injunction. We do not, however, accept that any transaction (even if not dissipatory in nature) can properly be described as one in the ordinary course of business. As explained earlier, the standard exception on which paragraph 9(b) is modelled provides a limitation on the scope of the injunction thereby enabling routine business transactions to be conducted without reference to the court. But dealings or disposals which are not part of the ordinary business of the defendant in that sense do not necessarily fall foul of the purpose of the freezing order. They merely require the approval of the court or the claimant before they are carried out and so enable the court to scrutinise what, on its face, may not appear to be a routine or regular transaction.

75.    The judge relied on the judgment in Normid Housing as providing support for his view that the paragraph 9 (b) exception should be construed widely and not narrowly. It should, he said, be construed as extending to the activity of holding and managing assets so long as it is not aimed at dissipating a defendant's assets. We think that this is too widely stated. Literally applied, it would entitle any defendant to dispose of or deal with his investments free of the scrutiny of the court and is inconsistent with the form and structure of a freezing order which, for the reasons stated earlier, deliberately does not limit the scope of the injunction to transactions carried out with an intention to dissipate. The need to protect a claimant from this risk (in a case which by definition must have involved a prior finding by the judge that there is a real risk of dissipation but for the grant of the injunction) is achieved by prohibiting all disposals of assets except those permitted by the express exceptions to the order and by giving the defendant a general liberty to apply in respect of any particular intended disposal. Transactions can therefore be sanctioned by the court and if found to be unobjectionable then permitted: see Atlas Maritime Co SA v Avalon Maritime Ltd ("The Coral Rose") [1991] 1 Lloyd's Rep 563.

76.    This format points, in our view, to the standard exception about disposals in the ordinary course of business being given a narrower rather than a wide meaning. Transactions in the ordinary course of business in the case (e.g.) of a trading company will include all its usual purchases and disposals and the payment of its trade and other liabilities as they fall due. A regulated investment company which acquires and sells shares and other securities on behalf of its clients would be treated in the same way. But we do not consider that the concept of the ordinary course of business would, as a general rule, comprehend alterations in investments by a private investor however wealthy he may be. For them to qualify it would be necessary to show that the investor was himself running a business by making the changes in his holdings rather than merely re-organising his investments to obtain a better outcome.

77.    The judge thought that, even on this view of the construction of the order, Mr A had demonstrated that the BTA Kazan and Omsk Bank transactions fell within paragraph 9(b). This was because his assets are made up of controlling interests in various businesses and that the divestment of the shares in the two banks and the investment of the proceeds of sale in BTA Moscow represent attempts by him to concentrate those assets in a business which he owns and runs. The essence of his reasoning is set out in paragraph 73 of his judgment:

> "BTA Moscow is one of a number of assets in respect of which Mr A has declared ownership. It may well be that the proceeds of sale of Omsk Bank would be safer had they remained in cash and that using them to purchase subordinated debt in BTA Moscow is fraught with risk. But Mr A has said that the purchase of debt in BTA Moscow assists it to maintain its required capitalisation. In circumstances where Mr A is using the cash to provide funds to an ailing bank which he owns I am unable to find that the purchase was not in the ordinary course of his business. The Bank has adduced no evidence that the purchase of debt in BTA Moscow was aimed at putting the proceeds of sale beyond the reach of the Bank rather than being aimed at supporting BTA Moscow."

78.    But this, with respect to the judge, ignores Mr A's evidence in support of the application which characterised the disposal of the shares and the purchase of the subordinated debt as independent investment decisions of the four vendor companies. Nor do we accept that the injection of significant assets into a company by its controlling shareholder necessarily constitutes part of the ordinary course of a business carried on by Mr A personally. A private investor does not *ipso facto* carry on an investment business. Mr A does not in terms suggest that he does. He simply characterises his dealings as shareholder with BTA Moscow as part of his business rather than his non-business activities. But on the evidence this is nothing more than the concentration by him of part of his assets in a particular business. As such, he is no different from any other private investor who, on his own behalf, decides where to put his money. We fully appreciate that the investment of those monies may be significant in terms of supporting the business of BTA Moscow. But that is not Mr A's business nor can a loan to BTA Moscow from its majority shareholder be regarded as part of that business.

79.    The judge took the view that if there were unresolved issues on the evidence as to whether the disposals of the underlying assets were carried out by the companies themselves or by him as part of his own business, the burden rested on the Bank to show that the transactions were outside the paragraph 9(b) exception and that they had not done this. This was, in our view, the wrong approach. Most of the evidence in support of the application was provided by Mr A in his second witness statement of 16th March 2010 and his fourth witness statement of 17th May 2010. On an application for committal the burden is undoubtedly upon the applicant to prove the breaches relied upon to the criminal standard of proof. This includes the burden of showing that a disputed transaction is not within an exception to the order such as that contained in paragraph 9(b): see Nokia Finance SA v Interstone Trading Ltd [2004] EWHC 272. But where the defendant chooses to seek guidance or clarification from the court as to whether certain transactions have contravened or will contravene the terms of the injunction, it seems to us that it is incumbent on him to provide the court with the evidence upon which it can properly answer the question posed by the application. Declaratory relief is discretionary and if the applicant is unwilling to do this the judge should simply decline to make the order and leave it to the claimant to decide in due course whether it wishes to pursue committal proceedings of its own. In any such proceedings the court would have to decide whether the disposals were disposals by Mr A of his assets at all and, if so, whether they were made in the course of his own business. But the court is not obliged to adjudicate upon the defendant's compliance or otherwise with its orders on the basis only of whatever material the defendant chooses to put before it.

80.    We therefore take the view that, even if otherwise unobjectionable, the transactions involving the shares in BTA Kazan and Omsk Bank and the re-investment of the proceeds of sale were not within the exception contained in paragraph 9(b) and that the judge should have dismissed the application for declaratory relief in that respect. If Mr A is right about the nature and purpose of the transactions then the breach of the Freezing Order is likely to be a technical one in the sense that permission for the transactions would have been granted and, in those circumstances, is unlikely to have much influence on the court on the central question whether Mr A would be likely to breach the Freezing Order in the future. We have not therefore taken these breaches into account in deciding whether the judge was right to make the receivership order. But that is not a matter for us and would have to be dealt with in a further application by Mr A if so advised.



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales High Court (Commercial Court) Decisions

---

**You are here:** BAILII >> Databases >> England and Wales High Court (Commercial Court) Decisions >> JSC BTA Bank v Ablyazov [2010] EWHC 1779 (Comm) (16 July 2010)
URL: *http://www.bailii.org/ew/cases/EWHC/Comm/2010/1779.html*
Cite as: [2010] EWHC 1779 (Comm)

---

[New search] [Printable RTF version] [Help]

---

**Neutral Citation Number: [2010] EWHC 1779 (Comm)**

Case No: 2009 Folio 1099

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**
**IN PRIVATE**

Royal Courts of Justice
Strand, London, WC2A 2LL

16/07/2010

B e f o r e :

**MR. JUSTICE TEARE**

---

Between:

**JSC BTA BANK**                                          **Claimant**

**- and -**

**MUKHTAR ABLYAZOV**                                      **Defendant**

---

**Stephen Smith QC, Clive Jones and Tim Akkouh (instructed by Hogan Lovells International LLP) for the Claimant**
**Anthony Trace QC, Duncan Matthews QC, Lawrence Akka, Thomas Grant and Alexander Winter (instructed by Stephenson Harwood) for the Defendant**
**Hearing dates: 25-28 May and 8 June 2010 (with further evidence and written submissions being completed on 7 July 2010)**

---

**HTML VERSION OF JUDGMENT**

---

Crown Copyright ©

**Mr. Justice Teare:**

1.  This is an extraordinary case.

2.  The Claimant ("the Bank") is a bank in Kazakhstan, 75.1% of whose share capital has, since 2 February 2009, been owned by the State of Kazakhstan through a sovereign wealth fund, Samruk-Kazyna. On that date the State effectively took control of the Bank when, according to the evidence of the Bank, there was significant concern as to the ability of the Bank to continue as a going concern. The Bank's accounts for the year ending 31 December 2008 recorded a negative equity of about US$6.1 billion. Its debts, which are said to amount to US$12 billion, are being restructured pursuant to the law of Kazakhstan.

3.  The Defendant ("Mr. Ablyazov") is the former chairman of the Bank and is accused by the Bank of "widespread misappropriation of the Bank's funds." It is said that he has treated the Bank "as if it were his own private source of funds". Four claims have now been issued in this jurisdiction against Mr. Ablyazov. The total sum claimed is in excess of US$1.8 billion. Further claims are anticipated which I was told will bring the total sum claimed to US$4 billion.

4.  Mr. Ablyazov denies these claims. He states that the claims are an attempt by the President of Kazakhstan, Nursultan Nazarbayev, to take control of his assets in support of a politically motivated claim against Mr. Ablyazov, who is a leading figure in Kazakhstan's democratic opposition. His evidence paints a chilling picture of life in Kazakhstan where power resides with the President and the members of his family and close associates, where the rule of law is not respected and where dissent is ruthlessly eliminated. In 2003 Mr. Ablyazov was arrested and imprisoned and his assets seized after what he and others have said was a politically motivated trial. Whilst imprisoned on what he says were "trumped-up" charges he says that he was subjected to mistreatment, torture and an unsuccessful plot to assassinate him and that his assets were "distributed to the President's coterie". He says that political assassination is used in Kazakhstan as a means of silencing opposition and that there was a further attempt to assassinate him in 2004 in Moscow. His evidence suggests that Kazakhstan has much in common with Ancient Rome.

5.  In late January 2009 Mr. Ablyazov was forced to leave Kazakhstan hurriedly. He arrived in London where he now lives with his wife and three of his four children in a house in Bishop's Avenue . He is seeking permanent leave to remain in this country. In August 2009 these proceedings were commenced and a Freezing Order was issued against him together with an order restraining him from leaving the jurisdiction and requiring him to surrender his passport.

6.  When he disclosed his assets pursuant to the Freezing Order they were said to be worth, in total, several billion US dollars. Since then, as a result of corrections and further evidence, he appears to value his assets in a somewhat smaller figure but the valuation is still in excess of one billion US dollars.

7.  Mr. Ablyazov does not hold his assets in his own name. Rather, a trusted associate appears to hold shares in a holding company on his behalf and by that means controls the shareholdings in a chain of other companies at the bottom of which chain is an operating business. The use of a nominee and of companies registered in offshore jurisdictions makes it difficult to trace his assets. He says that the elaborate scheme by which he owns his assets is necessary to protect him from unlawful depredations by the President of Kazakhstan.

8.  The Court has to determine three applications. The first is an application by the Bank for the appointment of a receiver over Mr. Ablyazov's assets in support of the Freezing Order ("the receivership application"). The second is an application by Mr. Ablyazov for clarification as to the ambit of the *Angel Bell* liberty to deal with assets in the ordinary course of business ("the clarification application"). The third is an application by Mr. Ablyazov for the return of his passport ("the passport application").

9.  Although this case is still only at an interlocutory stage it is apparent that it is being fought by means of the forensic equivalent of trench warfare. Very considerable evidence in writing has been exchanged. A great many points have been taken. Every response is met with a determined counter attack on a related but different point to which in turn a response is provided. And so the process goes on. Progress, if any, is slow. The Skeleton Argument of Mr. Smith QC on behalf of the Bank ran to some 91 pages. The Skeleton Argument of Mr. Trace QC for Mr. Ablyazov on the receivership application ran to some 110 pages and the Skeleton Argument of Mr. Matthews QC on behalf of Mr. Ablyazov on the clarification and passport applications ran to a modest 30 pages. The hearing required 4 and half days. Liberty was given for further evidence on discrete topics, together with further written submissions, to be filed after the hearing.

10. Whilst I have attempted to consider all of the many points canvassed in evidence and argument I have restricted this judgment, in order to ensure that it is of manageable size, to the principal points taken by the parties and in particular to those points which have enabled me to decide the applications before the Court.

<u>The Receivership Application</u>

11. Pursuant to a judgment and order of mine dated 17 March 2010 this application is being heard in private.

12. The court's power to order the appointment of a receiver derives from section 37 of the Supreme Court (now Senior Courts) Court Act 1981. The court may appoint a receiver "in all cases in which appears to the court to be just and convenient to do so."

13. In deciding whether it is just and convenient to make the order all the circumstances of the case must be considered. Those circumstances cannot be exhaustively defined but the context of the present case, where a Receivership Order is sought in support of a Freezing Order, suggests, as a matter of principle, that at least the following matters should be considered.

14. The appointment of a receiver prior to judgment displaces the defendant as the person in control of his assets. It is therefore an invasive remedy. When a Receivership Order is sought in support of a Freezing Order the court should therefore ask itself whether the Freezing Order has provided the claimant with adequate protection against the risk that the defendant's assets may be dissipated prior to judgment. For if it does provide adequate protection the Receivership Order will not be necessary and it will therefore be neither just nor convenient to grant the invasive remedy of a Receivership Order.

15. In a case where there is evidence that a defendant has breached or is about to breach the terms of a Freezing Order the court may well conclude that the Freezing Order does not provide the claimant with adequate protection against the risk that a defendant's assets may be dissipated before judgment. It was suggested that such evidence is the only evidence capable of founding such a conclusion. I disagree. There may be other circumstances which show that the defendant cannot be trusted to obey the Freezing Order. In the present case reliance is placed on the defendant's inadequate disclosure of his assets. In my judgment inadequate disclosure may, depending on the circumstances of the case, enable the court to conclude that the Freezing Order does not provide the claimant with adequate protection.

16. The risk that the appointment of a receiver may cause harm to the interests of the defendant will also have to be considered as will the adequacy of the claimant's undertaking in damages and any fortification of that undertaking which is offered. The potential for harm is greater where, as in this case, the application is to appoint a receiver over all of a defendant's assets. In such a case precisely how the receivers plan to take control of the defendant's assets will be a material consideration because it will have a bearing upon the damage likely to be caused to the defendant's interests.

17. In all cases the court will have to weigh the competing factors in order to determine whether the making of a Receivership Order is just and convenient.

18. I have been referred to two cases in which the power to make a Receivership Order has been exercised in support of a Freezing Order prior to judgment; *Derby v Weldon* (Nos. 3 and 4) 7 November 1988 (unreported at first instance) and [1990] Ch.65 in the Court of Appeal and *ICIC v Adham* [1998] BCC 134. In *Don King Productions Inc. v Warren* [1999] 2 Lloyd's Reports 392 the court decided not to exercise the power.

19. Since both parties have relied upon these cases it is necessary to note the approach of the court in each of those cases.

20. In *Derby v Weldon* Sir Nicholas Browne-Wilkinson, Vice Chancellor, appointed receivers over assets of a defendant against whom a freezing order had earlier been issued. The cause of action alleged was conspiracy to defraud and the amount of the claim was in excess of £25m. During the application for a freezing order the stance of the defendant had been one of "taciturnity" and non-disclosure. But on the last day of the hearing it was said that the defendant held certain assets. Another defendant, to whom over £50m. had been paid, had no assets. That disclosure led to the application for a receivership

order. Counsel for the defendant against whom the receivership order was sought presented no argument to the court on the question whether receivers should be appointed. The Vice Chancellor granted the order sought. He held that there was jurisdiction to appoint a receiver in aid of a freezing order. That should be done where "the proper preservation" of assets required the introduction of a receiver to hold the assets. He said that the history of the case had given rise to suspicion and alarm and there was a pattern of dissipation of assets. There was an appeal from that decision and the decision to grant a freezing order. The Court of Appeal dismissed the appeal. The argument on appeal concerned the grant of the freezing order and the extra-territorial effect of that order and the receivership order. The basis on which the Vice-Chancellor had made the receivership order was not disturbed and little was said about it. The decision is therefore consistent with the principle that a receiver may be appointed in support of a freezing order where to do so is necessary to preserve assets and prevent their dissipation prior to trial.

21. In *ICIC v Adham* a receiver had been appointed ex parte. The cause of action relied upon was again fraud and it appears that a court in the Cayman Islands had already found some or all of the defendants liable in respect of fraud. A receiver was appointed in support of a freezing order. The subject of the receivership order was real property. An application was made to discharge or vary the ex parte order. Robert Walker J. refused to do so. He was not convinced that the defendants could be "trusted" to obey the orders of the court and "not to continue to do their best to evade orders that have been made against them". He said that:

> "the court will, on appropriate occasions, take drastic action and will not allow its orders to be evaded by manipulation of shadowy offshore trusts and companies formed in jurisdictions where secrecy is highly prized and official regulation is at a low level."

22. Again, the decision is consistent with the principle that a receiver may be appointed in support of a freezing order where to do so is necessary to preserve assets and prevent their dissipation prior to trial.

23. In *Don King Productions Inc. v Warren* a winding up of the affairs of a partnership and a freezing order had been ordered. The claimants said that neither order had been complied with and sought the appointment of a receiver. It was submitted that the court should make such an order

> "where there is a Mareva injunction and a protective regime and where there is strong evidence to suggest at an interlocutory stage that the Mareva injunction and the protective regime are being breached."

24. Neuberger J. accepted that submission "as a matter of principle". However, the judge declined to appoint a receiver. He reached the conclusion that, "balancing the various competing factors, it would not be right to appoint a receiver…." Amongst the matters he took into account were "the real risk of substantial irrevocable damage to Mr. Warren's business ……as a result of the appointment of a receiver" and that additional protection could be given to the claimants by certain undertakings offered by Mr. Warren. This decision not only supports the principle that a receiver may be appointed in support of a freezing order where to do so is necessary to preserve assets and prevent their dissipation prior to trial but also supports the principle that the court must consider the effect of the order on the defendant and ultimately balance the competing factors in order to decide whether the appointment of a receiver is just and convenient in all the circumstances of the case.

25. I consider that these cases illustrate the type of circumstances in which the court may conclude that it is just and convenient to make a Receivership Order. They support the approach which I consider should be followed as a matter of principle where a receivership order is sought in support of a freezing order. It was submitted by Mr. Trace QC (counsel for Mr. Ablyazov on the receivership application) that where a receivership order is sought in support of a freezing order there must be strong evidence that the freezing order is being breached. Whilst such evidence will clearly support a submission that a receivership order is necessary to prevent dissipation of assets notwithstanding the existence of a freezing order I do not consider that such evidence of breach must always exist before a receivership order can be made in support of a freezing order. I do not understand the comments of Neuberger J. in *Don King Productions Inc. v Warren* to require such evidence. There was such evidence in that case and a submission was made on the basis of such evidence. The acceptance of that submission does not entail that such evidence must be adduced where a receivership order is sought in support of a freezing order.

26. The following passage in *Gee on Commercial Injunctions* 5th ed. at paragraph 16.008 reflects what I consider to be the right approach:

"The nature of the remedy [receivership] is more intrusive, more expensive, and less reversible than the granting of an injunction. The receiver has to be paid. The defendant no longer has control of the assets. Irreparable damage may be done to the business of the defendant through the publicity. The claimant must show that the appointment is appropriate because other less invasive remedies would be inadequate. If the claimant has contractual or other rights as to how assets may or may not be used (eg a negative pledge), then before appointing a receiver the court will consider whether damages or an injunction is a sufficient remedy. The court, in exercising its discretion, will take into account the likely costs of the appointment. Ordinarily an unsecured creditor is left to obtain judgment and then to enforce his judgment with the assistance of a receiver."

27.   Mr. Trace relied upon passages in textbooks and suggested that they showed that a clear case must be established and that the risk to the defendant must be very small; see *The Law Relating to Receivers, Managers, and Administrators by Picarda* 4th ed. at p.359, *Kerr and Hunter on Receivers and Adminstrators* 19th ed. at 2-35 and *Halsbury's Laws* Vol. 39(2) at paragraph 339. The principle relied upon by Mr. Trace was said to derive support from the case of *Owen v Homan* (1853) 4 HL Cas 997.

28.   *Owen v Homan* was a case in which the defendant was being sued under promissory notes which purported to have been executed jointly by the defendant and her nephew. The defendant denied liability and alleged that she had been defrauded by her nephew. The plaintiff thereupon sought the appointment of a receiver. The Lord Chancellor said at p.1032-3:

"No positive unvarying rule can be laid down as to whether the Court will or will not interfere by this kind of interim protection of the property. ........... But where the object of the Plaintiff is to assert a right to the property of which the Defendant is in the enjoyment, the case is necessarily involved in further questions. The Court by taking possession at the instance of the Plaintiff may be doing a wrong to the Defendant; in some cases an irreparable wrong. If the Plaintiff should eventually fail in establishing his right against the defendant, the Court may by its interim interference have caused mischief to the defendant for which the subsequent restoration of the property may afford no adequate compensation. In all cases, therefore, where the Court interferes by appointing a receiver of property in the possession of the Defendant before a title of the Defendant is established by decree, it exercises a discretion to be governed by all the circumstances of the case.

When the evidence on which the Court is to act .....is very clear in favour of the Plaintiff, then the risk of eventual injury to the Defendant is very small, and the Court does not hesitate to act. Where there is more of a doubt, there is of course more of difficulty; the question is one of degree, as to which, therefore, it is impossible to lay down any precise and unvarying rule........."

29.   It is apparent from that passage that whilst a receivership order may be expected in a clear case with a small risk of injury to the Defendant those are not the only cases where a receivership order may be obtained. I am therefore unable to accept Mr. Trace's submission that a clear case and small risk of injury are always required. That submission does not faithfully reflect what was said in *Owen v Homan*.

30.   *Owen v Homan* did not consider the grant of a Receivership Order in support of a Freezing Order (such an order did not then exist) but the three modern cases to which I have referred did. The latter cases may therefore be considered as better guides to the appropriate exercise of the court's discretion in this case than *Owen v Homan*.

31.   I was also referred to authorities from other jurisdictions, in particular the Australian cases of *Ballabil Holdings Pty Ltd. v Hospital Products Ltd.* (1985) 1 NSWLR 155 and *National Australia Bank v Bond Brewing Holdings* [1991] VLR 386 and the Singaporean case of *Wallace Kevin James v Merrill Lynch International Bank* [1998] 1 SLR 785.

32.   In *Ballabil Holdings Pty Ltd. v Hospital Products Ltd.* Street CJ observed that if the jurisdiction to appoint a receiver pending determination of a claim existed "it would obviously require a most exceptional case for it to be exercised, bearing in mind the grave consequences which ensue to a company placed under receivership."

JSC BTA Bank v Ablyazov [2010] EWHC 1779 (Comm) (16 July 2010)                     Page 6 of 30

33.  In *National Australia Bank v Bond Brewing Holdings* the Appeal Division of the Supreme Court of Victoria emphasised that particular caution is required when a receiver is sought over all of a defendant's assets.

> "...the appointment of a receiver in such a case authorises an irresistible invasion and that even if the army of occupation is withdrawn after only a short time things may never be the same again.....No court will make such an order unless convinced of its necessity. A case for some kind and degree of interlocutory relief may be made out which falls short of this extremely drastic remedy; for example, the court may not be satisfied – and it is of course for the applicant to persuade the court that nothing less than what he seeks will do – that in all the circumstances it should do more than grant an injunction. At times the court will be induced to refuse the remedy of a receiver by undertakings offered by the defendant."

34.  That approach was followed by the Court of Appeal of Singapore in *Wallace Kevin James v Merrill Lynch International Bank* .

35.  These authorities from other common law jurisdictions highlight the damage which a receivership order may cause. They therefore emphasise that good reason must be shown to appoint a receiver and that in all cases the consequences to the defendant must always be carefully weighed in the balance before concluding that it is just and convenient to appoint the receiver.

<u>The matters relied upon in the present case</u>

36.  Mr. Smith QC, counsel for the Bank, relied upon 13 matters in support of his submission that the Receivership Order was just and convenient. They may be reduced to 8 (because some are different aspects of the same point) as follows:

> i) The Bank has a good arguable case that Mr. Ablyazov has defrauded it of huge sums of money and there is a serious risk that Mr. Ablyazov will dissipate his assets.

> ii) The structure by which Mr. Ablyazov holds his assets is "more than a paradigm example" of the sort of case which cries out for a Receivership Order. In particular, the nominees who act for Mr. Ablyazov do whatever Mr. Ablyazov requires and use is made of corporate structures in jurisdictions "renowned for their secrecy and light regulation."

> iii) Mr. Ablyazov has breached the Freezing Order.

> iv) Mr. Ablyazov's disclosure of his assets has been evasive which has been underscored by his failure to reveal dealings in his assets.

> v) The Restricted Information regime (by which information disclosed by Mr. Ablyazov can only be seen by those advising the Bank, rather than the Bank itself) is a serious fetter on the ability of the Bank to police the Freezing Order and there is reason to believe that Mr. Ablyazov has an ulterior motive for insisting on the Restricted Information regime, namely, seeking to ensure that the Bank does not learn that other bad "loans" made by the Bank were in connection with assets now claimed by Mr. Ablyazov.

> vi) Drey, the Fourth Defendant, sought to assert the privilege against self-incrimination in circumstances which suggested money laundering offences by Mr. Ablyazov.

> vii) The proposed Receivership Order is proportionate and reasonable.

> viii) There is no good reason for not making the Receivership Order.

<u>Good arguable case and risk of dissipation</u>

37.  These two matters reflect my decision to continue the Freezing Order on 12 November 2009. On that occasion Mr. Ablyazov did not contend that the Bank lacked a good arguable case that Mr. Ablyazov had defrauded the Bank of $295m. ("the Drey Proceedings"). The position on the present applications (after some discussion) is the same save that Mr. Ablyazov contends that the Bank does not have a

good arguable case with regard to its proprietary claim and he has now issued an application to stay the Drey Proceedings (and presumably the other two sets of proceedings brought against him, namely, the Chrysopa Proceedings and the Tekhinvest Proceedings) on the grounds that they are an abuse of the process of the court. Mr. Ablyazov maintains that he has good defences not only to the Drey Proceedings but also to the other two sets of proceedings issued in this court. However, no argument was addressed to me on the merits of either the claims or the defences (save with regard to the proprietary claim in the Drey Proceedings). In those circumstances I shall proceed on the basis that the Bank has a good arguable claim in each of the three sets of proceedings. With regard to the proprietary claim in the Drey Proceedings I shall comment on that later in this judgment. Mr. Trace has reserved Mr. Ablyazov's right to argue on any future application that the Bank lacks a good arguable case.

38.   In my judgment of 12 November 2009 [2009] EWHC 2840 (Comm) I held that there was a real risk that Mr. Ablyazov's assets would be dissipated prior to trial; see paragraphs 10-19 of that judgment.

39.   So far as I am aware there was no appeal against my decision to continue the Freezing Order. Mr. Trace submitted that a risk of dissipation by itself was insufficient justification for making a Receivership Order. I agree. That finding underpins the Freezing Order. In order to show that a Receivership Order is just and convenient it will usually be necessary to show that the Freezing Order does not provide the claimant with adequate protection against the risk of dissipation. Mr. Trace further submitted that whatever may have been the position on 12 November 2009 the position now is that there is no risk of dissipation because Mr. Ablyazov has "bared his soul" with regard to his assets and the Court can "trust" him to obey the Freezing Order. Whether this is so can only be determined after I have considered the other matters relied upon by Mr. Smith.

The structure by which Mr. Ablyazov holds his assets

40.   It is common ground that the structure by which Mr. Ablyazov holds his assets makes it difficult for anyone who wishes to identify and seize his assets to do so. The structure also enables Mr. Ablyazov to instruct his nominee to dispose of an asset or to transfer an asset from one offshore company controlled by the nominee to another, also controlled by the nominee. However, Mr. Ablyazov says that this structure was not designed to keep creditors at bay but to keep his assets free from the unlawful depredations of President Nazarbayev. That is not accepted by the Bank. I cannot determine that particular dispute on this application. The question I must decide on this application is whether, whatever the reasons were for the creation of the structure, there is a real risk that Mr. Ablyazov will use the structure to deal with his assets in breach of the Freezing Order with the aim of ensuring that there are no assets on which the Bank can execute any judgment it obtains in this court.

41.   Mr. Ablyazov has said in his Third Witness Statement dated 16 April 2010 that he finds "the suggestion that I would dissipate my assets so as to thwart an English judgment both ludicrous and offensive." He wishes "to make it absolutely clear that I would never knowingly breach an Order of the English Court." Whether I can trust that assurance depends upon the other matters relied upon by Mr. Smith.

Breach of the Freezing Order

42.   Although Mr. Smith's Skeleton Argument and the witness statements of his instructing solicitor Mr. Hardman suggested that there had been several breaches of the Freezing Order, only two were relied upon by Mr. Smith in his oral submissions. The reason why Mr. Smith's oral submissions were restricted in this way is that until 11 December 2009 Mr. Ablyazov was entitled to dispose of or deal with assets outside England and Wales so long as the total of his assets whether in or outside England and Wales remained above £175m. Since the Bank is not in a position to assess whether Mr. Ablyazov's assets had that value on the evidence currently available it is not in a position to allege a breach with regard to dealings before 11 December 2009. However, for the reasons given in my judgment on that date the Freezing Order was amended so that he could only deal with his assets so long as the total value of his assets within England and Wales exceeded £175m. Mr. Ablyazov does not claim to have assets of that value in England and Wales. Thus disposals or dealings in assets after that date will be a breach of the Freezing Order unless they are "in the ordinary and proper course of any business conducted by Mr. Ablyazov personally."

43.   The first breach of the Freezing Order alleged by Mr. Smith was in relation to the sale of Mr. Ablyazov's interest in Omsk Bank. The second was the use of the proceeds of sale to acquire Tier 2 subordinated debt in BTA Moscow.

44.   Mr. Ablyazov held an interest in Omsk Bank through a nominee and, in particular, four companies

Rikas Finance, TuranAlem Capital, Delta Torg and AMK-Invest. Those four companies sold their shares in Omsk Bank on 22 January 2010. The proceeds of sale were used to purchase debt in BTA Moscow on 11 February 2010.

45.   Mr. Ablyazov has explained the circumstances in which these transactions took place in his Second Witness Statement dated 16 March 2010 as follows. The shares in Omsk Bank were owned by BTA Moscow (as to 19.99%), Rikas Finance (19.99%), TuranAlem Capital (19.92%), Delta Torg (18.98%) and AMK Invest (9.99%). The remainder were held by other parties unconnected with the dispute between the Bank and Mr. Ablyazov. BTA Moscow had a branch in Omsk and so was a competitor of Omsk Bank. It decided in 2007 to divest itself of its shares in Omsk Bank and concentrate on building the business of BTA Moscow. The Claimant Bank had a nominee on the board of BTA Moscow, Mr. Yuldashev, who was aware of this strategy. It was always intended that when BTA Moscow sold its shares in Omsk Bank, the four companies controlled by Mr. Ablyazov would do the same. In January 2010 the sale was completed. BTA Moscow received US$2.9m. for its shares, Rikas Finance received US$2.6m. for its shares, TuranAlem received US$2.6m. for its shares, Delta Torg received US$2.5m for its shares and AMK Invest received US$1.3m. for its shares. On 11 February 2010 the four companies purchased subordinated debt in BTA Moscow which carries interest at 10% and, in Mr. Ablyazov's view, was a "less risky investment than the holdings in Omsk Bank."

46.   Although the Bank does not accept that these transactions were in the ordinary course of the companies' business or of any business conducted personally by Mr. Ablyazov, Mr. Ablyazov's account of the transactions has not been challenged (save that some of the detail has been questioned by Mr. Hardman in his Fifteenth Witness Statement dated 11 May 2010 to which Mr. Ablyazov replied in his Fourth Witness statement dated 17 May 2010). With regard to the purchase of subordinated debt in BTA Moscow Mr. Hardman has referred to credit ratings of BTA Moscow which suggest that it is a very risky investment. He suggests that in any event the correct comparison is between the cash received for the sale of the shares and the subordinated debt in BTA Moscow.

47.   Mr. Matthews QC, who argued the Clarification Application on behalf of Mr. Ablyazov (which encompassed the question of breach) submitted that the sale of Omsk Bank and the purchase of debt in BTA Moscow were transactions in the ordinary course of business and so were not forbidden by the Freezing Order.

48.   The Clarification Application raised a question of construction of the Freezing Order which it is convenient to deal with in the present context.

49.   Paragraphs 4 and 5 of the Freezing Order prohibit Mr. Ablyazov from dealing with any of his assets, including those which he has the power directly or indirectly to dispose of or deal with as if they were his own. He is to be regarded as having that power if a third party holds or controls an asset in accordance with his direct or indirect instructions.

50.   Paragraph 9 states that the Freezing Order does not prohibit Mr. Ablyazov from dealing with his assets "in the ordinary and proper course of any business conducted by him personally." I refer to this as the *Angel Bell* liberty (see *Iraqi Ministry of Defence v Arcepey Shipping (The Angel Bell)* [1981] 1 QB 65).

51.   Having regard to the purpose of a Freezing Order, namely, to prevent a defendant from dissipating his assets in order to evade enforcement of a judgment rather than to prevent a defendant from dealing with his assets in the ordinary and proper course of business, the natural construction of paragraph 9 is that it applies to all assets otherwise caught by the Freezing Order, that is, those defined in paragraphs 4 and 5 of the Order. This is the construction for which Mr. Matthews contends on behalf of Mr. Ablyazov.

52.   Mr. Smith contends on behalf of the Bank that although the assets of a company in which Mr. Ablyazov is an indirect but controlling shareholder are caught by paragraphs 4 and 5 of the Freezing Order it is the company that carries on the business and not Mr. Ablyazov. Accordingly, the *Angel Bell* liberty in paragraph 9 does not apply because that only applies to dealings which are in the ordinary and proper course of a business conducted by him personally. Thus, on Mr. Smith's construction of the Freezing Order, there are assets caught by the Freezing Order which cannot be dealt with even if it is sought to deal with them in the ordinary and proper course of business. This seems to me to be a construction of the order which is unwarranted by the purpose underlying a Freezing Order.

53.   I consider Mr. Smith's construction of the Freezing Order to be mistaken. Paragraph 5 of the Freezing Order provides a very wide definition of the assets of a defendant. They include not only assets owned

by him in his own name but also assets in respect of which he has the power, directly or indirectly, to dispose of or deal with as if they were his own. This wide definition is necessary because companies and individuals "hold" their assets and conduct their businesses not only in their own name but, for a variety of reasons, through other entities in which they hold a controlling interest. If a narrow definition of assets were adopted, so that only assets held in the name of the defendant were included within the definition, it would be easy for companies and individuals to avoid the reach of a Freezing Order. However, it has long been recognised, ever since the decision in *The Angel Bell* [1981] 1 QB 65, that a Freezing Order is not intended to prevent a defendant from dealing with his assets in the ordinary and proper course of his business. Where a defendant holds his assets and conducts his business in his own name he will be entitled, notwithstanding the Freezing Order, to deal with his assets in the ordinary and proper course of his business. Where a defendant holds his assets and conducts his business through other entities in which he holds a controlling interest there is no reason, having regard to the principle underlying a Freezing Order, why he should not be able to deal with those assets in the ordinary and proper course of his business, notwithstanding that the "dealing" is in the name of the entity which nominally holds the asset and conducts the business.

54.    The position would be different where a defendant is a minority shareholder in a company and so does not control it. The assets of that company would not be within the extended definition of assets found in paragraph 5 of the Freezing Order. The defendant would not have the power, directly or indirectly, to deal with the assets of the company as if they were his own. Thus the assets of the company would not be caught by the Freezing Order. Similarly any dealing with the assets of the company in the ordinary and proper course of business would be in the ordinary and proper course of the business of the company and not of the defendant. The *Angel Bell* provision would not apply but there would be no need for it to apply.

55.    Mr. Smith seeks, by his construction of the Freezing Order, to obtain the benefit of the wide definition of asset in paragraph 5 of the Freezing Order (which is reflective of the way in which many assets are held and business conducted in the modern world (which makes considerable use, for example, of nominee off-shore companies) but then, when applying the *Angel Bell* provision, seeks to revert to a bygone world in which assets are held and business conducted only in the name of the defendant. This construction is, in my judgment, contrary to the underlying purpose and rationale of the Freezing Order. There is no justification in that underlying purpose and rationale for preventing a defendant, who conducts his business through other entities which he controls, from dealing with assets which he holds through those entities in the ordinary and proper course of that business.

56.    The Bank's further case is that Mr. Ablyazov does not conduct any business personally. Whilst he causes money to be applied in the purchase of assets and has power to deal with those assets Mr. Ablyazov was not, it is said, conducting a business when he exercised that power. Holding and managing one's own assets is not, it is said, the conduct of a business. The Bank further says that Mr. Ablyazov has not established that the sale of Omsk Bank and the purchase of debt in BTA Moscow was in the ordinary course of business because there is no evidence that any similar sale has been effected before. Finally the Bank contends that the purchase of debt was an exceptionally poor investment and so not in the ordinary course of business.

57.    Mr. Ablyazov holds a valuable portfolio of assets through a complex structure involving a nominee, a holding company, subsidiary companies and, at the base of the structure, the operating business. Mr. Smith submitted that holding and managing one's assets is not the conduct of a business but is the holding and managing of one's assets.

58.    This submission raises both a question of law and a question of fact. The question of law is the proper construction of "the ordinary course of business" in the *Angel Bell* liberty. The question of fact is whether Mr. Ablyazov conducts a business.

59.    In my judgment the answer to the question of law is to be found in *Normid Housing v Ralphs and Mansell* [1989] 1 Lloyd's Reports 274. Lloyd LJ, when referring to the *Angel Bell* principle at p.276 lhc, said :

> "But the principle extends beyond the payment of debts, or the incurring of ordinary living expenses. It applies also to all ordinary transactions in the course of life."

60.    A little later, on p.276 rhc he said:

> "I do not propose myself to offer any definition of what is meant by "ordinary course of

business". It can, perhaps, best be regarded as the obverse of the concept of dissipating a defendant's assets."

61.  The *Angel Bell* liberty should therefore be construed widely and not narrowly. As such it should be construed as extending to the activity of holding and managing assets so long as it is not aimed at dissipating a defendant's assets. The distinction is drawn by Robert Goff J. in *The Angel Bell* itself at [1981] 1 QB 65 at pp.71-72:

> "…the point of the Mareva jurisdiction is to proceed by stealth, to pre-empt any action by the defendant to remove his assets from the jurisdiction. To achieve that result the injunction must be in a wide form because, for example, a transfer by the defendant to a collaborator in the jurisdiction could lead to the transfer of the assets abroad by that collaborator. But it does not follow that, having established the injunction, the court should not thereafter permit a qualification to it to allow a transfer of assets by the defendant if the defendant satisfies the court that he requires the money for a purpose which does not conflict with the policy underlying the Mareva jurisdiction…"

62.  I therefore conclude that there is no reason in principle why the activity of holding and managing assets should not be regarded as a business (for the purposes of the *Angel Bell* liberty) so long as it is not aimed at ensuring that any judgment obtained against a defendant will be unenforceable. If it is so aimed then it conflicts with the policy underlying a Freezing Order and should be prohibited. A claimant is entitled to be protected against such "artificial" dealings. But where a sale of assets takes place for reasons which are not aimed at ensuring that any judgment will be unenforceable, for example because the defendant wishes to reduce his holdings in a particular sector, the defendant may conduct such sale. Similarly, the Freezing Order will prevent the defendant from handing the proceeds of sale to a collaborator for the purpose of protecting them from being seized by a judgment creditor. But if the defendant uses the proceeds to purchase another asset to add to his portfolio of assets in the ordinary course of managing that portfolio such action does not conflict with the policy underlying the Freezing Order and is not prohibited by it.

63.  I therefore reject the narrow or restrictive interpretation of "business" in the *Angel Bell* liberty which has, I think, been advanced by Mr. Smith to the effect that it does not encompass the activity of holding and managing one's assets.

64.  But even if such narrow or restrictive interpretation were appropriate in some contexts I am unable to apply it in the present context. Thus, it may be that not everyone who holds and manages his assets can be said to be conducting "a business". A doctor, architect or lawyer may hold and manage a share portfolio but may be said not to be conducting a business in so doing. However, when a person's assets are as large as Mr. Ablyazov says his are, made up of controlling interests in several businesses, it seems to me unrealistic to say that holding and managing his assets is not his business. He manages them, not by managing the operating business at the base of the structure, but by giving instructions to his trusted nominees. It is reasonable to assume that such management occupies a lot of his time. When he provided his affidavit of assets dated 27 August 2009 he said that he had had to cope with "my normal business duties and the effects of the freezing order". That is likely to have been a reference to his business of managing his valuable portfolio of assets. I have taken into account that he has not disclosed any accounts or tax returns in respect of his business but I am unable to accept Mr. Smith's submission that Mr. Ablyazov does not conduct any business personally. On his evidence Mr. Ablyazov is "in business" on a grand scale. In his Third Witness Statement dated 16 April 2010 he said:

> "16. My business interests are varied, but frequently involve the purchase, development and onward sale of commercial companies and other assets. I currently hold interests in various sectors. I have in the past held interests in, for example, media, energy and sugar production businesses.
>
> ………
>
> 181. My business frequently involves purchasing assets which are considered to be good investments, and managing those assets so as to increase their value and realise a profit; such assets are then either sold to realise a profit, or retained if they continue to be a desirable investment. In all cases, those assets are acquired and managed via holding companies, not by me acting as a sole trader."

65. I have also taken into account that there is evidence that Mr. Ablyazov did not until recently rely upon the *Angel Bell* liberty to justify dealings with his assets. Thus Mr. Neocleous, a solicitor acting for Vetabet Holdings Limited, has said that Mr. Ablyazov regarded the amendment to the Freezing Order made on 11 December 2009 as preventing dealings in assets. However, I do not regard this as cogent evidence that Mr. Ablyazov does not conduct a business personally. It seems to me clear that he did but that until recently he did not appreciate that he could rely on the *Angel Bell* liberty to justify his dealing with his assets.

66. I am also unable to accept Mr. Smith's further submission that Mr. Ablyazov is not conducting his business personally when he exercises a power to deal with his assets. If Mr. Ablyazov held shares in his own name in Omsk Bank, as part of a portfolio of business interests which he managed, and decided to sell those shares, for example, as part of a business strategy to move out of banking and in to another business sector, such sale would be in the ordinary course of his business of asset management. If, instead and as is the case on his evidence, he holds his shares in Omsk Bank not in his own name but by means of the structure which he has described the same sale would be in the ordinary course of his business of asset management. He would sell his interest in Omsk Bank, not by selling shares in Omsk Bank in his own name (because he has none) but by instructing his nominee to cause Rikas Finance, TuranAlem Capital, Delta Torg and AMK-Invest to sell their shares in Omsk Bank. In other words, the precise mechanism by which Mr. Ablyazov holds and deals with his assets does not determine the question whether he is conducting his business when selling an asset.

67. The important question, in the context of a suggested breach of the Freezing Order, is whether the transactions in question were or were not in the ordinary course of his business. In the light of Mr. Smith's submission that Mr. Ablyazov has not established that the sale of Omsk Bank and the purchase of debt in BTA Moscow were in the ordinary course of business it is necessary to consider the burden of proof. That question was considered by Moore-Bick J. in *Nokia France v Interstone* [2004] EWHC 272 (Comm) at paragraphs 53-54. He held that the burden was on the person who alleged a breach, and therefore a contempt, of the Freezing Order, to establish such breach in "every essential respect". I respectfully agree. On the true construction of the Freezing Order a dealing in the ordinary course of the defendant's business is not a breach of the Freezing Order. The person who alleges a breach must therefore prove that the dealing in question was not in the ordinary course of business.

68. The only evidence before the court as to the circumstances in which Mr. Ablyazov's interest in Omsk Bank was sold comes from Mr. Ablyazov. His evidence is to the effect that the four companies controlled by him were always going to sell their shares in Omsk Bank when BTA Moscow sold its shares in Omsk Bank. BTA Moscow appears to have been considering selling its shares in Omsk Bank for some time for what it considered were sound business reasons. There is no evidence to the contrary and no basis on which I can reject that evidence. There is no evidence that the sales by the four companies were aimed at putting Mr. Ablyazov's interest in Omsk Bank beyond the reach of the Bank if and when it has the opportunity of executing a judgment against Mr. Ablyazov.

69. It was said that there is no evidence that any similar sales had been effected in the past. However, in principle I do not consider that this needs to be shown; cf *Normid Housing v Ralphs and Mansell* [1989] 1 Lloyd's Reports 274 at p.276 rhc per Lloyd LJ and p.278 lhc per Slade LJ. A transaction may be in the ordinary course of business even though it is done only once.

70. My conclusion, based on the evidence of Mr. Ablyazov which has not been challenged in this respect, is that the sale of his interests in Omsk Bank was in the ordinary course of his business.

71. With regard to the purchase of subordinated debt in BTA Moscow the Bank advanced a positive case that this was an exceptionally poor investment. The evidence set out in Mr. Hardman's Fifteenth Witness Statement as to the views of credit agencies supports this. In addition, Mr. Hainsworth, who founded a credit agency focussing on Russian banks and who has provided an opinion for Mr. Ablyazov, has described BTA Moscow as "balanced on a knife edge".

72. The mere fact that an investment is an exceptionally poor investment does not mean that it cannot be made in the ordinary course of business. A similar point arose in *Normid Housing v Ralphs and Mansell* where a firm of architects settled a claim. Paraphrasing the language used in that case by Ralph Gibson LJ at p.277 rhc and Slade LJ at p.278 rhc, the test is whether the investment is so inexplicable and unreasonable that there appears to be no reason why Mr. Ablyazov might have sensibly made the investment so that one can conclude that it was done in bad faith as part of a plan to cheat the Bank.

73.  BTA Moscow is one of a number of assets in respect of which Mr. Ablyazov has declared ownership. It may well be that the proceeds of sale of Omsk Bank would be safer had they remained in cash and that using them to purchase subordinated debt in BTA Moscow is fraught with risk. But Mr. Ablyazov has said that the purchase of debt in BTA Moscow assists it to maintain its required capitalisation. In circumstances where Mr. Ablyazov is using the cash to provide funds to an ailing bank which he owns I am unable to find that the purchase was not in the ordinary course of his business. The Bank has adduced no evidence that the purchase of debt in BTA Moscow was aimed at putting the proceeds of sale beyond the reach of the Bank rather than being aimed at supporting BTA Moscow.

74.  For these reasons I am unable to accept that Mr. Ablyazov has acted in breach of the Freezing Order with regard to the sale of his interests in Omsk Bank and in his dealings with the proceeds of sale.

Disclosure

75.  At an earlier stage in these proceedings I ordered that Mr. Ablyazov be cross-examined as to his affidavit of assets on the grounds that his disclosure appeared at that stage to be inadequate. Much has happened since then. Mr. Ablyazov has been cross-examined for two days and he has provided a much fuller account of his assets in his Third Witness Statement dated 16 April 2010 at paras. 259-378. Mr. Smith has severely criticised Mr. Ablyazov's approach to disclosure of his assets. He says that the initial disclosure was incomplete and that some of his evidence when cross-examined was misleading. He invites the court to find that Mr. Ablyazov did not consider himself to be constrained to give the Bank (and the Court) a complete picture of his assets such that he cannot be trusted to obey the Freezing Order. By contrast Mr. Trace submitted that whatever the defects in the initial list of assets Mr. Ablyazov has now "bared his soul" and can be trusted. Although a great many points were made in Mr. Smith's Skeleton Argument and even more by Mr. Hardman, his instructing solicitor, in his witness statements I shall concentrate on what appear to be the four most significant. They are (a) the initial disclosure of assets, (b) the "Schedule C" disclosure, (c) the failure to mention certain dealings with the assets and (d) the trust deeds.

(a) The initial disclosure of assets

76.  Mr. Ablyazov's initial list of assets attached to his affidavit dated 27 August 2009 (but delivered on 30 September 2009 after the Court of Appeal had dismissed his appeal from my order dated 21 August 2009) can now be compared with his Third Witness Statement in which he has identified a number of assets which are held by means of the structure to which I have already referred.

77.  It is helpful to illustrate the structure by reference to an example. In his initial list of assets no.15 was an "indirect interest in Blackdesert Holdings Limited", a British Virgin Islands company, valued at approximately US$50m. No clue was given as to the business or assets of Blackdesert Holdings Limited; and no explanation was given as to the nature of Mr. Ablyazov's indirect interest in Blackdesert Holdings Limited save that the documents supplied with the list included a share certificate stating that 5000 shares in Blackdesert were held by Handcart Investments Limited and a further share certificate stating that 10000 shares in Handcart were held by Company A. It was in those circumstances that cross-examination was ordered.

78.  Mr. Ablyazov has stated in his Third Witness Statement that the business or asset at the bottom of the structure ("the operating business") was Eurasia Tower, a tower block in Moscow comparable to Canary Wharf in London. When Mr. Ablyazov acquired the site in 2004 it was a "bare site". When finished it will be the tallest building in Europe made of steel and will have 75 storeys consisting of shops on the ground floor, office space to the 49th floor and apartments above. Some 50 storeys have so far been built. That asset was owned by a Russian company called ZAO Tekhinvest. Shares in Tekhinvest were owned by a Cypriot company, Company P. 99.9% of the shares in Company P were held by Blackdesert. 50% of the shares in Blackdesert were held by Handcart Investments Limited and 50% by MCG International Holding Limited, a company not owned by Mr. Ablyazov but by Mr. Pavel Fuchs. Thus the Eurasia Tower project was a joint venture between Mr. Ablyazov (through Handcart) and Mr. Fuchs (through MCG). Shares in Handcart were held by Company A on trust for a nominee who in turn held them on trust for Mr. Ablyazov.

79.  I have asked myself whether Mr. Ablyazov could reasonably have been expected to give the information provided in his Third Witness Statement as to Eurasia Tower in his affidavit of assets dated 29 August 2009 bearing in mind the circumstance that the Freezing Order had been served on him in London that month where, unable to speak English, he had only recently sought refuge with his family, having hurriedly left Kazakhstan.

10-10638-jmp    Doc 59-5    Filed 12/30/10    Entered 12/30/10 17:22:23    Exhibit 5
JSC BTA Bank v Ablyazov [2010] EWHC 1779 (Comm) (16 July 2010)    Page 13 of 30

Page 30 of 53

80.  Eurasia Tower was one of his "assets". If it is comparable to Canary Wharf it is unlikely that he did not know he had a valuable share in it. Indeed he does not claim to have been ignorant of it. He in fact held a 50% interest in it through the chain I have described. He must also have known that a nominee held or controlled that interest on his behalf. Again he does not claim to have been ignorant of that. Mr. Ablyazov accepts in his Third Witness Statement that he knew "the big picture of the assets in which I have an interest".

81.  Although a refugee in London he had access to and advice from an experienced City solicitor, Clyde and Co. It seems to me that there are substantial grounds for concluding that he could reasonably have been expected, when informing the Bank's solicitors of his assets, to have informed them of at least two matters. First, he could reasonably have been expected to have informed them of the role of his nominee. He was Mr. Ablyazov's only direct link to Eurasia Tower. This nominee held shares in Handcart, via Company A, on trust for Mr. Ablyazov. His role as a trusted nominee was Mr. Ablyazov's most valuable asset. Second, he could reasonably have been expected to have informed the Bank's solicitors of the operating asset at the bottom of the structure, namely, Eurasia Tower in Moscow.

82.  Why did he not mention these two matters but instead mention only his interest in a British Virgin Islands company, Blackdesert, in the middle of the chain and provide documents evidencing the holding of shares in that company by Handcart and in Handcart by Company A? Making every allowance for the position in which Mr. Ablyazov found himself in August 2009 there are substantial grounds to believe that the likely explanation is that he wished to give away as little information as possible about his assets and so make it difficult for the Bank's solicitors to enforce the Freezing Order. Without knowing who held shares in Company A (a nominee) and what his role was (nominee for Mr. Ablyazov), it would be difficult for the Bank's solicitors to identify how Mr. Ablyazov controlled Blackdesert. Without knowing what Blackdesert owned or controlled it would be difficult for the Bank's solicitors to identify the operating asset at the bottom of the chain. The position in relation to the other assets "disclosed" by Mr. Ablyazov in August/September 2009 is similar though in relation to one he did reveal the operating asset.

83.  I have noted that Mr. Ablyazov has apologised to the court for the inadequacy of the information as to his assets provided in August/September 2009, that he has said that he had no intention of doing anything other than abiding by the orders of the court and that he has further said that he is extremely concerned that his disclosure has been criticised by the court. He does not feel that he was well served by Clyde and Co. However, even if Mr. Ablyazov did not know "the details of the holding structure" and even if "given the relatively complex nature of these holdings, [he did] not hold all the information in [his] head" that does not, it seems to me, provide an explanation for his failure to identify, in relation to Eurasia Tower, first, the role of the nominee and second, Eurasia Tower itself. They are the "big picture".

84.  I note that reliance has been placed by Mr. Bercow, of Stephenson Harwood, the solicitors now acting for Mr. Ablyazov, on what was said by Mr. Smith on 4 November 2009 in response to a question from me. It is said that he conceded that it was not necessary for Mr. Ablyazov to disclose the operating asset. However, in the light of what has now been disclosed by Mr. Ablyazov as to his assets I consider that the underlying asset should have been disclosed in circumstances where the holding company is simply the vehicle for holding that asset. The position is to be contrasted with a case where a defendant owns shares in a company which he does not control and which owns many assets.

85.  I have noted that Mr. Ablyazov is very concerned that he is being "painted" by the Bank as a dishonest person and that no such conclusion should be reached by the court until he has given evidence at this trial. The present applications are made at the interlocutory stage of the proceedings. No findings can be made with regard to the issues to be resolved at trial. On this application for a Receivership Order the court has to consider whether there is a real risk that the Bank may not obtain from the Freezing Order the protection against artificial dissipation of assets to which it is entitled. In that context it is relevant to consider, on the written evidence presently before it, whether there is a serious possibility that Mr. Ablyazov might have omitted to tell the Bank of the role of his nominee and the operating assets in order to make it difficult for the Bank to enforce the Freezing Order. If there is such a serious possibility that is a reason in favour of making a Receivership Order. On the written material presently before the court that is a serious possibility. There are, as I have said, substantial grounds to believe that Mr. Ablyazov wished to make enforcement of the Freezing Order difficult. However, at trial when the question of Mr. Ablyazov's honesty with regard to the Drey, Chysopa and Tekhinvest transactions (and it seems other transactions) will be in issue there will, I have no doubt, be far more evidence, including, in particular, oral evidence from Mr. Ablyazov which the court will have to consider and weigh before reaching any conclusion as to honesty.

<u>(b) The Schedule C disclosure</u>

86.  The original defects in the disclosure of Mr. Ablyazov's assets have now been remedied by Mr. Ablyazov in his Third Witness Statement. That is the basis of Mr. Trace's submission that Mr. Ablyazov has "bared his soul". Mr. Smith does not accept that he has bared his soul and submits that Mr. Ablyazov has omitted to disclose his interest in a number of other companies which are mentioned in what is known in this case as the Schedule C disclosure.

87.  As part of the Freezing Order Mr. Ablyazov was required to answer questions concerning what had happened to $295m. paid by the Bank to Drey. This information was required to enable the Bank to trace and recover those monies. This is the Bank's "proprietary" claim. In response information was given and illustrated by a chart showing what had happened to the monies. This is the Schedule C disclosure.

88.  The chart indicated that very substantial sums were paid out to various companies and on to others within a very short period of time. But the chart also indicated that $215m. had found its way back to Bank. Although not initially accepted by the Bank enquiries have confirmed that that is true. $215m. appears to have been paid back to the Bank in discharge of loans made by the Bank to the companies who paid back the $215m. However US$41.1m paid to FM Company is still "missing". (A further US$30m. paid to Estar Developments Limited was also said to be missing but the Bank has recently stated that it found its way back to the Bank for a short period of time).

89.  Mr. Smith submits that Mr. Ablyazov must have an interest in the companies receiving and making these payments, which interest has not been disclosed. His reasons for making that submission are these:

    i) Mr. Ablyazov could not otherwise have known or ascertained this information.

    ii) The speed and sequence of the payments would be incredible if the recipients were independent third parties.

    iii) Mr. Ablyazov has not disclosed any consideration or assets received in return for the payments made.

90.  When cross-examined Mr. Ablyazov denied any interest in the many companies mentioned in the chart other than Drey, Devesta, Company Z, AMK Invest and Company Y. He said that the chart had been provided by Mr. Y but he was no longer in touch with him. He did not know why $41m. had been paid by Drey to FM Company or why $30m. had been paid to Estar Developments Limited.

91.  In his Third Witness Statement he confirmed that his source of information was Mr. Y and that "since around September 2009" he has been unable to reach him. Mr. Y is said to be extremely concerned for his own safety.

92.  There appears to be some force in the points made by Mr. Smith. In the absence of any other explanation it seems likely that the reason why substantial payments were made quickly though a number of companies without, it appears, any assets or consideration being received in exchange is that the monies were being routed through companies in which Mr. Ablyazov was interested. Even allowing for Mr. Ablyazov being a very rich man and for his reliance on Mr. Y with whom he is no longer in contact it is surprising that he cannot say why $41m. and $30m. of his own money were paid to FM Company and Estar Developments. By contrast he was able to say why $5.75m. had been paid to Julia Seliverstrova, namely, the payment of a debt.

93.  This point was taken further when the Swift reports of the payments totalling $215m. which were ultimately paid to the Bank were analysed. That analysis revealed a number of connections between them and Mr. Ablyazov, including the following:

    i) Payments were made by allegedly independent companies from accounts with Trasta Komercbanka in Latvia or BTA Moscow ie the same banks which received the funds under the compensation agreements on behalf of Drey.

    ii) There were many links of incorporation and addresses between those companies.

iii) There were numerous connections of addresses between those companies and offshore companies of Mr. Ablyazov.

94.  I gave Mr. Ablyazov leave to put in a further statement dealing with this matter if he wished. I asked Mr. Trace for his response to Mr. Smith's submission that Mr. Ablyazov must have an interest in the companies making and receiving the payments in the schedule. His answer did not address Mr. Smith's submission. Rather he said that he had not understood the point being made and that Mr. Ablyazov would deal with the matter in further evidence.

95.  Thus Mr. Ablyazov provided his Seventh Witness Statement. He explained the various connections identified by study of the Swift reports as follows. Trasta Komercbanka is a leading bank in Latvia and is often used by businessmen both within and outside the CIS so there is nothing significant in that bank being used for making payments. BTA Moscow was used as a correspondent bank by Trasta Komercbanka. Offshore companies are used by many businesses and the same agents are often used. There is therefore nothing surprising in the companies listed in the schedule as having common addresses amongst themselves or with Mr. Ablyazov's companies. This explanation has been summarised by Mr. Trace in his further written submissions dated 18 June 2010 at paragraph 9.

96.  The explanation has been considered and rejected by those advising the Bank. Mr. Hardman has given further evidence about this matter in his Sixteenth Witness Statement dated 29 June 2010 and Mr. Smith has made detailed submissions on the topic at pp.4-8 of his further written submissions also dated 29 June 2010. There is a considerable dispute as to the inferences which may or may not properly be drawn from powers of attorney having been granted to persons in the Schedule C companies who also hold powers of attorney over companies controlled by Mr. Ablyazov.

97.  The Seventh Witness Statement of Mr. Ablyazov went further as Mr. Trace suggested it might. Mr. Ablyazov elaborated on the role of Mr Y and on his role in preparing the Schedule C answers. He said that Mr. Y arranged for short term loans from third parties and for the repayment of such loans. Mr. Y also made payments when assets were purchased by Mr. Ablyazov. He estimated that in any one year Mr. Y would handle payments between $500m. and $1b. Bearing those matters in mind he suggested that the various payments in the schedule prepared by Mr. Y are likely to represent the repayment of loans or payment for the purchase of assets (as was the case with Mrs. Seliverstrova). He suggested that the payment of $41.1m. to FM Company might have been in part a repayment of a loan and in part a repayment to Mrs. Seliverstrova by way of the purchase for her of a company from FM Company. He stated that it is not surprising that he is not able to look at the figure of $41.1m and be reminded of what the sum relates to. He maintains that he does not own directly or indirectly any of the companies in the schedule save for those in which he has already declared an interest.

98.  Mr. Ablyazov's Seventh Witness Statement seeks to answer the main thrust of Mr. Smith's submission though his evidence seems to be no more than informed speculation and the reasons for the payments of over $70m. to FM Company and Estar must remain in doubt. Mr. Smith has submitted that the speculation is implausible for reasons developed at paragraphs 4-13 of his written submissions dated 29 June 2010. Mr. Hardman goes further and appears to doubt even the existence of Mr. Y; see paragraphs 22-23 of his Sixteenth Witness Statement.

99.  Whilst Mr. Smith has identified reasons for doubting Mr. Ablyazov's explanation it would be a remarkable and brazen lie for Mr. Ablyazov to deny his interest in companies whose names were disclosed by Mr. Ablyazov himself in Schedule C. It would also be a remarkably stupid lie in circumstances where his honesty will be in issue at trial. In the result I am not persuaded on this application that Schedule C in fact lists other companies in which Mr. Ablyazov has an interest which he has not disclosed and refuses to disclose. Equally, I am not persuaded that Mr. Ablyazov has indeed "bared his soul" as to his assets. The most that I can say is there is a reasoned suspicion that he has not disclosed all his assets.

100.  But his explanation also reveals a remarkable state of affairs, namely, that Mr. Y, with whom Mr. Ablyazov is no longer in contact, has very considerable power over Mr. Ablyazov's funds. This emphasises the need for a receiver to be appointed in relation to the Bank's proprietary claim in respect of (at least) the missing $40m. paid to FM Company. (The $30m. payment to Estar has now been found to have made its way back to the Bank where it remained for a short period before being paid out to ABN Amro on a trade finance transaction.) Mr. Ablyazov has now denied owning Devesta, a company recorded by him as having made substantial transfers of the sums first paid to Drey. This apparent change of evidence (which he attributes to a mistranslation or a failure on his part to express himself) also emphasises the need for a receiver to be appointed.

101.   There is one other dispute I should mention in the context of whether Mr. Ablyazov has declared all his assets. I mention it in order to illustrate not only the Bank's efforts to uncover undisclosed assets of Mr. Ablyazov but also the difficulty of reaching any conclusion on the basis of the evidence adduced. Mr. Smith and Mr. Hardman say that Mr. Ablyazov has an interest in Glintmill Investments which he has not disclosed and which he has either sold or is on the market. Glintmill is said to hold (or to have held) a 70% interest in Gainsford Investments which in turn holds an indirect interest in the construction of the Holiday Inn hotel and EXPO centre in Belgrade. Mr. Ablyazov denies ever having had an interest in Glintmill.

102.   The Bank's evidence that Mr. Ablyazov has such an interest comes from discussions between two Serbian investors (who claimed to be the owners of the other 30% interest in Gainsford) and a representative of the Bank in Moscow in April 2009. Also in attendance at the meeting, apparently, was an officer of the KNB, the Kazakhstan security service. The Bank's case is supported by contact between the Serbian investors and Mr. Hardman in January 2010 and an arrangement to meet them after they had had a meeting with Clyde and Co. But such a meeting has been denied by Clyde and Co. and the meeting with Mr. Hardman was cancelled. Reliance is also placed by Mr. Smith on what has been said in certain Cypriot proceedings in relation to what might be the Glintmill investment by a lady who appears to have been imprisoned for 10 days, placed under house arrest, was in a depressed state and feared punishment by law enforcement authorities. After she had cooperated with the authorities the charges against her were dismissed. I am quite unable to resolve the dispute as to whether Mr. Ablyazov has an interest in Glintmill on this application.

(c) Failure to mention dealings in assets

103.   Mr. Smith submitted that the answers given by Mr. Ablyazov during his cross-examination were misleading. He submitted that Mr. Ablyazov failed to mention (i) the sale agreement in respect of his interest in the Eurasia Tower and (ii) the sale of his interest in BTA Kazan. Criticism has also been made of his failure to mention certain negotiations for the sale of assets. The Vitino Sea Port was mentioned in this context. I do not consider that much if anything can be made of a failure to mention negotiations.

(i) Eurasia Tower

104.   In his Third Witness Statement served on 16 April 2010 Mr. Ablyazov revealed that an agreement for the sale of his interest in Eurasia Tower had been made on 15 September 2009 for $50m. The purchaser was Mr. Fuchs. It was varied on 26 November 2009 and on 1 December 2009 the first tranche of $20m. was paid and title passed to the purchaser. The balance remains to be paid.

105.   Although the sale agreement was made on 15 September 2009 before Mr. Ablyazov's list of assets was disclosed on 30 September 2009, that list had been prepared and provided to Clydes at the end of August 2009 in accordance with my order. Mr. Ablyazov was cross-examined as to his list of assets on 27 October and 18 November 2009.

106.   On 27 October he said that Blackdesert owned a construction project which was presently frozen and that his share was valued at $50m. He did not mention that that was indeed the sale price which he had recently agreed for the sale of his share.

107.   On 18 November he said "I own 50% of Blackdesert." He did not mention that he had agreed to sell it.

108.   On 15 December 2009 Clyde and Co., who were then acting for Mr. Ablyazov, provided further information as to Mr. Ablyazov's assets. With regard to Blackdesert certain documents (trust deeds and share certificates) were referred to and it was stated that "Handcart Investments owns 50% of the shares in Blackdesert Holdings Limited." But as of the date of this letter this information was not correct. The title to the shares in Blackdesert had passed to Mr. Fuchs on 1 December.

109.   The question which arises is whether Mr. Ablyazov's failure to mention the sale until April 2010 is sinister in the sense that he deliberately avoided mention of it so that the Bank's solicitors would not learn of the sale and the sale proceeds.

110.   Mr. Ablyazov's explanation in his Third Witness Statement is that he did not expect Mr. Fuchs to pay the agreed price. Mr. Fuchs said he would pay by the end of September and then by 15 October and then again by 1 November.

> "At the time of my second cross-examination in November, I thought that the possibility of this asset being transferred to Mr. Fuchs was small if not non-existent, and accordingly the prospect of such a transfer is not something that it would have occurred to me to mention."

111.    In his Fourth Witness Statement he said that he understood the purpose of the cross examination was to ask him about the statements he had made in his affidavit of assets. As to Clydes' letter dated 15 December he said he could not remember whether or not he saw and approved the letter but even if he had he said that he would have assumed that it related to his assets as at the date of the original Freezing Order.

112.    Mr. Ablyazov's obligations under the Freezing Order were, by 27 August 2009, to inform the Bank's solicitors, to the best of his ability and after making all reasonable enquiries, of "the location, nature and value of all his assets……giving the value, location and details of all such assets." Since the sale agreement of his share in Blackdesert was not made until 15 September he was not required to mention that agreement when providing his affidavit to Clyde and Co. on 27 August (as he was required to do pending his appeal to the Court of Appeal). Ultimately, Mr. Smith did not submit that there was an implied obligation under the Freezing Order to update information as to assets. It seems to me that since breaches of the Freezing Order are punishable as a contempt a party's obligations pursuant to an order should be set out expressly. I agree with the suggestion in *Gee on Commercial Injunctions* at paragraph 22.017 that the information should be up to date at the time of service of the affidavit. However, since the affidavit was provided to Clyde and Co. on 27 August but not served on Lovells until 30 September after the dismissal of the appeal it would have been an awkward submission to make that there had been a breach of duty in this respect.

113.    I think that caution should be exercised in criticising Mr. Ablyazov's answers in cross-examination which were given through an interpreter. Moreover, as at the date of both sessions of cross-examination he still owned, indirectly, 50% of Blackdesert and, because the sale agreement was not known to Mr. Smith, he was not asked about any sale. Nevertheless, I find it surprising that he did not mention the sale agreement. He mentioned a valuation of $50m. but did not mention that that was the price at which he had agreed to sell his interest. On the evidence presently available it appears that he did not tell Clyde and Co. about the sale. If he had told Clyde and Co. they would surely have made reference to it in their letter dated 15 December to ensure that their letter was not misleading. As a result the Bank, or more correctly, the Bank's advisers believed until April 2010 that Mr. Ablyazov owned 50% of Blackdesert and therefore of Eurasia Tower. In fact, after the second cross-examination and before Clydes' letter of 15 December, title had passed and Mr. Ablyazov had received US$20m. which was used on 3-4 December to discharge obligations to another company (which obligations were entered into on 10 October 2008, a guarantee by Handcart of payment obligations owed by Company E).

114.    Mr. Ablyazov has not denied that he failed to inform Clyde and Co. of the sale. The significant question for present purposes is whether there are substantial grounds to believe that Mr. Ablyazov chose not to inform Clyde and Co. and the Bank (or rather its solicitors) as to the sale of his interest in Blackdesert because he did not wish the Bank's solicitors to know about the sale and that he had received $20m. I consider that there are substantial grounds to believe, on the material currently before the court, that this was his purpose. It fits with his earlier inadequate disclosure which made the task of the Bank's advisers to enforce the Freezing Order very difficult. His suggestion that he thought that the (exclusive) focus of attention was his assets as at the date of the Freezing Order seems to me most improbable. There is evidence from Mr. Neocleous that Mr. Ablyazov considered that dealings in his assets were injuncted after the Freezing Order was amended on 11 December 2009 and that he did not, at that time, appreciate the significance of the *Angel Bell* liberty. This may explain why Clyde and Co. were not informed.

(ii) BTA Kazan

115.    According to Mr. Ablyazov his interest in this bank was sold "in October 2009". Yet when cross-examined on 18 November 2009 he referred to the interest in BTA Kazan without mentioning that it had been sold the previous month. He said that Company F "owns" 34% of BTA Kazan. Nor was any mention of the sale made in Clyde and Co.'s letter dated 15 December 2009 which asserted that Company F owns Company G which in turn owns 50% of TuranAlemCapital which in turn "holds" 14.8% of BTA Kazan. Further shares in BTA Kazan were held in similar fashion through other companies. The proceeds of sale were used to purchase subordinated debt in BTA Moscow.

JSC BTA Bank v Ablyazov [2010] EWHC 1779 (Comm) (16 July 2010)                    Page 18 of 30

116.    Mr. Ablyazov has not denied that he failed to inform Clyde and Co. of the sale. Again, as with Eurasia Tower, the question is whether there are substantial grounds to believe that Mr. Ablyazov chose not to inform Clyde and Co. and the Bank (or rather its solicitors) as to his sale of his interest in <u>Company F</u> because he did not wish the Bank's solicitors to know of the sale and that he had received the proceeds of sale. As with Eurasia Tower, there are substantial grounds to believe that this was his purpose. It fits with his earlier inadequate disclosure which made the task of the Bank's advisers to enforce the Freezing Order very difficult.

117.    Mr. Matthews submitted that there was evidence that this sale was not a secret. The Claimant Bank had been wishing to merge it into BTA Moscow. This did not take place and since February 2009 there has been deadlock because Mr. Ablyazov owed 51% of BTA Kazan and the Claimant Bank owned 47% of it. Eventually Mr. Ablyazov sold his shares to companies controlled by Mr. Pukhlikov, who has interests in oil and gas. Mr. Hardman has himself referred to a press release issued by BTA Kazan referring to the sale. However, it is not clear to me from Mr. Ablyazov's evidence that the sale was known to the Claimant Bank before the issue of the press release. That press release is dated 30 November 2009.

118.    Whilst, in the light of the press release, any expectation Mr. Ablyazov had of keeping the sale secret was unlikely to be realised, there remain grounds to believe that this was his aim.

    (d) Trust deeds

119.    A curious, Mr. Smith would say extraordinary, aspect of this case is the production of written trust deeds evidencing the relationship between Mr. Ablyazov and a nominee between the initial disclosure of assets and the completion of cross-examination. Mr. Ablyazov said, when cross-examined on the second occasion, that he dictated them in Russian to a nominee who prepared them in English and sent them to him through the post. It would appear that Clyde and Co. were not involved. Mr. Ablyazov states in his Third Witness Statement that "the creation of these trust deeds was intended to show transparency and as an act of good faith in this litigation. They formalised an existing relationship."

120.    Mr. Ablyazov's account of the manner in which the trust deeds were produced is surprising. It is difficult to accept that he dictated the terms of these trust deeds in Russian to his nominee. It is also difficult to accept that his nominee translated them into English, for that nominee has now provided a witness statement in which he states that he speaks Russian and that the statement was translated into Russian for him. It now appears that at least one trust deed was in existence by 7 August 2009. If the deeds dated in October 2009 were produced on Mr. Ablyazov's instructions it seems to me more likely that he requested that they be produced in the form of the trust deed already in existence (but which was not disclosed with the initial list as it ought to have been). However, this is speculation. The important question is whether there was anything sinister in their production. Their production, after an affidavit of assets and before cross-examination as to that affidavit, is certainly unusual. Further, one would have expected someone in Mr. Ablyazov's position to have consulted Clyde and Co. about the need to produce them and whether it was wise to do so. There is no evidence that he did. Mr. Trace submitted that their execution is not consistent with a desire on the part of Mr. Ablyazov to evade the court's judgment or put obstacles in the way of enforcement. There seems to me some force in this. The trust deeds provide a written record signed by the nominee of his trustee status. Without them there would be no record (save in one, perhaps two, cases) that he held shares on trust for Mr. Ablyazov. Thus the production of the trust deeds would seem to assist rather than frustrate enforcement of any judgment. Mr. Smith did not, I think, suggest in what way, if any, their production might frustrate enforcement. In those circumstances I am not persuaded that the production of the trust deeds suggests that Mr. Ablyazov is likely to disobey the Freezing Order.

121.    Having reviewed the main criticisms on disclosure I have concluded that Mr. Ablyazov's initial disclosure and his failure to mention certain dealings with his assets to Clyde and Co. and hence to the Bank's advisers provide good reason to believe that the Freezing Order will, or may, not provide the Bank with adequate protection against the risk of dissipation of Mr. Ablyazov's assets prior to trial.

    The Restricted Information regime

122.    This regime was ordered by the Court of Appeal after it had been suggested by the Bank as a solution to Mr. Ablyazov's concerns as to information about his assets reaching the President of Kazakhstan via the Bank. I decided to continue it.

123.    There have been two successful applications to relax it, one concerning the Schedule C disclosure and

the other concerning four assets already in the pubic domain. Once the Schedule C disclosure was made known to the Bank it was learnt that the companies who had repaid $215m. to the Bank still owe the Bank some $642m. Once the Bank learnt of the four assets it was learnt that substantial sums had been borrowed from the Bank to purchase three of those assets. This has given rise to the suspicion that Mr. Ablyazov has an ulterior motive for insisting on the Restricted Information regime. However, Mr. Ablyazov clearly has his own reasons for insisting on the regime, namely his fears concerning the President of Kazakhstan, and I cannot, on this application, find that those reasons are bogus.

124.  It is likely that the regime impedes the ability of the Bank's solicitors and other advisers to police the Freezing Order, for they are unable to discuss the disclosure with the Bank. But I do not consider that that is an adequate reason for making the Receivership Order.

Drey's claim that it was exposed to criminal proceedings

125.  Drey attempted to rely upon the privilege against self-incrimination when ordered to give disclosure of its assets. It claimed that it might incriminate itself of an offence contrary to section 328 of the Proceeds of Crime Act 2002 of becoming concerned in an arrangement which facilitates the acquisition, retention, use or control of criminal property by or on behalf of another person. It is said that other person must have been Mr. Ablyazov since he owns and controls Drey which circumstance suggests a high risk of dissipation of assets. I am not sure that the other person must have been Mr. Ablyazov though if it were not him it must have been another company owned or controlled by him. But a risk of dissipation is in any event suggested by the fraud alleged against Mr. Ablyazov. I do not consider that the circumstance of Drey claiming privilege against self-incrimination materially adds to that risk.

The reasons for a Receivership Order

126.  In summary therefore the circumstances which give reason to believe that the Freezing Order may not provide the Bank with adequate protection against the risk that Mr. Ablyazov's assets will be dissipated prior to any judgment that the Bank obtains are as follows:

>   i) His initial disclosure of his assets can now be seen to have been seriously inadequate in that he failed to mention the crucial role of a nominee and the nature of the operating assets (save for one). There are grounds for believing that he wished to make it difficult for the Bank to enforce the Freezing Order.

>   ii) There are grounds to believe that his failure to mention the sale of Eurasia Tower to Clyde and Co. was to avoid the Bank's solicitors learning of the sale and that $20m. had been received in part payment.

>   iii) There are grounds to believe that his failure to mention the sale of BTA Kazan to Clyde and Co. was to avoid the Bank's solicitors learning of the sale and that the proceeds of sale had been received, though this was unlikely to succeed in the light of a press release by BTA Kazan.

127.  Those matters give rise to a real risk, in my judgment, that Mr. Ablyazov may use the structure by which he holds his assets to deal with them in breach of the Freezing Order. He has said that he will not do so and no breach has yet been proved but in the light of his prior conduct I am unable, on this application, to be sure that he will not do so in the future. There is therefore good reason for making the Receivership Order. It follows that I am unable to accept Mr. Trace's submission that whatever the position may have been in November 2009 there is no longer a risk of dissipation of assets.

128.  The unexplained whereabouts of at least $40m. paid out to Drey provide good reason for making the Receivership Order in support of the Bank's proprietary claim.

129.  However, all the circumstances of the case must be considered before a final decision can be reached as to whether it is just and convenient to make the Receivership Order.

The proposed receivers and method of operation

130.  The proposed receivers are Mr. Outen and Mr. Milsom who are partners in KPMG and Mr. Standish who is an associate partner in KPMG.

131. No criticism has been made of their experience but they have been criticised for an absence of pre-planning. However, they were only given access to the Restricted Information on 21 April 2010. It may be that instead of agreeing to carry out the receivership the more prudent response would have been to be decline to say whether or not they could carry out the receivership until they had been given access to more information. However, their expression of willingness to carry out the receivership before having access to that information probably reflects their wish to do the work rather than an absence of the necessary professional skill and care.

132. The proposed strategy is to seek to obtain control of Mr. Ablyazov's assets by obtaining control of the shares in the companies at the top of each chain which leads down to an operating business. The receivers do not envisage carrying on that business save with the consent of the court. The strategy has been described by them in these terms:

> "…[B]y securing the corporate structure we should be able to preserve the assets to a greater degree than currently exists and without directly intervening in the day to day management of the businesses in which [Mr. Ablyazov] has an interest."

133. In addition they wish to "follow and secure the sums transferred by the Bank to [Drey]". Although they "do not anticipate becoming involved in the day to day management of the underlying operating businesses" they do intend to

> "monitor the performance of the businesses on a regular basis in order to ensure that the value of [Mr. Ablyazov's] interest is not being improperly diminished or dissipated".

134. They envisage the co-operation of Mr. Ablyazov in this respect so as to "mitigate or eliminate the risk of knowledge of our appointment being widely disseminated or misunderstood." In the absence of such co-operation they may meet "an operational challenge".

135. The draft receivership order contains wide terms designed to enable the above objectives to be achieved. In particular Mr. Ablyazov is to be obliged to "deliver or cause to be delivered to the Receivers such of the Property as is in his possession, under his control or in respect of which he has the power to dispose or deal" (see para.9(a)). In addition he is to "deliver or cause to be delivered to the Receivers all share certificates ……." (see para.9(b)). Further, nominees are to be instructed to execute share transfer forms in the names of the receivers (see para.9 (d).

136. The strategy of the proposed receivers appears to me to be an attempt to do that which is necessary to secure the operating assets and no more. That is a reasonable and proportionate approach. It is plain that the strategy depends on Mr. Ablyazov's obligation to co-operate with the receivers. Nevertheless, the draft order imposes on Mr. Ablyazov wide obligations which may not be capable of fulfilment having regard to his evidence in this case. For instance unless he remains in touch with all his nominees he may not be able to comply with the order. The draft order requires him to give instructions to Mr.Y. On Mr. Ablyazov's evidence it is unclear how he is to do that. There seems to me a case for the order being in terms of best endeavours rather than the absolute obligation which might be appropriate in other contexts.

137. Mr. Trace submitted that if the envisaged strategy were the limit of what is intended a receivership order would not be required. Instead, an order for further information and disclosure from Mr. Ablyazov and confirmations from third parties would be required. Consistent with that submission Mr. Ablyazov has offered the court an undertaking in the following terms:

> "to use his best endeavours as soon as reasonably practicable to (i) procure letters to be written by the Companies in Schedule 1 and the individual nominees in Schedule 2 in the forms annexed hereto……and (ii) provide to the Court and Hogan Lovells LLP the most recent financial statements of the companies listed at Schedule 5."

138. The form of proposed letters from the companies provide for confirmation that the writer is aware of the Freezing Order, confirmation as to the ownership of shares, a list of the assets of the company and confirmation that no transfer of shares will be registered and that the assets will not be disposed of. The form of proposed letter from the nominees identifies assets held by the nominee and confirms that he is aware of the Freezing Order and that the assets will not be disposed of.

139. Whilst this undertaking would enable the first part of the strategy to be fulfilled it does not envisage

delivery up to the receivers of the documentation held by the third parties which records or proves their title to the shares in the relevant companies. Delivery up of such documentation of title appears to me to be an essential step in the receivers assuring themselves that they have control of the relevant companies. I therefore accept Mr. Smith's submission that the undertaking does not go far enough.

140. Mr. Trace has submitted (in paragraph 14(1) of his written submissions dated 18 June 2010) that some title documentation has been disclosed. However, delivery up of documents of title is different from disclosure. As to delivery up it has been suggested that it "engages potential tax and regulatory questions" (see paragraph 18 of those submissions). They have not been identified and it has not been explained why the receivers cannot hold the relevant share certificates in order to ensure control of the corporate structure.

141. Mr. Trace also submits, with the support of Mr. Christopher Morris, someone with great experience as a receiver, that the proposed receivership will be expensive and time consuming and that knowledge of the receivers' appointment will spread down the chain with the consequent risk of damage to Mr. Ablyazov's assets. It is said that the proposed receivership is likely to lead, ultimately, to the receivers assuming control of the operating businesses and thereby causing considerable damage to them and to Mr. Ablyazov. Mr. Trace submits that the costs of the receivership, bearing in mind that "this litigation and connected proceedings are likely to continue for years" are likely to be "huge".

142. The costs of the receivership and the risk of damage to the operating businesses and hence to Mr. Ablyazov are highly material factors to bear in mind when deciding whether it is just and convenient to make the Receivership Order. There clearly is a risk that the costs of the receivership will be very substantial indeed. The three receivers are likely to have a team assisting them. Proposed hourly rates run from £220-£695 per hour in London and from £190 to £590 per hour in Moscow. They have engaged Freshfields to advise them on legal matters. There must also be a risk that the Receivership Order will be perceived as a form of insolvency procedure which is likely to be damaging to the operating businesses and to Mr. Ablyazov. In weighing these risks I have taken into account the following considerations on the other side of the balance:

> i) It is not in the interests of the receivers to damage either the operating businesses or Mr. Ablyazov. Their role and duty is to preserve his assets, not to damage them. I would therefore expect that they would strive to limit the damage which might be caused by assuming control of the operating assets through control of the companies at the top of the respective chains.

> ii) Mr. Ablyazov will be obliged to co-operate with the receivers. The greater the degree of co-operation the less the risk of damage to the operating businesses and to himself.

> iii) Particular powers or provisions requested in the draft order may be excluded with liberty to apply to include them at a later stage. Thus the draft provides that a further order of the court is required before the receivers may manage a company's business.

> iv) The Bank must give an undertaking in damages. At present fortification of that undertaking by way of a £5m. bond is offered. If greater fortification is required Mr. Smith has invited the court to bear in mind that companies controlled by Mr. Ablyazov still owe very considerable sums to the Bank. Thus in respect of Project D, the Oceanarium, Business Centre 1812, Paveletskaya and Project E, large sums are owed to the Bank. He has suggested that Mr. Ablyazov in effect already has security in those amounts. A charge can be created by the Bank to ensure that he has the benefit of that security.

143. Mr. Trace has submitted that, if the Receivership Order is made, fortification in the sum of about £900m. should be required. This has been assessed by assessing Mr. Ablyazov's assets at about $5b. and assessing the loss likely to be caused by the Receivership Order at about 50% of that, namely, $2.5b. 50% of that sum is then "taken to represent the possible loss of value in relation to the assets as a whole", reducing the sum to $1.25b. (I am not sure I understand that step in the analysis. It may be that it is intended to represent a loss in value which might occur in any event.) In sterling terms that amounts to £870m. to which must be added a sum for the costs of the receivership over two years, giving a total of £900m.

144. It is obvious that Mr. Trace has used an exceptionally broad brush. But it is difficult to estimate the losses which might be suffered by reason of the Receivership Order (which is itself a reason for exercising great caution before making the Order) and Mr. Smith has not identified the route by which

£5m. is thought to be an appropriate sum for the purposes of fortification. Given the size and possible value of Mr. Ablyazov's assets fortification in the sum of £5m. may well be inadequate. Equally, £900m. does not seem to me to reflect either the receivers' duty to preserve rather than damage the assets or the ability of Mr. Ablyazov to minimise any damage by co-operating with the receivers. The court must, if it can, make a realistic or intelligent estimate of the harm which may be caused to Mr. Ablyazov. If the court cannot predict with certainty what loss will be caused the court must at least ensure that the cross-undertaking has real value. The court should take the course which is least likely to lead to an injustice; see *Bloomsbury International Limited and others v Holyoake and others* [2010] EWHC 1150 (Ch) at paragraphs 13,16, 17 and 30.

145.    Mr. Trace has further questioned the enforceability of the charge offered by Mr. Smith as security. He has suggested that it might not be enforceable having regard to the fact that the Bank "is subject to an insolvency procedure in Kazakhstan". Such a charge may offend the *pari passu* principle. The Bank has now adduced evidence from White and Case Kazakhstan LLP to the effect that any claim to enforce such a charge would not be subject to the "restructuring" process underway in Kazakhstan and that "under the current situation of the Bank and the proposed restructuring arrangements there are and should be no impediments to the Bank granting security in this way". In response Mr. Ablyazov has adduced evidence from Professor Maggs to the effect that Article 158 of the Civil Procedure Code may render the proposed charge unenforceable. Further, if the Bank were placed into bankruptcy the administrator would have broad powers to rescind the proposed charge.

146.    Having considered the receivers' strategy and the submissions of Mr. Trace I do not consider that the strategy is such that a Receivership Order should be ruled out. However, it will be necessary to examine carefully the terms of the proposed order and the extent to which the Bank's undertaking should be fortified.

147.    Mr. Ablyazov has informed the Court and the Bank in his Sixth Witness Statement that he has appointed a nominee as sole director of certain companies in the various chains of companies. Mr. Smith has described this as "a blatant attempt to undermine the application by ensuring that a person whom Mr. Ablyazov trusts will stand between the receivers and the valuable assets at the bottom of the chains." By contrast Mr. Trace submits that this appointment ought to be "a source of reassurance, rather than concern" for the Bank. It is impossible for me to say which submission is correct. All that I can say is that whilst the appointment is a striking illustration of the manner in which Mr. Ablyazov can control the companies in the various chains of companies it also illustrates that cooperation by Mr. Ablyazov, in the form of appropriate instructions to his nominee, will reduce the risk that the receivership order will cause damage to Mr. Ablyazov and his assets.

Other reasons for not making the Receivership Order

(a) The political backdrop

148.    Mr. Trace submitted, on the basis of extensive evidence from Mr. Ablyazov and others independent of him, that the President of Kazakhstan wishes to eliminate Mr. Ablyazov as a political force and so stifle democratic opposition. Mr. Trace has further submitted that the Bank is under the control of the President and that the actions before this court are motivated by an illegitimate intention to cause damage to Mr. Ablyazov's reputation and interests and so weaken him as a political opponent. It is necessary to note that Mr. Ablyazov has issued an application to stay the proceedings against him on the grounds that they are an abuse of the process of this court. The application was issued on 23 April 2010, that is after the receivership application was issued but before it was heard. Mr. Trace has submitted that if there is any risk of what he says is the illegitimate intention of the President and the Bank to damage Mr. Ablyazov being advanced by the Receivership Order then the Court should refuse to make it.

149.    The Bank denies that its claims are motivated by an illegitimate intention to damage Mr. Ablyazov and weaken him as a political opponent of the President of Kazakhstan. The Bank has adduced evidence that it is in very serious financial difficulties and that it is seeking, with the consent of its major Western creditors, to recover monies wrongfully misappropriated from it by Mr. Ablyazov for, in part, the benefit of those creditors. Mr. Smith submitted that the existence of a political dispute between the President of Kazakhstan and Mr. Ablyazov is not a good reason for allowing Mr. Ablyazov to keep monies which have been wrongfully misappropriated by him from the Bank.

150.    It is not possible for the court to make findings on this hearing as to the motivation behind the Bank's actions in this court against Mr. Ablyazov. There is a stark conflict of evidence. On the one hand the

Bank has adduced evidence that it is seeking to recover those sums for the benefit of its creditors and it has not been disputed that the Bank has a good arguable case that Mr. Ablyazov has defrauded it of very considerable sums of money. On the other hand Mr. Ablyazov has adduced evidence that he has been the target of unlawful action by the President of Kazakhstan and that the board of directors of Samruk-Kazyna which now owns 75% of the Bank is headed by persons appointed by the President. He denies the claims which have been brought against him and says that they are politically motivated.

151. The submissions of Mr. Trace and Mr. Smith as to how the court should deal with the political backdrop to this receivership application were simple and straightforward. Mr. Trace said that the court should guard against the risk that its processes are being used for improper collateral purposes by refusing the application. Mr. Smith said that the political backdrop was irrelevant.

152. By contrast with the simplicity of counsel's submissions I have found this aspect of the case difficult, perhaps because the submissions of counsel were so simple, and worrying, because of the seriousness of the allegations on both sides. Having considered the matter I do not feel able to accept the submissions of either counsel as to how to deal with the political backdrop to this application. My approach to this aspect of the case is as follows.

> i) Freezing orders are granted where the claimant has a good arguable case. They are not denied because the defendant has an arguable defence. Since the Receivership Order is sought in support of the Freezing Order which has been granted in this case it also should not be denied merely because Mr. Ablyazov has an arguable defence.

> ii) The court cannot, in determining the receivership application, determine the question whether the proceedings before this court are an abuse of its process. That will have to be determined when the court hears the stay application. Indeed, it is accepted by Mr. Trace that the court cannot on this application make findings in relation to the stay application.

> iii) If the court were to refuse to make the Receivership Order on the grounds that there is a risk that such an order might advance the illegitimate ends of the President of Kazakhstan, as submitted by Mr. Trace, the court would, in effect, be saying that the outcome of the receivership application should await the determination of the stay application. Mr. Trace did not suggest that in terms. If he had done so I have no doubt that the suggestion would have been resisted by Mr. Smith on the grounds that directions for hearing the receivership application were given in order to ensure that the application was heard as promptly as was consistent with justice, without any suggestion being made that the hearing of the application should be adjourned pending the determination of the stay application. The court should therefore seek to determine the receivership application on its merits.

> iv) However, the fact that a stay application has been issued and will therefore have to be determined is not something which I can regard as irrelevant. For if the stay application were hereafter to succeed it would follow that the Receivership Order, if granted, would have to be rescinded. This is therefore a further reason why the undertaking in damages must be of real value.

(b) Human Rights

153. Mr. Trace also submitted that the grant of the Receivership Order would give rise to serious interference with Mr. Ablyazov's rights under the European Convention on Human Rights.

154. He first referred to Mr. Ablyazov's right under Article 1 of the First Protocol to the peaceful enjoyment of his possessions and his right not to be deprived of his possessions except in the public interest. Mr. Trace submitted that the Receivership Order must therefore be justified and proportional. He said that if the Freezing Order strikes a fair balance between the rights of Mr. Ablyazov and the rights of the Bank not to be deprived of the opportunity to enforce a judgment in this action by reason of illegitimate dissipation of assets, then the further restriction on Mr. Ablyazov's rights as owner imposed by the Receivership Application would neither be justified nor proportional. Mr. Trace accepted, however, that this was not a different test from that which the court would in any event apply when deciding whether the Receivership Order was just and convenient. It reinforced that test.

155. Mr. Trace next referred to Mr. Ablyazov's rights under Article 8 of the Convention to respect for his private and family life. He submitted that the requirement in paragraph 12 of the proposed Receivership Order to attend upon the receivers at all times and do all such things "as the receivers may reasonably require for the purpose of getting in the Property and carrying out their functions" was extraordinarily wide and constituted a very substantial interference with his private life. It therefore required clear and compelling justification and must be proportionate. It was submitted that the Bank's interests are adequately protected by the Freezing Order and therefore that the interference with his private and family life inherent in paragraph 12 could not be justified. Mr. Trace again accepted that his reliance on Article 8 reinforced the court's general approach to the making of a receivership order in the circumstances of this case. (I would add that if the making of a Receivership Order is just and convenient, and therefore justified and proportionate, because adequate protection is not provided by the Freezing Order, a requirement that Mr. Ablyazov do such things as the receivers may *reasonably* require is unlikely to be disproportionately wide.)

156. Finally, Mr. Trace relied upon Mr. Ablyazov's right to a fair trial under Article 6 of the Convention. He submitted that the grant of Receivership Order would involve the effective "determination" of Mr. Ablyazov's "civil rights and obligations" where there was a risk of irreversible damage to his business. In those circumstances it was submitted that he was entitled to have an opportunity fully to test the evidence being adduced against him in support of the application. This required the cross-examination of the Bank's witnesses. The court should therefore require the Bank, if it is contemplating making the Receivership Order, to tender its witnesses for cross-examination. Upon the assumption that Mr. Ablyazov's Article 6 rights are engaged by the receivership application I am not persuaded that those rights required, in the context of this interim application, the opportunity to cross-examine the Bank's witnesses. No authority was cited in support of that submission. I consider that the form of hearing adopted for determining the receivership application, namely, one which provided for written (and voluminous) factual and expert evidence and for oral submissions (over 4 and a half days) on that material, enabled there to be a fair trial of the receivership application.

157. Thus, although it is necessary that the Court be informed of the interaction between the receivership application and Mr. Ablyazov's rights under the European Convention on Human Rights (because the Court is under a legal obligation not to act inconsistently with his Convention rights) it does not appear that recognition of those rights would lead to any different conclusion from that which would flow from considering whether it was just and convenient to make the Receivership Order. I shall, however, in addition to considering whether it is just and convenient to make the order, consider whether such an order is justified and proportionate having regard to Article 1 of the First Protocol and Article 8 of the Convention.

(c) The proprietary claim

158. Part of the Receivership Order concerned the Bank's proprietary claim to some $80m. Mr. Trace submitted that this claim was fatally flawed. The Bank relies upon the expert evidence of Kazakh law from Mr. Markov. Mr. Ablyazov relies upon the evidence of Mr. Newton and, because Mr. Newton's experience was called into question, on Professor Maggs. I have therefore had regard to the evidence of Mr. Markov for the Bank and Professor Maggs for Mr. Ablyazov.

159. The dispute is whether Kazakh law recognises a proprietary claim to electronically transferred money. Mr. Markov says that it does pursuant to Chapters 15 and 48 of the Civil Code. Professor Maggs says that Chapter 15 concerns identifiable physical property and so does not extend to electronically transferred money. He says that the claim provided by Chapter 48 cannot be described as proprietary because the transferor retains no interest in the fund until the court provides a remedy.

160. I do not have to decide this dispute. All that I have to decide is whether the Bank has a good arguable claim to a proprietary claim. Having considered the rival expert reports and counsel's submissions I consider that it does.

Conclusion

161. Although Mr. Ablyazov has stated that he will obey the orders of this Court that statement has to be considered in the light of his conduct in this action. He has stated that he can be trusted but I have to have regard not only to what he has said but also to what he has done. Consideration of his conduct with regard to disclosure of his assets in August/September 2009 and of his failure to inform Clyde and Co. of dealings in the Eurasia Tower and BTA Kazan has left me unable to trust him not to deal with his assets in breach of the Freezing Order.

162.  Something more than the Freezing Order is therefore necessary to assure the Bank of the protection it is entitled to. A Receivership Order ought to ensure that protection. But a receivership of all of Mr. Ablyazov's assets is invasive and carries with it a risk of damage to those assets and to Mr. Ablyazov's interests. His freedom to buy, manage and sell his assets in the ordinary course of business will be curtailed and he will only be able to do so with the consent of the receivers or of the court. I have therefore asked myself whether something less than a receivership could give the Bank adequate protection such as a freezing order strengthened by appropriate undertakings from Mr. Ablyazov. What has been offered in that regard is not sufficient. Letters from the nominees and companies in the asset chain do not go far enough. The nominees and companies are not subject to the jurisdiction of this court and no provision is made for the shares or other evidence of title to be deposited in "safe" hands. It therefore appears that there is no alternative to a receivership.

163.  The risk of damage to Mr. Ablyazov can be reduced in several ways. The Receivership Order is designed to enable the receivers to assume control of the companies at the top of the respective chains. That should serve to limit very substantially the risk of damage to Mr. Ablyazov and the operating businesses for the operating businesses can be operated as before. In principle once share certificates or other instruments of control have been deposited with the receivers the assets should be "secured" and the receivership will have achieved its purpose. Any risk of damage caused by persons becoming aware of the receivership can be reduced by Mr. Ablyazov co-operating with the receivers. He can give appropriate instructions to his nominees and if necessary the operating businesses. In addition it is to be noted that the proposed order does not give the receivers power to carry on the business of a company without a further order of the court. The receivership ought not to interfere with *bona fide* decisions Mr. Ablyazov may wish to take with regard to the management of his investment portfolio. The policy underlying the Freezing Order does not prevent such decisions and there is therefore no reason why the Receivership Order, which is made in support of the Freezing Order, should prevent such decisions. Any disputes between the receivers and Mr. Ablyazov regarding such decisions will have to be resolved by the Court.

164.  It may be that some loss may still be caused. It is difficult to make a realistic or intelligent estimate of such loss in respect of which the Bank may be ordered to compensate Mr. Ablyazov should it hereafter be held that the Receivership Order should not have been granted (because the stay application succeeds or the Bank fails to establish its claims). However, I do not consider that that should lead to a refusal to make the Receivership Order. In the circumstances of this case, in particular the nature of the case against Mr. Ablyazov and the reasons why I am not convinced that he can be trusted to obey the Freezing Order, I consider that despite that difficulty the Receivership Order should be granted.

165.  In view of the financial condition of the Bank the Bank's undertaking in damages must be fortified. I am not satisfied, having read Professor Maggs' report, that any charge which the Bank grants (to ensure that the debts owed by certain of the companies controlled by Mr. Ablyazov can be applied in discharge of any damages which the court should hereafter order the Bank to pay Mr. Ablyazov) will be enforceable. There will therefore have to be some other form of fortification of the Bank's undertaking in damages. The cross-undertaking must be of real value. There must be either a payment into court or a guarantee from a first class bank. I consider that a sum of £25 million would be appropriate having regard to the factors which serve to limit the risk of damage, namely, the proposed strategy and the ability of Mr. Ablyazov to limit any damage by co-operating with the receivers. That is in addition to the £7.5 million that has been provided as fortification of the undertaking in damages given to obtain the Freezing Order. In addition a further sum of £7.5 million should be provided in respect of the costs of the receivership. The sufficiency of the fortification and the sum in respect of costs should be kept under review. Finally, the £5 million bond offered in respect of the receivers' liabilities pursuant to CPR 69.5 should be put in place.

166.  For these reasons I have concluded that it is just and convenient to make the Receivership Order and that such order is justified and proportionate having regard to Article 1 of the First Protocol and Article 8 of the Convention.

167.  The terms of the draft Receivership Order nevertheless require some alteration. Paragraphs 6-8 (and Schedule 2) should be amended to take account of my conclusions as to the appropriate fortification of the undertaking in damages. The obligations in paragraphs 9 (a)-(d) and 11 should, in the light of Mr. Ablyazov's evidence, be ones of "best endeavours" and "as soon as practicable". Paragraph 10 should be amended by deleting the words "and in any event by no later than 7 days after the communication referred to below". Adverse comment has been made by Mr. Trace of paragraph 12 but since it is governed by the phrase "as the receivers may reasonably require" it does not appear to me to be objectionable.

168. There was a dispute as to whether the property which is the subject of the Receivership Order can be ordered to "vest" in the receivers. I consider that it can but of course it would be held subject to the orders of the court. My reasons for so concluding are:

> i) The mere making of a receivership order does not vest the property of the defendant in the receiver; see *Vine v Raleigh* (1883) 24 Ch.D. 238 at p.243, *Claythorpe Properties v Evans* [1986] 1 WLR 1223 at p.1228, *Masri v Consolidated Contractors Int.* [2009] QB 450 at paras.53-54 and *Picarda on Receivers, Managers and Adminstrators* 4th ed. p.439.

> ii) Nevertheless it is open to the court to order that property of the defendant vest in the receiver if that is necessary for the purposes of the receivership. This seems to me to be right in principle and I can see no reason why it is wrong in principle. Although the property may vest in the receiver he holds the asset as directed by the court.

> iii) Mr. Smith did not refer me to any authority where this was specifically held to be the case. He did however refer me to the orders made in *Derby v Weldon*. In that case the Vice Chancellor ordered that assets be "delivered or transferred" to the receiver. In the Court of Appeal such an order was described as "usual"; see *Derby v Weldon* [1990] 1 WLR 1139 at p.1146 per Dillon LJ. At p.1150 Dillon LJ referred to "the traditional view that receivership assets ought to be held solely by the receiver appointed by the court." In some contexts delivery and transfer may refer just to possession. But the order of the Court of Appeal in that case specifically ordered that the defendants procure that certain assets "be vested in the sole name and under the sole control of the Receiver."

> iv) *In re Sacker* (1888) 22 QBD 178 is not an authority to the contrary. It was there held that where an order had been made that a certain sum be paid to the receiver that receiver was not a "creditor" entitled to present a bankruptcy petition. The reasoning is at p.183. "There is no debt due to him from the appellant". I do not regard that decision as authority for the proposition that the court has no power to order that certain assets be vested in a receiver.

169. I therefore see no objection in principle to paragraph 11 of the order or to the powers 3 and 4 in Schedule 4. In the circumstances of the present case where the shares are held by a nominee for Mr. Ablyazov that order and powers are appropriate.

170. I ask the parties to agree the terms of a revised draft order. After judgment is formally handed down Counsel should also address me on the question whether future applications concerning the receivership should be in the Chancery Division or in this court; see para.22 of the draft order.

### The Clarification Application

171. By this application Mr. Ablyazov seeks clarification of the meaning of the Freezing Order, in particular, whether the assets which may be dealt with in the ordinary course of business (the *Angel Bell* liberty) include all of the assets otherwise caught by the Freezing Order. I have already dealt with this matter when dealing with Mr. Smith's allegations of breach; see paragraphs 48-74 above.

172. Mr. Ablyazov also seeks a declaration that certain dealings with assets were not in breach of the Freezing Order, in particular, dealings with BTA Kazan, Omsk Bank, BTA Armenia, Project D, Paveletskaya Station Square and Eurasia Tower.

173. Having regard to my decision to appoint receivers in respect of Mr. Ablyazov's assets this application loses much of its relevance so far as future dealings are concerned because decisions regarding the sale of assets will be in the hands of the receivers and, in the event of dispute, the court. But the application is still relevant so far as past dealings are concerned.

### The past transactions

174. Mr. Ablyazov seeks a declaration from the court that certain transactions were not in breach of the Freezing Order. The Bank says that it would not be appropriate to grant declarations.

175. In so far as Mr. Ablyazov seeks declarations that certain proposed transactions will not be in breach of

the Freezing Order I consider that it would not be appropriate for the court to grant the declarations. Whether or not a transaction is in the ordinary course of business can only be determined when that transaction has taken place.

176. However, where a transaction has taken place and the Bank has asserted that it is a breach of the Freezing Order or questioned whether it is a breach it seems to me that the court ought to resolve the question. Whether or not there has been a breach of the Freezing Order will not be an issue at the trial. In fairness to Mr. Ablyazov there ought to be a means by which he can ascertain whether a transaction, which the Bank does not accept was within the ordinary and proper course of his business, was or was not within it.

BTA Kazan

177. The Bank does not, on this application, say that the sale of Mr. Ablyazov's interests in BTA Kazan in October 2009 to Mr. Pukhlikov was a breach of the Freezing Order because it cannot presently say whether Mr. Ablyazov's assets were or were not at that time in excess of the then maximum sum which applied to the Freezing Order. However, it does not accept that the sale was in the ordinary course of business.

178. Mr. Ablyazov has said in his Second Witness Statement dated 16 March 2010 that the sale was in the ordinary course of his business. He has said that the sale was made pursuant to a long standing strategy of divesting from BTA Kazan. There is no evidence to the contrary. I have already rejected Mr. Smith's arguments to the effect that Mr. Ablyazov did not carry on a business personally. The burden of proof is on the Bank to establish that a transaction was not in the ordinary course of business. It has not discharged that burden of proof. It follows that Mr. Ablyazov is entitled to a declaration that the sale of his interest in BTA Kazan was in the ordinary course of his business.

Eurasia Tower

179. Mr. Ablyazov has set out the circumstances in which his interest in Eurasia Tower was sold in his Third Witness Statement dated 16 April 2010. The events which led to the sale were the withdrawal of a line of credit of US$500m. from Sberbank after the "nationalisation" of the Bank in February 2009. Construction of the project stalled and Mr. Fuchs, who owned the other half of Eurasia Tower, suggested the provision of alternative finance or the sale of Mr. Ablyazov's interest. He began to make offers in April or May 2009. Negotiations continued during the summer of 2009. Sberbank was also making proposals which entailed Mr. Ablyazov buying out Mr. Fuchs and transferring a 25% interest in Eurasia Tower to Sberbank. In September 2009 Mr. Ablyazov agreed to sell his interest to Mr. Fuchs for $50m. Title eventually passed in December 2009.

180. Mr. Ablyazov's account is consistent with the sale being in the ordinary course of his business. There is no evidence to the contrary. He is therefore entitled to a declaration that the sale was in the ordinary course of business.

Omsk Bank

181. I have already rejected the Bank's case that the sale of Mr. Ablyazov's interest in Omsk Bank was not in the ordinary course of business.

182. Declarations are also sought in respect of proposed sales of, or negotiations with regard to, his interests in BTA Armenia, Project D, and Paveletskaya Square. However, as I have already stated I do not consider it appropriate to make declarations until a transaction has actually taken place.

The Passport Application

183. The order for delivery up and retention of Mr. Ablyazov's passport has been in force for over 8 months. The jurisdiction to make such an order was exercised so as to ensure that Mr. Ablyazov complied with the asset disclosure obligations under the Freezing Order. He sought return of his passport by an application dated 14 January 2010. That application has been heard at the same time as the Receivership Application because the Bank says that the continuation of the order is necessary to ensure that he complies with his obligations under the Receivership Order.

184. Mr. Matthews submits that it is not necessary for the order to remain in place. He says there is no risk

that Mr. Ablyazov will leave this jurisdiction. Mr. Ablyazov is now settled here with his wife and three youngest children, two of whom are in school here. The eldest is soon to attend University in London. Mr. Ablyazov has applied for permanent leave to remain here. He has no incentive to leave this jurisdiction because he is contesting the litigation which has been commenced here against him by the Bank. To leave the jurisdiction and ignore his obligations under the Receivership Order would imperil his defence of the proceedings and be wholly contrary to his interests. Mr. Matthews says there is no evidence of any risk that he will leave the jurisdiction and ignore his obligations under court orders.

185.  Mr. Smith submitted that whilst Mr. Ablyazov is presently here there is no evidence that he has any assets here. His cross-examination did not suggest any. He has, however, access to considerable funds, as shown by the quality and quantity of his legal team, and he could easily move to another jurisdiction. If his assets abroad are not "secured" (using that word in a non-technical sense) he may leave this jurisdiction, confident that any judgment given against him cannot be enforced against his assets.

186.  The passport order is an interference with Mr. Ablyazov's freedom to travel. It should only be maintained if it is necessary to ensure that he complies with his obligations under the Receivership Order. I have given this matter anxious consideration. It is an unusual order. However, I am persuaded, in the light of (a) my conclusion that, considering his prior conduct, I am unable to trust him to obey the Freezing Order and (b) the points made by Mr. Smith, that the continuance of the passport order is necessary, at any rate for a short further period. The receivers' first report, which will be due in 6 weeks, is an appropriate and early time to consider whether it should be renewed thereafter. If by then Mr. Ablyazov has taken significant steps to arrange for share certificates in the companies at the top of the asset chains to be held by the receivers it may well be that the passport order should not be renewed. I will therefore continue the order but only until the receivers' first report at which time the Bank, if it wishes the order to be renewed, must apply for an order to that effect.

Conclusions as to the three applications:

187.  (i) The receivership application succeeds; see paragraphs 161-166.

(ii) The clarification application succeeds; see paragraphs 48-74 and 171. Declarations may be made in respect of the sales of BTA Kazan, Omsk Bank and Eurasia Tower; see paragraphs 177-181.

(iii) The passport application fails; see paragraph 186.

188.  I adjourn the hearing pursuant to paragraph 4.3B of the Practice Direction to CPR 52 to enable the form of the order and other matters to be debated on a date to be arranged.

Postcript

Stephenson Harwood's letter to me dated 13 July 2010

189.  By a letter dated 13 July, after I had sent my draft judgment to counsel, the Defendant asked that I postpone giving judgment in this matter on the grounds that he has "after making the necessary enquiries, decided also to offer the provision of share certificates and documents establishing participation rights in the holding and nominee companies (so far as permissible by law) to [Stephenson Harwood] to be held to the Order of the Court." He asked that I should postpone giving judgment pending consideration of this further undertaking and further submissions. It was suggested that there should be a hearing to discuss the terms of the new undertaking. I declined to postpone giving judgment, for these reasons.

190.  When Mr. Smith replied to the submissions made on behalf of the Defendant on 28 May and 8 June 2010 he made the point that no undertaking had been offered to deliver up or supply documents of title or share certificates; see Transcript 28/5/10 at pp.169-170 and Transcript 8/6/10 p.22. That was 5-6 weeks or so ago. Since then there have been two further witness statements from Mr. Ablyazov, Nos. 7 and 8, dated 14 June and 18 June 2010 and further submissions by Mr. Trace dated 18 June 2010. The undertaking now offered was not offered in those further statements or submissions. On the contrary Mr. Trace submitted that the lodging of documents of title engaged "potential tax and regulatory questions, in relation to which [Mr. Ablyazov] is seeking advice. He will revert as soon as possible." He did not revert and no suggestion was made that an appropriate undertaking might be

offered. Almost a month has passed since that submission was made. On 30 June Stephenson Harwood indicated a desire to reply to the final submissions and further evidence submitted by the Bank. A request was made to respond on the question of Kazakhstani insolvency law to which request I acceded. No mention was made that Mr. Ablyazov might offer a new undertaking. On 7 July I received from Stephenson Harwood Professor Maggs' report as to the enforceability of the charge offered by the Bank as fortification for the Bank's undertaking in damages. I was then able to complete my judgment. No suggestion was made on 7 July that a further undertaking might be offered. I completed my draft judgment over the weekend and my clerk sent it to counsel on Monday 12 July. Shortly thereafter Stephenson Harwood sent me "an amended version of the undertakings document" which contained a new undertaking "to provide (so far as is permissible by law) to Stephenson Harwood any and all share certificates and documents establishing rights which are within the First Defendant's possession or control in the companies named in Schedules 1,2 and 3, to be held by Stephenson Harwood."

191.    I dealt with the sufficiency of the undertakings offered at the hearing in paragraphs 137-140 of this judgment. I noted Mr. Trace's last written submission on the matter. I observed that the potential tax and regulatory questions had not been identified. That remains the position. The new undertaking offered is prefaced "so far as permissible by law" without any explanation as to why delivery up may not be possible.

192.    I consider that the Defendant has had ample opportunity to offer the new undertaking since 28 May. In the event he offered it, without any warning that he might be about to do so, after I had sent out my draft judgment on 12 July following the completion of the service of written evidence on 7 July. I accept, as I have been informed by Stephenson Harwood, that the contents of the letter containing the new undertaking had been drafted before my draft judgment had been received. But the fact remains that Mr. Ablyazov had ample opportunity to provide this undertaking between 28 May and 7 July, when evidence and submissions were closed.

193.    Even if there were good reason for the delay in informing me of the new undertaking, it is unclear precisely what is being offered because the undertaking is prefaced "so far as is permissible by law" without any explanation as to what obstacles there might be. This appears to mirror Mr. Trace's submission that delivery up "engages potential tax and regulatory questions". (I have since been informed by Stephenson Harwood in a letter dated 15 July received at 1841 that the reason for the qualification is that companies in CIS countries do not produce share certificates. If so then the proposed undertaking in respect of CIS companies would offer no comfort.)

194.    In the circumstances I did not consider it fair and just to delay the giving of judgment in this matter any further in order to allow "further submissions" and "a hearing a discuss the terms of the undertaking".

Further evidence received on 15 July from Stephenson Harwood

195.    After I had informed Stephenson Harwood that I did not consider it appropriate to postpone formally handing down judgment my clerk received (by email at 1142 on 15 July) a further communication from Stephenson requesting me "to delay any decision as to handing down the judgment" until I had considered "key new evidence" which had been "unearthed overnight" and which related to "two key findings" in my draft judgment.

196.    Later that day (by fax at 1716) I received a witness statement from Mr. Flannery and Mr. Ablyazov's Ninth Witness statement.

197.    The content of these two statements relates to paragraphs 104-116 of my judgment and in particular to paragraphs 113-116. Evidence has now been provided that on 30 September 2009 Mr. Ablyazov, when asked by Clyde and Co. whether the list of assets had changed, replied "Yes. Eurasia agreement signed. BTA Kazan." These passages are said to be self – explanatory. I understand it to be said that the sales of Eurasia Tower and BTA Kazan had been disclosed by Mr. Ablyazov to Clyde and Co. on 30 September 2009.

198.    This issue had been raised by Mr. Smith in his submissions. He did so prominently and forcefully. He said that Mr. Ablyazov had misled his own solicitors (and hence the Bank and the Court) by not informing Clyde and Co. of the sales of Eurasia Tower and BTA Kazan; see the transcript for 26 May pages 68-77. Mr. Trace replied to those submissions on 27 May. Whilst Mr. Trace said that there was no evidence from Clyde and Co. no suggestion was made that such evidence would or might be obtained; see the transcript for 27 May at pp.82-85. Mr. Smith returned to the matter in his reply on 8

June. He pointed out that if there was any relevant evidence to give it could have been given; see the transcript for 8 June at p.34.

199.    Mindful that there might be further evidence on this matter at trial I expressly referred, in paragraph 113, to "the evidence presently available". Mindful that these were interlocutory proceedings when findings of fact with regard to issues to be resolved at trial could not be made I used the phrase "substantial grounds to believe" when dealing with what I regarded as the significant questions; see paragraphs 85,114,116 and 126 of the judgment.

200.    Stephenson Harwood must have been aware of the point being made by Mr. Smith. It appears that no attempt was made to adduce evidence on the point until after Stephenson Harwood had seen my draft judgment. Mr. Flannery states that on reading my draft judgment he was surprised to read the "very serious findings". He then inquired into the matter with Mr. Ablyazov and Clyde and Co.

201.    Mr. Flannery does not explain why these inquiries were not made on 26 May when Mr. Smith made the allegations in question, or on 27 May when Mr. Trace said there was no evidence from Clyde and Co. or on 8 June when Mr. Smith said that if there was any relevant evidence to give it could have been given. He does not explain why he was surprised by findings on matters which had been prominently canvassed in argument.

202.    Draft judgments are sent to the parties to enable time and costs to be saved in formally handing down the judgment. They are not provided to enable a party to see what adverse findings have been made by the judge on matters argued before the judge so that he may then go about obtaining evidence to refute those findings before the Judge formally hands down his judgment. To use a draft judgment in that way is to abuse the practice by which judges provide draft judgments to counsel.

203.    I therefore consider that it would be inappropriate for me to alter my judgment in order to take account of new evidence obtained in the circumstances that this new evidence has been obtained.

204.    Notwithstanding the circumstances in which the new evidence has been obtained I have considered whether it would be unfair or unjust to Mr. Ablyazov not to review my judgment in the light of the new evidence. I am not persuaded that it would be, for these reasons.

> i) The new evidence is very sparse. Mr. Ablyazov does not say precisely what he told Clyde and Co. Mr. Flannery says that Mr. Ablyazov told him that "he was sure that he had informed Clyde and Co. about both of these transactions." In this regard it is to be noted that Mr. Hardman had raised the inconsistency between Mr. Ablyazov's disclosures as to the sale of Eurasia Tower and Clyde's letter dated 15 December 2009 in his Fifteenth Witness Statement at paragraph 40. Mr. Ablyazov replied to that in his Fourth Witness Statement at paragraph 11. I referred to his response in paragraph 111 of my judgment. He did not at that stage suggest that he had disclosed to Clyde Co. that Eurasia Tower had been sold. He offers no further details or explanation in his Ninth Witness Statement.

> ii) If, nevertheless, I were to hold, on the basis of the new evidence, that Mr. Ablyazov had told Clyde and Co. about the sale of Eurasia Tower and BTA Kazan, I would remain of the view that his seriously inadequate initial disclosure of his assets provides reason to believe that the Freezing Order may not provide the Bank with adequate protection against the risk that his assets may be dissipated prior to judgment. There would remain a risk that he may use the structure by which he holds his assets to deal with them in breach of the Freezing Order. I would still be left unable to trust him not to deal with his assets in breach of the Freezing Order.

> iii) I would therefore not alter my conclusion that it is just and convenient to make the Receivership Order and that such an order is justified and proportionate.

BAILII: Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: http://www.bailii.org/ew/cases/EWHC/Comm/2010/1779.html

81.  That leaves the Eurasia Tower. As mentioned earlier, this is a development under construction in Moscow. Mr A says in his third witness statement that the development was a joint venture between Handcart Investments Ltd (one of Mr A's company) and MCG International Holding Ltd controlled by Mr Pavel Fuchs through the joint venture company called Blackdesert Holdings Ltd. In 2009 Sberbank, the financier of the development, withdrew its support as a result, it is said, of pressure from the Kazakhstan government. Mr Fuchs then approached Mr A with a view to buying him out and so resolving this difficulty.

82.  Mr A agreed to sell his 50% interest in Blackdesert to Mr Fuchs under an agreement made on 15th September 2009. The sale price was $30 million. The agreement was subsequently varied and on 1st December 2009 the first tranche of the purchase price in the sum of $20 million was paid and title passed. The balance was due in May 2010 but remains unpaid.

83.  In his fourth witness statement Mr A explains that the $20 million received from the sale has been used to meet some of the guarantee liabilities of Handcart to a company called Company E. Demands under the guarantee totalling $20 million were made and have been satisfied with the Blackdesert proceeds.

84.  The judge held that Mr A's account of the sale of his interest in and the use of the proceeds of the sale of Blackdesert was consistent with the sale being in the ordinary course of his business. But this finding is subject to the same criticisms as those levelled at his treatment of the transactions in respect of BTA Kazan and Omsk Bank. For the same reasons, we think that he gave paragraph 9(b) too wide an interpretation and that the sale of the shares in Blackdesert was no more than Mr A's exit from what had become a difficult investment. It was not a sale in the ordinary course of a business carried on by him.

85.  We therefore allow the Bank's appeal against the clarification orders and set aside the declarations which the judge made.

---

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2010/1141.html*



Thursday December 30, 2010

Available on the iPad

# Ablyazov Loses U.K. Appeal Over Control of $5 Billion

December 08, 2010, 4:00 PM EST

*By Erik Larson*

(Updates with Ablyazov comment in sixth paragraph.)

Dec. 8 (Bloomberg) -- Mukhtar Ablyazov, the former chairman of Kazakhstan's BTA Bank JSC, will have about $5 billion of assets placed in receivership during an embezzlement lawsuit in London after losing an appeals court ruling.

Ablyazov can't be trusted with control of his assets during the case because he didn't reveal all of his business deals or ownership in a Moscow skyscraper project while making witness statements to the court, Court of Appeal Justice Maurice Kay said in an Oct. 19 ruling made public this week.

BTA Bank, based in Almaty, claims Ablyazov and two others embezzled more than $2 billion before the lender defaulted on $12 billion in debt during the financial crisis. The bank accused Ablyazov of trying to dodge a freezing order in the case by failing to reveal sales of his bank shares and his ownership in Moscow's Eurasia Tower, a 75-story building now under construction.

"There were dealings which he concealed from his own solicitors," Kay wrote on behalf of a three-judge panel. "An asset the size of Canary Wharf can hardly have slipped Mr. Ablyazov's mind."

The ruling upheld a lower-court judgment that proposed KPMG LLP as receiver. Louis Flannery, a lawyer for Ablyazov and the other defendants at Stephenson Harwood, declined to comment.

'Cooperate Fully'

"I remain in control of my business under the terms of the receivership order," Ablyazov said in an e-mailed statement. "Any decisions regarding the sales of my assets will have to be cleared with KPMG. I will cooperate fully with the receivers."

BTA Bank sued Ablyazov, former management board Deputy Chairman Zhaksylyk Zharimbetov and one-time Chief Executive Officer Roman Solodchenko in the High Court in London in August 2009 over claims that they embezzled and laundered money from the bank through companies based in the British Virgin Islands, the Seychelles and the U.K.

"It may be the case that freezing orders like the one made in this case are not a feature of Kazakh jurisprudence," Kay wrote in the ruling. "But those who take up residence in this country must understand that judges of the commercial court do not make freezing orders lightly."

Kazakh prosecutors issued arrest warrants for Ablyazov and Solodchenko in March 2009 on suspicion that they embezzled money from the bank and laundered it through loans to fictitious companies. The men have denied the charges.

--Editors: Christopher Scinta, Peter Chapman.

To contact the reporter on this story: Erik Larson in London at elarson4@bloomberg.net.

To contact the editor responsible for this story: Anthony Aarons at aaarons@bloomberg.net.



About | Advertising | EDGE Programs | Reprints | Terms of Use | Disclaimer | Privacy Notice | Ethics Code | Contact Us | Site Map

©2010 BLOOMBERG L.P. ALL RIGHTS RESERVED.



SEARCH

Search Keywords:    [          ]  Go    Country:  - Select Country -

Time Window:  Full Archive  [How 2 Search?]    Product:  - Select Product -

EVENTS | SIGN UP FOR FREE TRIAL | MANAGE MY DELIVERY OPTIONS | SUBSCRIBE TO BNE | RSS | ABOUT US | CONTACTS | ADVERTISERS | FAQ

**REGISTER NOW** and receive **ONE MONTH FREE TRIAL**, just **click here**

Translate This Page
Select Language
Powered by Google Translate

Free 30 Day Trial
Click Here

CONTENT

Home
News
Features
Comment

REGIONS

Central Europe
Eastern Europe
Southeast Europe
Eurasia

Country

SERVICES

RSS Feeds
About Us
Contact

Latest Special Report:
2011 Outlooks

*Special Reports Archive*

☒ **RUSSIA 2011: Growth, but
state-led recovery is bad news**
*Ben Aris in Moscow*

☒ **RUSSIA 2011: Part II**
*Ben Aris in Moscow*

☒ **UKRAINE 2011: In a better
position to bounce back than
for at least half a decade**
*Ben Aris in Moscow*

☒ **EURASIA 2011: Slower rising
commodity prices to determine
2011**
*Clare Nuttall in Almaty*

☒ **CENTRAL EUROPE 2011: A tale
of two cities**
*Nicholas Watson in Prague*

☒ **SOUTHEAST EUROPE 2011: No
Turkey for some**
*Nicholas Watson in Prague*

*Special Reports Archive*

## UK court upholds receivership order for former BTA Bank chief's assets

Clare Nuttall in Almaty
December 7, 2010

A UK court has turned down an appeal from former BTA Bank chief, Mukhtar Ablyazov, upholding a previous ruling by the British High Court that a receivership order be placed on the Kazakh oligarch's assets.

Ablyazov is accused of embezzling around $10bn from the bank, which was nationalised in February 2009. The Kazakh government is pursuing Ablyazov through the British courts. Four fraud charges totalling $1.8bn have been brought against him in the UK so far, and further claims worth up to $4bn are expected.

Ablyazov fled Kazakhstan in March 2009 to avoid arrest. He maintains his innocence, saying the fraud accusations were politically motivated. He is currently seeking asylum in the UK.

After its September 16 hearing, the Court of Appeal upheld a decision by High Court judge Mr Justice Teare, following hearings in May and June, that the receivership order be put in place. The judgment from the Court of Appeal said that it did not find Mr Justice Teare's concerns over Ablyazov's honesty "in the least surprising."

"Those who take up residence in this country must understand that judges of the Commercial Court do not make Freezing Orders lightly: they only do so where there is a good arguable case against the defendant and, where the allegations are (as in this case) allegations of fraudulent conduct, where there is a good arguable case of fraud," reads the Court of Appeal judgement.

This follows Mr Justice Teare's judgement, which stated: "I am not persuaded that Mr Ablyazov has indeed 'bared his soul' as to his assets. The most that I can say is that there is a reasoned suspicion that he has not disclosed all his assets."

Ablyazov had failed to disclose his ownership of the Eurasia Tower in Moscow, which he acquired in 2004. "An asset the size of Canary Wharf can scarcely have slipped Mr Ablyazov's mind," the Court of Appeal judgment wryly notes.

Mr Justice Teare's ruling that Ablyazov's passport should continue to be retained by the court until the receivers' first report is due has also been upheld. The court has held Ablyazov's passport since November 2009.

Receivership orders are used infrequently. It is particularly unusual for receivers to be appointed before a trial begins. This is also the largest case of its kind, since Ablyazov is believed to have assets worth $5bn. "Receivership orders and freezing injunctions are the nuclear weapons in the court's armoury to try to ensure that judgments bite," comments Professor Mark Watson-Gandy, a barrister at law firm Thirteen Old Square Chambers. "Receiving orders are fairly rare because this is an expensive process and difficult to unwind. The Ablyazov ruling shows when this step can be taken. This is a good day for lawyers, and a bad day for the super rich."

**Pursued**

Kazakh government officials say that BTA was on the brink of collapse in early 2009 when the state was forced to step in to nationalise and re-finance the bank. A debt restructuring deal has since been agreed with creditors.

A former government minister, Ablyazov has had a turbulent relationship with the regime of President Nursultan Nazarbayev. He was a co-founder of the Democratic Choice of Kazakhstan, a political movement comprising many high-level officials, and probably the most credible opposition force since Kazakhstan gained its independence.

In July 2002, Ablyazov was sentenced to six years in prison for abuse of ministerial power, but let out after just one year. Two years later, he became chairman of BTA's board of directors. Under Ablyazov's leadership, the bank expanded rapidly, becoming one of the largest banks in the CIS by asset size. However, the growth was fuelled by international borrowing, which abruptly dried up after the onset of the credit crunch in July 2007.

In addition to the legal procedures in the UK, in Russia the investigative committee of the Interior Ministry has issued a warrant for Ablyazov's arrest. He has been charged on four counts of financial crime, one of them amounting to $5bn.







Register | Edit My Details | RSS Feeds | About Us | Contacts

© Copyright 2008. bne Ltd. All rights reserved.

**guardian.co.uk**

# Kazakh banker loses courtroom battle over assets

Mukhtar Ablyazov, former head of the now state-owned Kazakh bank BTA, fails to prevent his assets from being subject to a receivership order by high court in London

**Simon Goodley**
guardian.co.uk, Friday 3 December 2010 20.26 GMT

A larger | smaller

A Kazakh businessman exiled in Britain and facing claims that he has embezzled $2bn (£1.3bn) has lost a legal fight to prevent his assets from being subject to a receivership order.

Mukhtar Ablyazov, a former head of the now state-owned Kazakh bank BTA, has been told by the high court in London that he "cannot be trusted" not to dissipate assets which the bank says are not his. The court had earlier frozen the assets.

Mr Justice Teare also ruled that Ablyazov, who has settled in a plush part of north London with his wife and three youngest children, should continue to have his passport retained by the court to prevent him leaving the country.

Mr Justice Teare said: "Although Mr Ablyazov has stated that he will obey the orders of this court, that statement has to be considered in the light of his conduct in this action.

"Consideration of his conduct with regard to disclosure of his assets in August/September 2009 ... has left me unable to trust him not to deal with his assets in breach of the freezing order."

The ruling released this week was a part of a drawn-out legal process which the judge has described as being like the "forensic equivalent of trench warfare".

Both sides submitted hundreds of pages of legal argument over the pre-trial applications about whether a receiver should take control of Ablyazov's assets and his passport be retained by the court.

A high court case now awaits in which Ablyazov will face claims that he embezzled $2bn of BTA's money, with further claims taking the figure to $4bn. Ablyazov says the allegations are politically motivated and that the Kazakh government illegally took control of the bank.

Ablyazov said in a statement to the court in April that he finds "the suggestion that I would dissipate my assets so as to thwart an English judgment both ludicrous and offensive".

He wished "to make it absolutely clear that I would never knowingly breach an order of the English court."

But Mr Justice Teare, who noted that Ablyazov had the means to hire a legal team of "quality and quantity", said that there was "a real risk" that "Mr Ablyazov may use the structure by which he holds his assets to deal with them in breach of the freezing order.

He has said that he will not do so and no breach has yet been proved but in the light of his prior conduct I am unable, on this application, to be sure that he will not do so in the future. There is therefore good reason for making the receivership order."

guardian.co.uk © Guardian News and Media Limited 2010